FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 28 2020 ☆

LONG ISLAND OFFICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RYAN YOUNG,<br>    **also known as "Richard Cullen,"**<br><br>    **Defendant.**<br><br>\*\*\*<br><br>**PACNET SERVICES, LTD.,**<br>**CHEXX (AMERICAS) INC., and**<br>**ACCU-RATE CORP.**<br><br>    **Petitioners.** | 18-CR-46 (JMA)<br><br>Judge Joan A. Azrack |

### VERIFIED PETITION FOR ANCILLARY PROCEEDINGS
### TO ADJUDICATE INTEREST PURSUANT TO 21 U.S.C. § 853(n)

PacNet Services, Ltd. ("PacNet Services"), Chexx (Americas) Inc. ("Chexx"), and Accu-Rate Corporation ("Accu-Rate") (collectively, "PacNet," "PacNet Group," or "Petitioners"), by and through counsel,[1] hereby petition the Court for an ancillary hearing pursuant to 21 U.S.C. § 853(n) and Federal Rule of Civil Procedure 32.2 and move the Court to amend the Preliminary Order of Forfeiture in the above-captioned matter (Dkt. 15) ("Preliminary Order") by striking paragraphs (c) through (g) of that Order. Petitioners further move the Court to order the property identified in those paragraphs deposited in the interpleader account maintained in the Court's registry in Case No. 17-cv-6027 (E.D.N.Y.) in sufficient amount to satisfy the terms of the

---

[1] This Petition is Verified by the sworn signature of Bill Leong pursuant to 21 U.S.C. § 853(n)(3). My Leong is employed as Chief Accountant to PacNet Services Ltd., overseeing accounting matters for the PacNet Services Group, from January 2011. He remains on a contract basis to assist with the orderly wind-down of the group, a complex process which has already taken some three-and-a-half years.

Government's September 2017 agreement with PacNet and that any remaining funds be returned to the Petitioners. Petitioners further request an award of attorney's fees and expenses relating to this ancillary petition pursuant to federal law, including 28 U.S.C. § 2412.

Additionally, Petitioners adopt and incorporate by reference the Interpleader Complaint, its accompanying exhibits, and its accompanying declarations filed in case *PacNet Services Ltd. v. Office of Foreign Assets Control of the United States Dep't of Treasury, et al.*, No. 17-cv-6027 (E.D.N.Y.).

Dated: February 28th, 2020

_____

A. Jeff Ifrah
jeff@ifrahlaw.com
George R. Calhoun (*pro hac vice* to be filed)
George@ifrahlaw.com
IFRAH LAW
1717 Pennsylvania Ave., NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 524-4142

ii

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.   FACTUAL BACKGROUND ..................................................................................... 6

  A.   PacNet .................................................................................................................. 6

  B.   OFAC's Unlawful September 2016 Designations .......................................... 8

  C.   OFAC's Rescission of the Unlawful Designations, and the Execution of the
  September 2017 Agreement ...................................................................................... 10

  D.   The Interpleader Action ................................................................................. 13

  E.   Current Procedural Posture of the Interpleader Action ............................. 17

  F.   Summary of PacNet Accounts Seized by U.S. Government......................... 18

III.  ARGUMENT .......................................................................................................... 20

  A.   The Preliminary Order of Forfeiture is Invalid and Cannot Support Forfeiture of
  the PacNet Accounts .............................................................................................. 21

  B.   Petitioners' Vested Interest in the PacNet Accounts Renders the Forfeiture in this
  Proceeding Invalid; the Property is not Forfeitable ............................................. 25

     1.   Petitioners Have a Vested and Superior Interest in the PacNet Accounts.................. 25

     2.   The Government Has No Statutory Basis to Forfeit the PacNet Accounts ................ 29

  C.   The Government Should Be Judicially Estopped from Forfeiting These Funds ... 36

  D.   The Government's Actions Violated the U.S. Constitution. ....................................... 38

  E.   Any Forfeiture of the PacNet Accounts Cannot Exceed Money Judgment ............. 43

## TABLE OF AUTHORITIES

**Cases**

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
    416 U.S. 663 (1974)..................................................................... 38, 39

*De Almeida v. United States*,
    459 F.3d 377 (2d Cir. 2006) .............................................................. 34

*District Attorney of N.Y. County v. Republic of the Philippines*,
    307 F. Supp. 3d 171 (S.D.N.Y. 2018).............................................. 36, 37

*DSI Assocs. LLC v. United States*,
    496 F.3d 175 (2d Cir. 2007)............................................................... 28

*Hercules v. United States*,
    516 U.S. 417 (1996)......................................................................... 38

*Honeycutt v. United States*,
    137 S. Ct. 1626 (2017)................................................................ *passim*

*Intellivision v. Microsoft Corp.*,
    484 F. App'x 616 (2d Cir. 2012) ........................................................ 36

*Leonard v. Texas*,
    137 S. Ct. 847 (2017)......................................................................... 42

*Nelson v. Colorado*,
    137 S. Ct. 1249 (2017)................................................................ 39, 40

*PacNet Services Ltd. v. Office of Foreign Assets Control of the United States*
    *Dep't of Treasury, et al.*,
    Case No. 17-cv-6027 (E.D.N.Y.)......................................................... 6

*Parklane Hosiery Co., Inc. v. Shore*,
    439 U.S. 322 (1979)........................................................................ 41

*United States v. Awad*,
    598 F.3d 76 (2d Cir. 2010)................................................................ 43

*United States v. Barka et al.*,
    1:16-cv-05266 (E.D.N.Y. May 31, 2017) ........................................... 16

*United States v. Barka*,
    No. 2:18-cr-00031-JMA (E.D.N.Y. filed Mar. 26, 2018)..................... 16

*United States v. BCCI Holdings (Luxembourg), S.A.*,
    46 F.3d 1185 (D.C. Cir.), *cert. denied*, 515 U.S. 1160 (1995) ............... 29

*United States v. Brown*,
    714 F. App'x 117 (3d Cir. 2018) ........................................................ 34

*United States v. Capoccia*,
    503 F.3d 103 (2d Cir. 2007)................................................... 3, 21, 22

*United States v. Casey*,
    444 F.3d 1071 (9th Cir. 2006) .......................................................... 43

*United States v. Church & Dwight Co.*,
    510 F. App'x 55 (2d Cir. 2013) ......................................................... 26

*United States v. Contorinis*,
    692 F.3d 136 (2d Cir. 2012)............................................................. 30

*United States v. Daugerdas*,
    892 F.3d 545 (2d Cir. 2018)......................................................... 3, 23

iv

## TABLE OF AUTHORITIES
### (continued)

*United States v. Day et al.*,
   No. 2:19-cr-155 (D. Nev. filed June 19, 2019) ............................................................ 9

*United States v. Dobruna*,
   146 F. Supp. 3d 458 (E.D.N.Y. 2015) ...................................................................... 30

*United States v. Dupree*,
   919 F. Supp. 2d 254 (E.D.N.Y. 2013), *aff'd in part and vacated in part on other grounds*
   *sub. nom United States v. Watts*,
   786 F.3d 152 (2d Cir. 2015) .................................................................................... 26

*United States v. Emor*,
   785 F.3d 671 (D.C. Cir. 2015) ................................................................................ 30

*United States v. GAF Corp.*,
   928 F.2d 1253 (2d Cir. 1991) .................................................................................... 1

*United States v. Ginsburg*,
   773 F.2d 798 (7th Cir. 1985) .................................................................................. 43

*United States v. Gorman*,
   859 F. 3d 706 (9th Cir. 2017) ................................................................................. 38

*United States v. Lester*,
   85 F.3d 1409 (9th Cir. 1996) .................................................................................. 32

*United States v. Monsanto*,
   491 U.S. 600 (1989) ............................................................................................... 21

*United States v. Murray*,
   297 F.2d 812 (2d Cir. 1962) ..................................................................................... 1

*United States v. Ovid*,
   No. 09–CR–216 (JG)(ALC), 2012 WL 2087084 (E.D.N.Y. 2012) ........................ 28

*United States v. Ribadeneira*,
   105 F.3d 833 (2d Cir. 1997) ................................................................................... 28

*United States v. Sanders*,
   211 F.3d 711 (2d Cir. 2000) ................................................................................... 43

*United States v. Steele*,
   685 F.2d 793 (3d Cir. 1982) ................................................................................... 16

*United States v. Watts*,
   477 F. App'x 816 (2d Cir. 2012) ............................................................................ 34

*United States v. Watts*,
   786 F. 3d 152 (2d Cir. 2015) ................................................................... 3, 21, 22, 26

*United States v. Wilson*,
   659 F.3d 947 (9th Cir. 2011) ................................................................................. 26

**Statutes**
18 U.S.C. § 1341 ......................................................................................................... 1
18 U.S.C. § 1349 ......................................................................................................... 1
18 U.S.C. § 981 ................................................................................................... *passim*
18 U.S.C. § 982 ......................................................................................................... 34
21 U.S.C. § 853 ................................................................................................... *passim*
28 U.S.C. § 2461 ......................................................................................................... 1

**Other Authorities**
Asset Forfeiture Policy Manual 2019, U.S. Department of Justice, Criminal Division .............. 23

## TABLE OF AUTHORITIES
### (continued)

DOJ Statement for the Record before the Senate Judiciary Committee for a Hearing Entitled "The Need to Reform Asset Forfeiture" .......................................................................... 40, 42

Executive Order 13581 (July 24, 2011) .................................................................................. 9

Press Release, Treasury Sanctions Individuals and Entities as Members of the PacNet Group (Sept. 22, 2016) ................................................................................................................. 9

S. Rep. 99-1026, pt. 2 (1986) ................................................................................................. 33

**Rules**

Fed. R. Crim. P. 32.2 ................................................................................................... *passim*

## I.     INTRODUCTION

On February 13, 2018, Defendant Ryan Young ("Young") waived his right to an indictment and pled guilty to a single count of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1349. Dkt. 7. The criminal information to which Young pled guilty contained a general "Criminal Forfeiture Allegation" alleging that 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) "require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense." Dkt. 6 at 5. The information did not identify the specific property the Government sought to forfeit, nor did the public docket or the plea colloquy include any other indication of the specific property the Government intended to forfeit.

After Young pled guilty, the Government filed two bills of particulars that identified the specific property the Government sought to forfeit.[2] Dkts. 4 and 11. Those bills identified twelve distinct pools of money, many of which were not the property of Young and did not constitute, and were not derived from, "proceeds obtained directly or indirectly as a result of" the offense to which Young pled guilty. The transcript of Mr. Young's February 13, 2018 Change of Plea hearing before this Court confirms there was no mention of these pools of money nor any facts proffered or presented to support their forfeiture by Mr. Young to the U.S. Government. As relevant here, the identified pools of money included over $6.2 million in funds held in Petitioners' bank accounts at BMO Harris Bank and Avidia Bank and funds which had been transferred from Petitioners' accounts at Union Bank to this Court's registry pursuant to an October 18, 2017 Order of this

---

[2] It is an improper use of the bill of particulars vehicle to file a bill of particulars after the criminal defendant already has pled guilty in an attempt to initiate judicial forfeiture proceedings against unrelated third parties and their property. *See United States v. Murray*, 297 F.2d 812, 819 (2d Cir. 1962) ("The function of a bill of particulars is to enable the accused to prepare for trial and to prevent surprise[.]"); *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991) ("The[] purpose [of bills of particulars] is to inform a defendant of charges with sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double jeopardy. A bill of particulars is a statement of what the government will or will not claim in its prosecution.") (citing *Murray*) (additional citations omitted).

Court ("PacNet Accounts"). In violation of the terms of a September 19, 2017 Settlement Agreement the Government reached with PacNet, the Government seized the funds in this Court's registry. Pursuant to that settlement, the Government directed that PacNet, as a disinterested stakeholder, would interplead funds contractually owed to certain former clients. The Government further issued a federal license authorizing PacNet through its counsel to transfer the funds to the Court's registry. Furthermore, this Court on October 18, 2017 pursuant to an unopposed motion determined that the facts warranted the establishment of an Interpleader Fund and approved PacNet to transfer the funds.   PacNet complied with its September 19, 2017 Agreement and the Government's directive and license by instituting the interpleader action in this Court.

More than a year and a half later and without notice, the Government in September 2019 moved to forfeit the property identified in the bills of particulars, including the PacNet Accounts Dkt. 14. The Government's motion was three sentences long and requested that the Court "so order" the proposed Preliminary Order attached to the motion, in which Young consented to a $1.5 million forfeiture money judgment and to forfeit certain property as set forth in the Order. *Id.* [3] The Court granted the motion on the following day without providing PacNet with any notice or opportunity to be heard. Dkt. 15. The Court made no revisions to the proposed Preliminary Order submitted by the Government, nor did it make any independent findings. *Id.*   Critically, the Order made no findings either that: (1) Mr. Young had *any* interest in the PacNet Accounts; or (2) that any funds in those accounts constituted proceeds traceable to the criminal activity to which Mr. Young pled guilty. *See* Preliminary Order. Nor was there any factual predicate elsewhere in the record to support such findings.

---

[3] By seeking to forfeit $6.2 million in PacNet funds to which Young has no access, interest, or control, the Government seeks to take a third party's property in over *four times the amount* of the forfeiture money judgment against the criminal defendant himself.

In relation to the Petitioners' bank accounts and the interpleader funds deposited in the Court registry and referenced at paragraphs (c) through (g) of the Preliminary Order (the "Forfeited Funds"), the Order was improper and should be amended for the following principal reasons:

*First*, the Government failed to present and prove the PacNet Accounts are subject to forfeiture and the requisite nexus—that the funds in these accounts constitute *proceeds* of conspiracy to commit mail fraud *by Ryan Young* and *directly traceable to that fraud*. In sum, the Preliminary Order is invalid on its face because there were no findings sufficient to support the forfeiture of the PacNet Accounts. The Government has failed to proffer any facts—let alone prove—that Defendant Ryan Young had any interest in the accounts, that the funds were proceeds of his criminal activity, and that he obtained. This is a fatal defect and warrants amending the order to release those accounts. *See United States v. Watts*, 786 F. 3d 152, 172 (2d Cir. 2015) ("Federal Rule of Criminal Procedure 32.2(b)(1) . . . requires *the sentencing court* to determine what property is subject to forfeiture under the applicable statute.'") (emphasis and ellipsis in original) (quoting *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007)). Due process, federal rule and statute, and judicial estoppel[4] entitle Petitioners to challenge that defect under these circumstances in this ancillary proceeding, particularly in light of the Government's effort to forfeit property to which Petitioners indisputably hold exclusive title based on the mere "consent" of a criminal defendant with no interest in that property. *See United States v. Daugerdas*, 892 F.3d 545, 557 (2d Cir. 2018).[5]

---

[4] *See United States v. Liquidators of European Federal Credit Bank*, 630 F.3d 1139, 1148-49 (9th Cir. 2011) (exercising discretion, based on Government's "sleight of hand" in seeking to prevent Petitioner from raising arguments in ancillary proceeding, to "hold that judicial estoppel bars the government from arguing that [Petitioners] cannot raise its legal claims challenging forfeitability").

[5] Federal Rule of Criminal Procedure 32.2 provides that the "**government must** publish notice of the order and **send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture** in the ancillary proceeding." Fed. R. Crim. P. 32.2(b)(6) (emphasis added). The Government has been on notice of

*Second*, Petitioners' vested and superior interest in the accounts "renders the order of forfeiture invalid" as to that property. 21 U.S.C. § 853(n)(6)(A). The Government may only forfeit "property, real or personal, which constitutes or is derived from proceeds traceable to" certain federal crimes, 18 U.S.C. § 981(a)(1)(C), or which is "property of the defendant," forfeitable as substitute property under 21 U.S.C. § 853(p). Here, Petitioners had exclusive "legal right, title, or interest" in the funds which was vested and "superior to any right, title, or interest of the defendant," Ryan Young, "at the time of the commission of the acts which gave rise to the forfeiture of the property" or at any other time. *Id.* Indeed, Mr. Young has never had *any* right, title, or interest in the Forfeited Funds. The Government offered no facts or evidence to identify any nexus between the accounts and Mr. Young's criminal activity. Moreover, as the Supreme Court recently reiterated, forfeiture "is limited to property the defendant himself actually acquired as the result of the crime," and joint-and-several forfeiture liability is impermissible. *Honeycutt v. United States*, 137 S. Ct. 1626, 1634 (2017). Thus, the Preliminary Order presented by the Government violates the federal forfeiture statutes, U.S. Supreme Court precedent, and the Federal Rules of Criminal Procedure and, therefore, should be amended to provide for the release Petitioners' property.

*Third*, the Government should be judicially estopped from forfeiting Petitioners' accounts and the interpleader account because the Government expressly agreed, directed, and licensed that the funds be used in an interpleader proceeding pending in this Court—not seized and forfeited without notice to Petitioners. In reliance, the Petitioners then filed a motion with this Court which

---

Petitioners' interest in all of the PacNet Accounts since their seizure but has provided no explanation for its failure. The Government also failed to comply with any of the procedures outlined in 21 U.S.C. § 853(e) to restrain Petitioners' property prior to seeking to forfeit their property in this criminal proceeding. See, e.g., *Kaley v. United States*, 571 U.S. 320, n.2 (2014) ("The forfeiture statute itself requires a hearing when the Government seeks to restrain the assets of someone who has not yet been indicted.") (citing 21 U.S.C. § 853(e)(1)(B)).

was unopposed by the Government. The Court then made appropriate factual determinations and ordered the establishment of an interpleader fund into which the Petitioners were approved to submit the funds. Pursuant to that Order, the Petitioners then transferred their assets into the interpleader fund within the Court's registry.

*Fourth,* the Preliminary Order and the Government's actions violate the Constitution's Due Process Clause. Not only has the Government failed to provide PacNet with adequate notice and opportunity to respond to the Government's attempts to forfeit PacNet's property, it would violate key Constitutional principles for the Government to criminally forfeit the property of an entity that has been neither indicted nor convicted.[6]

*Fifth,* even to the extent that the Government could reach Petitioners' property in this criminal prosecution and *in personam* forfeiture (and it cannot), the Government would be limited to the total amount of the $1.5 million money judgment entered against Defendant Young minus the amounts already paid and credited to satisfy that judgment. As detailed below, this Court has found, based on the Government's submission and agreement with defendant Young, that the total amount of defendant Young forfeiture liability is $1,500,000, of which just $290,626.57 still outstanding and represents the upper limit of what the Government is entitled to seize from the PacNet Accounts even if it could demonstrate they were subject to forfeiture, defendant Young had a property interest in and had obtained the funds, and the Petitioners did not have a vested, superior interest.

For these reasons and those explained in greater detail below, PacNet respectfully requests that the Court strike paragraphs (c) through (g) of the Preliminary Order and direct that the funds

---

[6] It additionally constitutes an excessive fine and double jeopardy to forfeit PacNet's property as the Government previously has imposed unlawful punishment upon PacNet, resulting in the closing and termination of a lawful, registered, and regulated commercial financial services business.

identified in those sections be deposited in the interpleader account maintained in the Court's registry in *PacNet Services Ltd. v. Office of Foreign Assets Control of the United States Dep't of Treasury, et al.*, Case No. 17-cv-6027 (E.D.N.Y.) in sufficient amount to satisfy the terms of the Government's September 2017 agreement with PacNet and that any remaining funds be returned to the Petitioners. The Government also should be permanently enjoined from re-seizing the funds.

## II.    FACTUAL BACKGROUND

### A.    PacNet

From its inception in 1994 to September 2016, PacNet operated a leading international payment processing business with headquarters in downtown Vancouver, British Columbia. PacNet offered merchants around the world payment solutions involving credit card, electronic payment, direct debit, and check processing services.

PacNet Services boasted a roster of more than 700 clients, including well-respected companies and organizations such as Bloomberg Business Week, MasterCard Payment Gateway Services Client Finance, the Catholic Archdiocese of Durban, Dementia Research UK, Animals Asia Foundation Limited, Special Olympics British Columbia Society, and iATS Payments LLC (through which PacNet processed payments for dozens of charities and community organizations). A relatively small percentage of PacNet Services' business pertained to merchants that distributed direct-mail promotions involving sweepstakes reports or astrological information.

In addition to PacNet Services, other companies that formed the PacNet Group included Chexx and Accu-Rate. Chexx was not a payment processor which accepted and processed incoming payments. Instead, Chexx's business was as an outbound payment processor, involving the payment of refunds, rebates, reimbursements, prizes, and other payments at the direction of or to customers. Among Chexx's clients were leading international companies such as Decision

Analyst, Neilsen Netratings, Payoneer Inc and Global Market Insite. Chexx did not process incoming payments for any clients.

Accu-Rate was a foreign exchange business, having operated in the city of Ottawa within Canada for more than 20 years prior to September 2016. From its two branches it served up to 600 retail clients per day, including local businesses, individuals, and large numbers of foreign diplomats including many employees of the U.S. Embassy. Accu-Rate did not process check or credit card payments for any clients of PacNet Services, including any direct mail clients. Accu-Rate purchased cash from individuals and other businesses on a daily basis, and it often purchased cash from clients of PacNet Services. In all instances, Accu-Rate filed appropriate reports with the Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC"), including suspicious transaction reports ('STRs") and large cash transaction reports ("LCTRs"). In addition, Accu-Rate acted to ensure that its courier, the internationally respected Brinks Global Services, filed appropriate reports with the Canada Border Services Agency, including the E667 or Cross-Border Currency or Monetary Instruments Report disclosing the transportation and importation of certain cash amounts into Canada.

For more than 20 years, PacNet was a fully licensed and heavily regulated business which operated openly, transparently, and honestly, employed approximately 125 persons in Canada and Europe, and cooperated with law enforcement agencies. PacNet was audited regularly and frequently by the Canadian government, major financial institutions, and independent auditors/accountants. PacNet employed professional compliance staff and well-respected outside auditors.

Furthermore, at all relevant times, PacNet was a registered and regulated money services business. In Canada, PacNet was registered with FINTRAC, which is part of the Canadian Ministry

of Finance. As a registered and regulated company, the PacNet Group was subjected to periodic on-site examinations and reviews of its operations, reporting, and recordkeeping by FINTRAC in relation to compliance with Canadian anti-money laundering ("AML") laws and regulations. Those examinations involved review of the PacNet Group's reports to FINTRAC and bank account records. The PacNet Group regularly filed reports with FINTRAC, including STRs, LCTRs, and electronic funds transfer reports ("EFTRs"). The PacNet Group filed reports specifically notifying FINTRAC of suspicious transactions and large cash transactions involving companies owned or controlled by Ercan (John) Barka and, according to information provided by the United States, by Ryan Young. In the United States, PacNet Services was registered with the Financial Crimes Enforcement Network ("FinCEN"), which is part of the U.S. Department of Treasury. In compliance with regulations of FinCEN, PacNet Services submitted suspicious activity reports ("SARs") and currency transaction reports ("CTRs") with FinCEN.

**B.      OFAC's Unlawful September 2016 Designations**

On September 22, 2016, without prior notice, warning, or opportunity to be heard, the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury designated PacNet, its subsidiaries, and its affiliates (together, the "PacNet Group") as a significant transnational criminal organization ("TCO"), thereby effectively ending PacNet's business.[7] At the time, the Executive Order by President Obama permitting TCO designations expressly limited that designation to multinational criminal organizations "such as" The Brothers' Circle, Camorra, Yakuza, and Los Zetas. Executive Order 13581 (July 24, 2011).

---

[7] *See* No. 17-CV-6027 (E.D.N.Y.) ("OFAC Interpleader"), Dkt. 1, ¶¶ 3-5. Many of the facts surrounding OFAC's designation of PacNet are discussed in more detail in the pleadings and additional documents filed by PacNet in the OFAC Interpleader—which is also pending before this Court. Thus, this Petition incorporates by reference to documents already on file with the Court in that matter. PacNet will not inundate the Court with copies of those already-filed papers at this time, but it stands ready to provide additional copies of those papers at the Court's request and asks that the Court take judicial notice of them.

Despite the limited permissible scope of the TCO designation, OFAC's designation of the PacNet Group rested on allegations that it had engaged in money laundering when it processed payments on behalf of alleged mail fraud schemes aimed at U.S. residents.[8] Prior to September 22, 2016, neither PacNet nor its affiliates, directors, or officers had ever been accused—much less charged and convicted—of any criminal offense arising from its business activities.[9] To the contrary, in connection with the U.S. Department of Justice's ("DOJ's") investigation of direct mailers prior to the September 2016 designations, a DOJ prosecutor assured counsel for PacNet that PacNet was not a target of DOJ's mail fraud investigation, which ultimately resulted in civil and criminal actions against various other entities. In fact, that prosecutor stated in an e-mail dated May 26, 2015 that he "appreciate[d] PacNet's cooperation with [the] investigation and [its] willingness to voluntarily produce records." OFAC Interpleader, Dkt. 139-6, ¶ 7 & Ex. D.

The immediate legal impact of the OFAC designation was twofold: (i) a block was placed on all property and interests in property of the PacNet Group and all designees subject to United States jurisdiction, and (ii) all "United States persons," as defined in Executive Order No. 13581, were prohibited from transacting business with the designees. OFAC Interpleader, Dkt. 1, ¶ 4. The practical effect of the designation was devastating. Nearly all financial institutions, insurers, and other businesses—even those without any connection to the United States or any United States person—denied the PacNet Group access to bank accounts, insurance, and property that the PacNet Group needed to conduct business. *Id.* Thus, the PacNet Group was forced to cease operations and

---

[8] Press Release, Treasury Sanctions Individuals and Entities as Members of the PacNet Group (Sept. 22, 2016), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl5055.aspx (last visited Nov. 6, 2019).

[9] To this date, the U.S. Government has never brought any criminal charges against PacNet or any affiliate entities. And, it has been publicly reported in a March 2019 report released by the Attorney General of British Columbia, Canada that the Canadian government has declined to prosecute PacNet due to insufficient evidence. Following that declination, however, the U.S. Government charged certain individual PacNet employees and officers with mail fraud and wire fraud in an indictment filed in June 2019 in the District of Nevada. *See United States v. Day et al.*, No. 2:19-cr-155 (D. Nev.).

wind down its business, *id.* ¶ 5, but lacked the legal and practical ability to return funds it was holding on behalf of all of its clients, especially as the United States had stated that it believed certain PacNet clients were engaged in fraud or money laundering.

The OFAC designation was ill-considered, incorrect, and contrary to law. *Id.* ¶¶ 6, 38-53. Rather than constituting a national security emergency measure as required by federal law, PacNet believes that the designation was part of a coordinated government effort by OFAC with the United States Postal Inspection Service ("USPIS") and DOJ to coerce cooperation by PacNet in a criminal investigation and put it out of business by holding it to answer to the public branding and designation as a "criminal" or a "significant TCO" without due process of law.[10] The investigation leading to the OFAC designation was marred by impropriety, incompleteness, and a failure to consider contrary and strongly exculpatory facts readily available to, and in the possession of, the United States Government. *Id.* ¶¶ 6, 30-37.

### C.    OFAC's Rescission of the Unlawful Designations, and the Execution of the September 2017 Agreement

PacNet and its employees petitioned OFAC to be removed from OFAC's Specially Designated Nationals and Blocked Persons List (the "SDN List"). From February 2017 through August 2017, OFAC rescinded the designations of nine employees and officers and removed them from the SDN List. *Id.* But the PacNet Group's continued inclusion (along with that of three employees and officers) on the SDN List prevented the PacNet Group from dissolving and formally closing its business.

In May and through the summer of 2017, OFAC informed the PacNet Group that it would only rescind the designations of the PacNet Group and remaining individuals if the PacNet Group

---

[10] Indeed, the Treasury Department's press release stated that "OFAC closely coordinated today's action with the Consumer Protection Branch of the Department of Justice and the U.S. Postal Inspection Service." https://www.treasury.gov/press-center/press-releases/Pages/jl5055.aspx.

agreed to (i) waive any claim for monetary damages against OFAC and (ii) submit funds contractually owed to certain former clients to an interpleader or escrow account where the competing claims of OFAC/the United States Government and the former clients could be contested. *Id.* ¶¶ 9, 54.

In light of OFAC's position and inaction to rescind the final designations, OFAC and the PacNet Group entered into an agreement on September 19, 2017. OFAC Interpleader, Dkt. 139-6, ¶ 4 & Ex. A. Under the Agreement, OFAC promised to remove the PacNet Group, its subsidiary companies, and three individuals from the SDN List subject to certain terms and conditions. OFAC Interpleader, Dkt. 1, ¶ 10. In addition to waiving any claims to monetary damages against OFAC, PacNet was contractually required to provide OFAC with a list of PacNet's outstanding debts and liabilities to former clients. *Id.* ¶ 55. On September 19, PacNet complied with the Agreement and, *inter alia*, provided the Government with a list of all outstanding balances/transactions and a list of all its bank accounts, including accounts in the United States at Union Bank, Avidia, and BMO Harris. Dkt. 139-6, ¶ 8.

OFAC, the DOJ, and other agencies of the U.S. Government then examined PacNet's submissions, including its bank account information. OFAC Interpleader, Dkt. 1, ¶ 20. On October 6, 2017, OFAC stated specifically: "OFAC has identified and hereby represents to PacNet that a reasonable factual basis exists to believe that certain proposed transactions disclosed by PacNet pursuant to [the Agreement] involve the proceeds of fraud or money laundering allegedly committed by certain PacNet clients." *Id.* ¶ 56; OFAC Interpleader, Dkt. 139-6, Ex. B. Attached to that letter was a list of former PacNet clients and associated account balances selected by OFAC in consultation with the DOJ and others within the Government. OFAC further "direct[ed] PacNet to initiate the transfer of the funds" pursuant to the Agreement and provided a mandatory license

"which authorize[d] PacNet to engage in all transactions necessary to transfer the identified funds into one or more interpleader accounts of the United States District Court for the Eastern District of New York." OFAC Interpleader, Dkt. 139-6, Ex B at 1 & Ex. C § I, at 2; *see also* OFAC Interpleader, Dkt. 1, ¶¶ 56–57.

OFAC expressly contemplated, consented to, directed, and licensed the filing of the OFAC Interpleader, and it even specified that it be filed in the U.S. District Court for the Eastern District of New York. Specifically, OFAC directed and agreed:

> In the event that OFAC identifies and represents to the PacNet Group that a reasonable factual basis exists to believe that a proposed transaction involving any client of the PacNet Group disclosed pursuant to paragraph A.2 involves the proceeds of fraud or money laundering allegedly committed by the client and provides the PacNet Group with written notification of that determination ... the PacNet Group agrees . . . *to interplead those funds in the United States District Court for the Eastern District of New York. Through the interpleader action or the deposit with the escrow agent, PacNet will provide a list to the United States Attorney's Office for the Eastern District of New York listing the following for each transaction OFAC identifies and for which PacNet transfers funds pursuant to OFAC's direction consistent with this agreement: (i) the PacNet client associated with the transaction; and (ii) the amount of funds transferred related to the transaction. PacNet accepts the representation by OFAC as sufficient to indicate to PacNet that a dispute exists as to the identified funds and PacNet will therefore interplead or deposit the money in escrow until the dispute can be resolved.* The parties agree that the interpleader or deposit of any funds into escrow is not an admission that any funds are proceeds of fraudulent conduct or money laundering or that PacNet had any involvement in or knowledge of any fraudulent conduct or money laundering. . . .

OFAC Interpleader, Dkt. 139-6, Ex. A at A.7 (emphasis added). Although the Agreement contained a specific waiver of claims against OFAC (*see* Ex. A at A.8), PacNet and OFAC expressly carved out the OFAC Interpleader from that waiver. The Agreement provides: "PacNet and the individual petitioners maintain and do not waive any right to file or bring an action or claim against OFAC . . . (ii) in the form of an interpleader action pursuant to 28 U.S.C. § 1335 and Fed. R. Civ. P. 22 as contemplated under paragraph A.7 above." *Id.*

12

In addition to consulting with the DOJ, OFAC involved the U.S. Attorney's Office for the Eastern District of New York directly in the September 2017 Agreement and the OFAC Interpleader. As indicated in the above-quoted passage, PacNet was required to and did provide a list to the U.S. Attorney's Office of the PacNet clients and amounts of funds transferred to the interpleader fund. PacNet further agreed in the September 2017 Agreement that the representation by OFAC of the Government's claim was sufficient proof of competing claims to move forward with the OFAC Interpleader. *Id.* at A.7. On October 6, 2017, OFAC issued a specific license which was necessary under federal law to authorize PacNet to transfer funds from its accounts to the "interpleader accounts of the United States District Court for the Eastern District of New York, as described in the [September 19, 2017] Agreement." OFAC Interpleader Dkt. 2-1, Ex. A.

### D.     The Interpleader Action

Pursuant to OFAC's October 6, 2017 direction and license, PacNet on October 16, 2017 filed an interpleader action ("OFAC Interpleader") to initiate the transfer of contested funds and to bring all actual and potential claimants before the Court so that they may have an opportunity to assert their interests in the subject funds and obtain a judicial determination on their claims. OFAC Interpleader, Dkt. 1. Based on contractual obligations to clients and the prospect that making payment to those clients would conflict with federal law and claims of the United States, PacNet reasonably feared the results of competing claims and obligations to the interpleader fund. For that reason, initiating the OFAC Interpleader was necessary to discharge the PacNet Group's debts and liabilities to all interested parties and to eliminate any risk that PacNet or any companies within the PacNet Group or current or former employees or officers of the PacNet Group will be subject to inconsistent rulings concerning the disposition of the interpleader fund or any portion thereof.

13

On October 16, 2017, PacNet also filed a motion for leave to deposit $5,220,855.08 USD into the Court registry, which the Government did not oppose. OFAC Interpleader, Dkt. 2. On October 18, 2017, Judge Garaufis granted PacNet's unopposed motion. *See* OFAC Interpleader, Dkt. 7. Judge Garaufis found, "based on the record," that (1) PacNet had provided sufficient notice to all defendants, (2) the "competing claims to the funds made them subject to an interpleader action under 28 U.S.C. § 1335," and (3) the Government had "granted a license authorizing PacNet and its subsidiary and affiliate companies" to transfer "the Interpleader Fund into the Court registry." *Id.* at [1]. Judge Garaufis's Order specifically stated that "[t]he PacNet Group is authorized to transfer funds from BMO Harris Bank, Union Bank, and/or any other necessary financial institution or account to the registry of the Court, and may do so through one or more transactions." *Id.* at 2. The Order also directed "[t]he Clerk of the Court . . . to deposit the total amount of $5,220,855.08 USD tendered by PacNet in a manner consistent with the Court's findings regarding the nature of the Funds above[.]" *Id.*

Pursuant to Judge Garaufis' Order, on or about November 8, 2017, Union Bank wired $2,671,335.59 to the Clerk of Court to be deposited into the Court registry. However, on April 5, 2018, the Government provided notice to the Court and to PacNet that it had seized those very funds from the Court registry. *See* OFAC Interpleader, Dkt. 137. Those funds now are subject to the Court's Preliminary Order and are expressly identified as item (g).

In addition to those Union Bank funds deposited in the Court registry, the Government seized PacNet's funds at BMO Harris and Avidia Banks without PacNet's knowledge pursuant to *ex parte* seizure warrants that federal prosecutors obtained in this District.[11] By letter dated

---

[11] Those funds represent items (d) through (f) of the Preliminary Order. PacNet also contests the seizure and forfeiture of paragraph (c), which represent its funds from BMO Harris Bank which were seized on September 20, 2016—concurrent with the initial OFAC designations—as Defendant Young has likewise never held title to those funds.

November 8, 2017, Assistant U.S. Attorney Tanisha R. Payne notified counsel for PacNet that a total of $2,631,085.14 USD had been seized from various PacNet-related bank accounts pursuant to *ex parte* seizure warrants issued by this Court. *See* OFAC Interpleader, Dkt. 139-6, ¶ 9 & Ex. E (Letter from Tanisha R. Payne, Assistant U.S. Att'y, Dep't of Justice, to George R. Calhoun, Ifrah PLLC (Nov. 8, 2017)). The letter specifies that (i) $1,503,251.39 USD was seized from account ending in –0703 held at BMO Harris (now item (d) of the Preliminary Order); (ii) $765,611.07 USD was seized from account ending in –3306 held at BMO Harris (now item (e) of the Preliminary Order); and (iii) $362,222.68 USD was seized from account ending in –5257 held at Avidia Bank (now item (f) of the Preliminary Order). *Id.* Ms. Payne's November 8, 2017 Letter omitted reference to the Government's earlier seizure of funds from BMO Harris Bank in September 2016, as to which PacNet never received any formal notice, and which, like all of the other funds at issue in this Petition, is subject to the Preliminary Order (*see* paragraph (c)) despite Young having never held title to or control over the funds. *Id.*

In total, the Government has seized over $6.25 million from PacNet and now seeks to forfeit those funds pursuant to paragraphs (c) through (g) of the Preliminary Order. That $6.25 million is well more than is needed to completely fund the interpleader account (valued at approximately $5.2 million), as contemplated by the September 2017 Agreement between PacNet and OFAC.

Not only did the Government surreptitiously seize PacNet's funds, it has also failed to afford PacNet appropriate due process and has attempted to forfeit the funds by citing them in bills of particulars in criminal proceedings. Indeed, the Government ultimately identified PacNet's

---

Certain of the bank accounts were held in the name of PacNet Services Ltd., while others were held by its subsidiary, Chexx.

seized funds in bills of particulars in two criminal proceedings against criminal defendants who *already had pled guilty*: Ryan Young[12] and Ercan Barka,[13] a criminal defendant whose matter is proceeding separately before this Court. Neither Mr. Young nor Mr. Barka have ever worked for, or on behalf of, PacNet. Although Mr. Young and Mr. Barka may have a potential contractual claim as creditors of PacNet, they *never* controlled or held title to any PacNet accounts. The Government has not charged or named PacNet (or any of its associated companies) as a co-conspirator in the criminal actions against either of the men. That is the case even though the Government has long been aware that Mr. Barka and Mr. Young's companies had been PacNet clients. PacNet was identified as having provided payment services to companies affiliated with both in a civil complaint filed by the Government in May 2017. *United States v. Barka et al.*, 1:16-cv-05266 (E.D.N.Y. May 31, 2017), Amended Complaint.

Indeed, far from conspiring with Young and Barka, beginning in at least August 2012, the PacNet Group submitted Suspicious Transaction Reports and other reports with the Canadian government revealing the conduct of Ercan Barka or companies allegedly operated or controlled by him and co-conspirators. STRs are the Canadian equivalent of a Suspicious Activity Reports ("SARs") filed with the U.S. Treasury Department's FinCEN. PacNet filed STRs in relation to the conduct of Barka with FINTRAC, a Canadian federal government regulator. Such disclosure of information to the government would necessarily defeat a claim of criminal conspiracy. *See, e.g.*, *United States v. Steele*, 685 F.2d 793, 801 (3d Cir. 1982) ("as a matter of law" an entity could not be a member of a conspiracy where it disclosed the alleged conspiracy to law enforcement officials).

---

[12] *See* Bill of Particulars, Dkt. 11.

[13] *See United States v. Barka*, No. 2:18-cr-00031-JMA (E.D.N.Y. filed Mar. 26, 2018), Dkt. 33.

### E.     Current Procedural Posture of the Interpleader Action

With the above factual background in mind, PacNet provides a brief procedural history summarizing the OFAC Interpleader still pending before this Court as Case No. 17-cv-6027.

More than a year before this Court's assignment to the OFAC Interpleader and in response to an unopposed motion, Judge Garaufis entered the Interpleader Deposit Order on October 18, 2017, directing the deposit of $5.2 million into a Court interpleader account, according to the terms of the September 19, 2017 Agreement and the October 6, 2017 specific license and direction of the Treasury Department. Despite expressly agreeing to and directing the interpleader process, the U.S. Government within days of the September 19 Agreement acted secretly to prevent the enforcement of Judge Garaufis's Interpleader Deposit Order by: (1) seizing approximately $2.6 million of those funds via an *ex parte* seizure warrant before they could be deposited in the Court registry; and (2) subsequently seizing—also via an *ex parte* warrant without notice and opportunity to be heard—the remaining $2.6 million that PacNet already had deposited in the Court registry.

The Government also has attempted to interfere with Judge Garaufis's Interpleader Deposit Order by moving to dismiss the interpleader action, even though the Government developed the idea for, agreed in writing to, and directed the initiation of the proceeding. To cloud matters further, the U.S. Attorney's Office for the Eastern District of New York sometimes claims to solely represent OFAC and at other times claims to represent the "United States." *Compare* OFAC Interpleader Dkt. 139-1, *with* OFAC Interpleader Dkt. 139-8. Such posturing begs the question posed by Judge Garaufis at the February 9, 2018 hearing: "[A]re there two governments here?" OFAC Interpleader, Dkt. 136 at 5:15–16.

The following motions in the OFAC Interpleader—which necessarily involve the same issues underlying the instant Motion—have been fully briefed and pending since the spring and summer of 2018. In light of the Government's actions to interfere with Judge Garaufis's

17

Interpleader Deposit Order and the pendency of these motions, the OFAC Interpleader has been unable to proceed.

      a. U.S. Department of Treasury's Motion to Dismiss for Lack of Subject Matter Jurisdiction (*Fully Briefed on April 5, 2018 (OFAC Interpleader, Dkt. 139)*)

      b. PacNet's Cross Motion to Compel the United States to Comply with Interpleader Deposit Order (*Fully Briefed on April 5, 2018 (OFAC Interpleader, Dkt. 139)*)

      c. PacNet's Motion for Order to Show Cause Why U.S. Department of Treasury Should Not Be Held in Contempt (*Fully Briefed on July 9, 2018 (OFAC Interpleader, Dkt. 158)*)

      d. International Payout's Motion to Join Motion for Order to Show Cause (*Fully Briefed on July 30, 2018 (OFAC Interpleader, Dkt. 161)*)

Resolution of those four motions in the OFAC Interpleader—along now with the instant Petition—is necessary to ensure both that the OFAC Interpleader proceeds properly and efficiently, but also necessary to give effect to Judge Garaufis's October 18, 2017 Interpleader Deposit Order and to end the Government's abuse of the forfeiture process. This abusive conduct also constitutes a denial of due process because the proposed forfeiture would allow the Government to impede and obstruct another agency of the U.S. Government, the U.S. Department of Treasury, agreement to the interpleader action—an agreement the U.S. Department of Justice reviewed and approved.

    **F.**    **Summary of PacNet Accounts Seized by U.S. Government**

    As discussed herein, leading up to the Preliminary Order, the Government seized funds from PacNet bank accounts starting in September 2016, all the way through its seizure of funds from this Court's interpleader fund in December 2017. The following table summarizes the seized funds, identified by individual bank account, corresponding PacNet Group company, date of seizure, and related item in the Preliminary Order:

| PacNet Group Bank Account | PacNet Group Company | Amount | Date of Seizure | Preliminary Order Item |
|---|---|---|---|---|
| BMO Harris Bank - #xxx0703 | PacNet Services | $963,205.14 | September 20, 2016 | (c) |
| BMO Harris Bank - #xxx2949 | PacNet Services | $1,503,251.39 | September 22, 2017 | (d) |
| BMO Harris Bank - #xxx3306 | Chexx | $765,611.07 | September 22, 2017 | (e) |
| Avidia Bank - #xxxx5257 | PacNet Services | $362,222.68 | September 22, 2017 | (f) |
| Union Bank - #xxxxxx0401 | PacNet Services | $2,671,335.59 (seized together from Court's interpleader registry) | December 12, 2017 | (g) |
| Union Bank - #xxxxxx3328 | Chexx | | | |
| Union Bank - #xxxxxx1635 | Chexx | | | |
| Union Bank - #xxxxxx0527 | Chexx | | | |
| Union Bank - #xxxxxx8176 | Accu-Rate | | | |

At all relevant times prior to the Government's seizure, the funds maintained in the above listed bank accounts were owned, controlled, maintained, and used exclusively by the PacNet Group (with the exception being the Union Bank funds that were transferred into the Court's interpleader fund on or about November 8, 2017, pursuant to the Interpleader Deposit Order). The sole signatories to these accounts are PacNet employees. No client of the PacNet Group held any access to, dominion or control over, or property interest in, any of the funds maintained in these accounts. Moreover, Ercan Barka, Ryan Young, and the companies they are affiliated with never had any interest in or control over these accounts at any time. Indeed, only employees of the PacNet Group had access to and dominion or control over these accounts, and the funds were only used for lawful PacNet business.

Moreover, multiple of the bank accounts and funds at issue bore no relationship to nor would have ever received funds related to PacNet clients that distributed direct-mail promotions involving sweepstakes reports or astrological information. For example, as discussed in Section

II.A, *supra*, because the Accu-Rate account was related to Accu-Rate's foreign exchange business, none of the funds in that account could have had any relationship to defendant Young's criminal activity. Additionally, the BMO Harris account ending in -2949 was a collateral account held at the request of BMO Harris Bank to serve as collateral for BMO Harris Bank in relation to ACH credits and debits processed by BMO Harris Bank on behalf of PacNet Services.[14] A commercial bank such as BMO Harris Bank commonly requires business customers using the ACH Network to maintain a collateral account which serves to provide security for any credit extended by a commercial bank in relation to its handling of ACH transactions for the business customer. PacNet Services did not transfer operational funds to or from this account in relation to its regular, daily business operations. Funds were maintained in this account by PacNet Services to serve as collateral or security in relation to the processing of payments by BMO Harris Bank through the ACH Network.

## III.    ARGUMENT

The Government's failure to satisfy its obligation to demonstrate the forfeitability of the PacNet Accounts, Petitioners' exclusive and superior title to those accounts, and due process violations committed by the Government render paragraphs (c) through (g) of the Preliminary Order invalid. Accordingly, for all the reasons set forth below, Petitioners move the Court to vacate those paragraphs and order the property identified in those paragraphs deposited in the interpleader account maintained in the Court's registry in Case No. 17-cv-6027 (E.D.N.Y.) in sufficient amount to satisfy the terms of the Government's September 2017 agreement with PacNet and that any remaining funds be returned to the Petitioners.

---

[14] ACH is a reference to an automated clearing house (ACH) or electronic network used by financial institutions around the world to process the exchange of electronic transactions between participating financial institutions. In the United States, a principal ACH is the ACH Network of the National Automated Clearing House Association ("NACHA")

### A.  The Preliminary Order of Forfeiture is Invalid and Cannot Support Forfeiture of the PacNet Accounts

The Government has failed to present and prove the PacNet Accounts are subject to forfeiture and the requisite nexus—that the funds in these accounts constitute *proceeds* of conspiracy to commit mail fraud *by Ryan Young* and *directly traceable to that fraud.* In sum, the Preliminary Order is invalid on its face because there were *no* findings to support the forfeiture of the PacNet Accounts. The Government failed to proffer a single fact—let alone prove—that defendant Ryan Young had any interest in the accounts or that the funds were proceeds of his criminal activity. This is a fatal defect and warrants amending the order at this time to release those accounts. *See Watts*, 786 at 172 ("Federal Rule of Criminal Procedure 32.2(b)(1) . . . requires *the sentencing court* to determine what property is subject to forfeiture under the applicable statute.'") (emphasis and ellipsis in original) (quoting *Capoccia*, 503 F.3d at 109).

The Preliminary Order is invalid on its face because it fails to include the required findings that: (1) defendant Young had a property interest in the PacNet accounts; (2) there was any factual predicate establishing any nexus between the criminal activity underlying defendant Young's conviction; and (3) defendant Young obtained the funds. *See* Preliminary Order; Fed. R. Crim. P. 32.2; *Honeycutt*, 137 S.Ct. at 1632 (noting that "[i]n addition to limiting forfeiture to tainted property, 853(a) defines forfeitable property solely in terms of personal possession or use"). Although the Government enjoys significant forfeiture powers, those powers are not unlimited. A defendant may be compelled to give up the fruits of their offense, ensuring that "crime does not pay." *United States v. Monsanto*, 491 U.S. 600, 614 (1989). But untainted property is off limits insofar as criminal *in personam* forfeiture is concerned except in the instance of "substitute property" which is limited to the requirements of 21 U.S.C. § 853(p), which itself does not permit the Government to confiscate substitute property from others, whether co-conspirators or

21

disinterested stakeholders and other third-parties. *Honeycutt*, 137 S.Ct. at 1634 (stating that "Congress did not authorize the Government to confiscate substitute property from other defendants or co-conspirators; it authorized the Government to confiscate assets only from the defendant who initially acquired the property and who bears responsibility for its dissipation.")

For that reason, the federal forfeiture statutes, the Rules of Criminal Procedure, and binding case law all require the U.S. Government to provide evidence—at trial or in connection with a plea—to establish that specific property is properly subject to criminal forfeiture. *See Watts*, 786 F. 3d at 172; *accord* Fed. R. Crim. P. 32.2 (b)(1)(A). More specifically, "[w]hen the government seeks to obtain an order of forfeiture, 'Federal Rule of Criminal Procedure 32.2(b)(1) . . . requires *the sentencing court* to determine what property is subject to forfeiture under the applicable statute.'" *Watts*, 786 F. 3d at 172 (quoting *Capoccia*, 503 F.3d at 109) (emphasis and ellipses in original).

The Second Circuit has stated that this "standard means that, among other things, '*the court* must determine whether the government has established the requisite nexus between the property and the offense.'" *Id.* (quoting Fed. R. Crim. P. 32.2(b)(1)(A) (emphasis in original). "At various points in the proceedings, the government bears the burden of proving this legal conclusion to varying degrees of certainty: as a matter of probable cause at a post-indictment hearing, or by a preponderance of the evidence at a bench trial or before a jury." *Id.* (internal citations omitted). "Only if the government meets the relevant legal threshold, however, may the property in question be considered 'subject to forfeiture' in any legal sense. Prior to that, while the government has simply announced its intent to seek forfeiture through the indictment, the property is seen merely as 'potentially forfeitable,' or 'potentially subject to forfeiture.'" *Id.* (citations omitted). *See also Luis v. United States*, ___ U.S. ___, 136 S.Ct. 1083, 1091 (2016) (emphasizing the importance of

a finding that the assets were shown to be "traceable to the crime"). Thus, the Government's failure to meet its obligations in this proceeding with respect to the PacNet Accounts means the property is not subject to forfeiture.

Petitioners' have exclusive right, title, and interest to the PacNet Accounts. *See* Section II.F, *supra*. Neither defendant Young, defendant Barka, nor anyone else has an interest in these accounts. *Id*. Despite this fact, Petitioners were not provided with the required notice of this proposed forfeiture by the Government. Following the entry of a preliminary order of forfeiture, the United States is required to both publish a public notice and to provide direct written notice to any person known to have alleged an interest in the property. Federal Rule of Criminal Procedure 32.2 provides that the "government must publish notice of the order *and* send notice to any person *who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding*." Fed. R. Crim. P. 32.2(b)(6) (emphasis added). *See also* 21 U.S.C. § 853(n)(1). The Government was well aware for several years prior to the commencement of the forfeiture action that Petitioners were the sole owners of the accounts. Yet, the Government have provided no explanation for their failure to comply with this statutory requirement.[15]

The Government also seeks to deprive Petitioners of their property interest based solely on the "consent" of a third party who indisputably has no interest in the property in a proceeding to which Petitioners were not a party. Accordingly, Petitioners are entitled to challenge the basis for forfeiture in this ancillary proceeding. *See Daugerdas*, 892 F.3d at 557 ("The Due Process Clause does not permit us to hold that a third party is precluded from asserting, in her own right, her

---

[15] Notice is also required by DOJ's own policy which states "the AUSA must comply with the requirements applicable to third party interests (e.g., 21 U.S.C. § 853(n)(1)-(7)), and the provisions of Federal Rule of Criminal Procedure 32.2, including affording third parties with notice of the forfeiture and of their right to obtain an post-conviction adjudication of their interests in the property." Asset Forfeiture Policy Manual 2019, U.S. Department of Justice, Criminal Division ("DOJ Manual"), at 158-159, available at https://www.justice.gov/criminal-afmls/file/839521/download.

23

entitlement to property she claims is hers, on the ground that she is bound by a determination that the property belonged to someone else, when that determination was made in a separate proceeding in which she was not permitted to participate.").[16]

Petitioners recognize that third parties typically do not have the right to challenge a finding of forfeitability. But in this case, there was never a finding that the PacNet Accounts were subject to forfeiture. There was no showing at trial or otherwise that Ryan Young either owned or had any interest in the accounts or that the funds in the accounts were in any way traceable to the proceeds of his criminal activity. Moreover, the U.S. Government should not be afforded the opportunity to attempt to "cure" that defect. There should be no "second bite at the apple" in light of the Government's actions, delays, and failures to comply with federal law.[17] The Preliminary Order should be vacated as to the PacNet Accounts.

The Government's abuse of the forfeiture process in this proceeding constituted gamesmanship designed to prevent Petitioners from protecting their property interests. By way of example, the Government: (1) utilized the U.S. Department of the Treasury's designation process to restrain Petitioners' assets without effective recourse; (2) upon the rescission of that designation, directed Petitioners to deposit funds into the Court registry to resolve pending claims against those funds pursuant to the September 19, 2017 Settlement Agreement; (3) delayed and then failed to

---

[16] The Government has conceded before the Supreme Court that even in the context of an indictment founded on a probable cause finding that there is a constitutional right to a hearing on the question whether "the assets in dispute are traceable." *Kaley*, 134 S.Ct. at 1095 and n.3. *See also* 21 U.S.C. § 853(e)(1)(B) (requiring hearing). Such right should be even more strongly protected here were the Petitioners, who have been determined after investigation by the Government to be a disinterested stakeholder in the funds, were not provided notice as required by law.

[17] *See also* Fed.R.Crim.P. 32.2(b)(1)(A) (requiring the Government to act such that "[a]s soon as practical . . . after a plea of guilty . . . is accepted, . . . the court must determine what property is subject to forfeiture under the applicable statute."). Defendant Young pled guilty in February 2018. The Government failed to file a motion for a preliminary order of forfeiture until September 2019 or more than a year and a half later. That delay and violation of Rule 32.2(b)(1)(A) combined with the Government's violation of the specific notice requirement of Rule 32.2(b)(6) suggest the inference that the Government sought to catch the Petitioners unaware and to forfeit the funds by default. Such gamesmanship is further reason for the Court to amend the Preliminary Order at this time as requested by the Petitioners.

24

provide then required specific notice to the Petitioners of its intention to forfeit their property in the criminal proceeding of an unrelated individual; and (4) apparently relied upon the "consent" to the forfeiture of the Petitioners' property from a criminal defendant who the Government knew had no property interest of any kind in the accounts and without even attempting to proffer any evidence justifying forfeiture. In light of these actions—which constitute an egregious abuse of the forfeiture process—the Government should not be permitted to now preclude Petitioners from challenging the forfeitability of the PacNet Accounts. *See Liquidators of European Federal Credit Bank*, 630 F.3d at 1148-49 (exercising discretion, based on Government's "sleight of hand" in seeking to prevent Petitioner from raising "its legal claims challenging forfeitability"). To do so would effectively reward the Government's abuse of the process.

**B.     Petitioners' Vested Interest in the PacNet Accounts Renders the Forfeiture in this Proceeding Invalid; the Property is not Forfeitable**

PacNet's vested and superior interest in the PacNet accounts "renders the order of forfeiture invalid" as to those accounts. 21 U.S.C. § 853(n)(6)(A). Petitioners had exclusive "legal right, title, or interest" in the PacNet Accounts "superior to any right, title, or interest of the defendant," Ryan Young, "at the time of the commission of the acts which gave rise to the forfeiture of the property" or at any other time. *See* Section II.F, *supra*; 21 U.S.C. § 853(n)(6)(A). The Government cannot satisfy any of the statutory bases to forfeit Petitioners' property as "constitut[ing] or is derived from proceeds traceable to" the crimes committed by the convicted defendant, 18 U.S.C. § 981(a)(1)(C) or as "property of the defendant," forfeitable as substitute property under 21 U.S.C. § 853(p).

**1.     Petitioners Have a Vested and Superior Interest in the PacNet Accounts**

Petitioners, not Ryan Young, own the PacNet Accounts. If, as here, a petitioner can establish by a preponderance of the evidence that the petitioner "has a legal right, title, or interest

in the property, and such right, title, or interest . . . was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture," the Court "shall amend the order of forfeiture" to strike the property from the order. 21 U.S.C. § 853(n)(6)(A). *See United States v. Wilson*, 659 F.3d 947, 952 (9th Cir. 2011) ("The language of § 853(n)(6)(A) is clear. If the petitioner can show by the preponderance of the evidence that his interest is greater than that of the defendant, the district court is to amend the order of forfeiture."); *United States v. Dupree*, 919 F. Supp. 2d 254, 262 (E.D.N.Y. 2013), *aff'd in part and vacated in part on other grounds sub. nom United States v. Watts*, 786 F.3d 152 (2d Cir. 2015) ("Thus, if a third-party establishes a valid and superior interest in the forfeited property, then that property shall be stricken from the final order of forfeiture.").[18]

Here, the Government first published an official Notification of Forfeiture on www.forfeiture.gov on January 4, 2020. In that Notification, the U.S. Government gave official notice that this Court entered the Preliminary Order "condemning and forfeiting" the following property (in addition to other property not subject to this Petition) to the United States:

> All right, title, and interest in Nine Hundred Sixty-Three Thousand Two Hundred Five Dollars and Fourteen Cents ($963,205.14), more or less, seized from BMO Harris Bank account number 3720703, held in the name of PacNet Services Ltd. (16-USP-002441), on or about September 20, 2016 in Washington, D.C.; . . .

> All right, title, and interest in Three Hundred Sixty-Two Thousand Two Hundred Twenty-Two Dollars and Sixty-Eight Cents ($362,222.68), more or less, seized from Avidia Bank account number 33595257, held in the name of PacNet Services, Ltd. (17-USP-002300), on or about September 22, 2017 in Hudson, Massachusetts;

---

[18] After a court enters a preliminary order of forfeiture, as the Court did here on September 11, 2019 (Dkt. 15), and the Government publishes notice and sends notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture, a third party with an interest in forfeited property may "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." *Watts*, 786 F.3d at 161.. Petitioners have standing to file such a petition here. *United States v. Church & Dwight Co.*, 510 F. App'x 55, 58 (2d Cir. 2013) (the inquiry as to whether a petitioner has a "legal interest" in forfeited property sufficient to establish standing under § 853(n)(2) is identical to the inquiry on the merits under § 853(n)(6)).

All right, title, and interest in One Million Five Hundred Three Thousand Two Hundred Fifty-One Dollars and Thirty-Nine Cents ($1,503,251.39), more or less, seized from BMO Harris Bank account number 3722949, held in the name of PacNet Services Ltd. (17-USP-002301), on or about September 22, 2017 in Chicago, Illinois;

All right, title, and interest in Seven Hundred Sixty-Five Thousand Six Hundred Eleven Dollars and Seven Cents ($765,611.07), more or less, seized from BMO Harris Bank account number 2033306, held in the name of Chexx (America) Inc., (17-USP-002302) on or about September 22, 2017 in Chicago, Illinois; and

All right, title, and interest in any and all funds seized from the U.S. District Court Registry under case docket number 17-CV-6027 (E.D.N.Y.), up to and including the sum of Two Million Six Hundred Seventy-One Thousand Three Hundred Thirty-Five Dollars and Fifty-Nine Cents ($2,671,335.59) (18-USP-000180), on or about December 12, 2017 in Brooklyn, New York.

As described above, Petitioners had exclusive title and control over the first four of these accounts. *See* Section II.F, *supra*. The fifth collection of funds constitutes funds Petitioners deposited in this Court's registry pursuant to the September 19, 2017 Settlement Agreement with the Government in which the Government directed PacNet, as a disinterested stakeholder, to deposit in the Court's registry funds contractually owed to certain former clients pending resolution of the OFAC Interpleader. *See* Sections II.D, II.F, *supra*.

All of this property is—and was at all times—owned by PacNet and held in bank accounts exclusively owned, controlled, and used by PacNet. First, each of these accounts is held in the name of PacNet or one of its subsidiaries. *See* Section II.F, *supra*. Second, the sole signatories for each of the accounts are PacNet officers and employees. *Id.* Third, the accounts were exclusively used for official, lawful PacNet business operations. *Id.* No one other than PacNet employees had access to these accounts. *Id.* Ryan Young, who has never worked for or on behalf of PacNet, and was never on record as the owner of any Direct Mail business contracting with PacNet, certainly did not have access to them. *Id.* Even if Mr. Young had a contractual claim against PacNet as a

creditor, which he does not, he would *never have* controlled or held title to any of the accounts allegedly subject to forfeiture. Although a general, unsecured creditor "might collect from a debtor's general assets, they cannot be said to have any present claim to, or interest in, the debtor's property." *Luis v. United States*, ___ U.S. ___, 136 S.Ct. 1083, 1092 (2016). The Government failed to show the contrary.

The forfeited property is also untainted by Mr. Young's criminal activity. Indeed, the Government did not even attempt to show that the Forfeited Funds are proceeds of Mr. Young's criminal activity. Nor can the Government, given that these funds are entirely unrelated to Mr. Young or his illegal conduct. Because the "legal right, title, or interest" in the Forfeited Funds is— and has been at all times—vested in PacNet, not Young, the Preliminary Order is "invalid" and should be amended to strike PacNet's property. 21 U.S.C. § 853(n)(6)(A).

At most, defendant Young is a "general creditor" of PacNet. As such, defendant Young lacks an interest in any of PacNet's specific property. *See Luis*, 136 S. Ct. at 1092. For instance, when the roles are reversed and a third-party's interest in the criminal defendant's property is at issue, a third-party which is merely a general creditor lacks an interest in any specific property of the criminal defendant. As explained by District Judge John Gleeson of this Court: "A general creditor of the defendant lacks an interest in any of the defendant's specific property and, thus, lacks standing under 853(n)(2)." *United States v. Ovid*, No. 09–CR–216 (JG)(ALC), 2012 WL 2087084, at *3 (E.D.N.Y. 2012) (citing *DSI Assocs. LLC v. United States*, 496 F.3d 175, 184 (2d Cir. 2007) and *United States v. Ribadeneira*, 105 F.3d 833, 835 (2d Cir. 1997)) (following the rule that "general creditors lack a legal interest in forfeited property" because they have no interest "in" any particular, specific property). *See also United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1191-92 (D.C. Cir.) (interpreting forfeiture provision under RICO and stating that

"bank depositors, as general creditors, have no interest in the specific account to which their deposits might be traced"), *cert. denied*, 515 U.S. 1160 (1995).

Applying that rule here, defendant Young as a general creditor arising from his status as a former direct mail client of PacNet, as alleged by the Government, "lacks an interest in any" of the "specific property" in the PacNet Accounts. Accordingly, the interest in the specific property maintained in the PacNet Accounts "was vested in" PacNet "rather than the defendant" Young. 21 U.S.C. 853(n)(6)(A). Further, PacNet's property interest in the funds most definitely "was superior" to defendant Young who had no property interest in any particular, specific property of PacNet. The same conclusions apply even more strongly for the specific property or bank account funds of Accu-Rate and Chexx, of which defendant Young was not even arguably a general creditor (nor was defendant Barka). Thus, pursuant to the plain terms of Section 853(n)(6), "the court shall amend the order of forfeiture" to strike the provisions of the order referencing the PacNet Group's funds in the seized accounts, including the funds from the bank accounts of Chexx, Accu-Rate, and PacNet Services which were deposited in the court's interpleader fund prior to being seized by the Government.

### 2.    The Government Has No Statutory Basis to Forfeit the PacNet Accounts

The Government may only seek to forfeit the Funds in the PacNet Accounts on one of two legal bases: (1)(a) the funds in the accounts are "property, real or personal, which constitutes or is derived from proceeds traceable to" the crime committed by the convicted defendant and (b) the funds were obtained or acquired by the defendant, 18 U.S.C. § 981(a)(1)(C) and *Honeycutt*, 137 S.Ct. at 1632-33; or (2) the funds in the accounts constitute tainted proceeds initially acquired by the defendant and then transferred or sold to, or deposited with, a third party and thus forfeitable

as substitute property, 21 U.S.C. § 853(p) and *Honeycutt*, 137 S.Ct. at 1644. The Government

failed to satisfy either of these bases for forfeiture nor is there any other valid basis for forfeiture.

a.    **The Property Does Not Constitute and Was Not Derived from "Proceeds Traceable to" Young's Criminal Charge**

Although the Preliminary Order was entered pursuant to 18 U.S.C. § 981(a)(1)(C), it does

not comply with the plain language of that statute. Under Section 981(a)(1)(C), the Government

may only forfeit "[a]ny property, real or personal, which constitutes or is derived from proceeds

traceable to" Young's criminal charge. Furthermore, under Second Circuit case law, in order for a

court to be able to forfeit property in a criminal matter under Section 981(a)(1)(C), "the property

must have, at some point, been under the defendant's control or the control of his co-conspirators."

*United States v. Contorinis*, 692 F.3d 136, 147-48 (2d Cir. 2012) ("[W]e hold that the district court

erred in ordering appellant to forfeit funds that were never possessed or controlled by himself or

others acting in concert with him, and remand to determine the proper forfeiture amount."); *accord*

*United States v. Dobruna*, 146 F. Supp. 3d 458, 461 (E.D.N.Y. 2015) (denying forfeiture as to

funds never possessed by defendant).[19]

Rule 32.2(b)(1)(A) similarly dictates that the Government must have "established the

requisite nexus between the property and the offense" before the Court may issue a preliminary

order of forfeiture. *See also United States v. Emor*, 785 F.3d 671, 680-81 (D.C. Cir. 2015).

Far from carrying its burden of linking the property to Mr. Young's criminal offense, the

Government submitted a three-sentence motion for entry of a preliminary order of forfeiture. The

Government failed to establish a nexus between the property and Young's offense because the

---

[19] PacNet notes that, in the wake of the Supreme Court's 2017 decision in *Honeycutt*, it likely is no longer sufficient to merely show that the property was in the control of a co-conspirator—the Government must show that the property was under the control of the defendant himself. That distinction does not matter here, as the Government has not attempted to show that Young or any of his co-conspirators controlled the property at issue.

30

Government cannot do so: there is no nexus between the PacNet Accounts and the criminal charge to which Mr. Young pled guilty.

The PacNet Accounts were not even identified as property subject to forfeiture until two days *after* Young's guilty plea with the filing of a bill of particulars. *See* Dkt. 4. The bill similarly provided no reference to how the accounts were related to Mr. Young's criminal activity in any way. There was no evidence presented in connection with the guilty plea or otherwise in the proceeding that Mr. Young held any interest or right in the PacNet accounts or that the funds were proceeds of any criminal activity. *See, e.g.,* Transcript of February 13, 2018 Change of Plea Hearing of Ryan Young at 11. Indeed, there was not even a finding of probable cause by a grand jury that the accounts were related to the offense. Mr. Young pled guilty on February 13, 2018. Dkt. 7, *United States v. Young,* 18-cr-00046 (E.D.N.Y. Feb. 13, 2018). Furthermore, there was no evidence that defendant Young acquired the funds in the accounts. *Honeycutt,* 137 S. Ct. at 1633.[20]

Notably, the Government's approach was wholly inconsistent with DOJ's own policies. In deference to the statutory requirements of criminal forfeiture, the DOJ's 2019 Asset Forfeiture Manual explicitly states "[t]here must be a statutory basis for the forfeiture of the property and sufficient facts stated in the settlement documents and any related pleadings to satisfy the elements of the statute." DOJ Manual, *supra* note 15, at 151. The Government cannot cure this defect now by alleging that the accounts were simply involved somehow in the alleged criminal conduct. It was required to demonstrate the accounts contain "proceeds of the criminal activity" which were obtained or acquired by defendant Young; but, it failed to do so when it was so required. The Government did not even attempt to make such a showing.

---

[20] The Government has conceded before the Supreme Court that "the rationale of *Honeycutt* applies equally to § 981(a)(1)(C) as it does to § 853(a)(1)." *Peithman v. United States,* ___ U.S. ___, 140 S. Ct. 340 (2019) (Sotomayor J., dissenting from denial of certiorari).

### b. The Funds Are Not "Property of the Defendant" and, Therefore, Are Not Subject to Forfeiture as Substitute Property

Nor may the Court forfeit PacNet's property as "substitute property" under 21 U.S.C. § 853(p). *See* Dkt. 15 at 3 (referencing 21 U.S.C. § 853(p)). Where the Government seeks to forfeit substitute assets, "only the substitute '*property of the defendant*' may be forfeited to the Government." *United States v. Lester*, 85 F.3d 1409, 1412, 1415 (9th Cir. 1996) (quoting 21 U.S.C. § 853(p)) (emphasis in original). The Government has not shown—and cannot show—that PacNet's funds were somehow the property of Young.

Nor has the Government carried its burden of proving that any of the five conditions precedent to forfeiting substitute property are present here. *See* 21 U.S.C. 853(p)(2); *Honeycutt*, 137 S. Ct. at 1634 ("Only if the Government can prove that one of these five conditions was caused by the defendant may it seize 'any other property of the defendant, up to the value of' the tainted property—rather than the tainted property itself."). PacNet's funds therefore cannot be forfeited as substitute property.

Perhaps even more fundamentally, PacNet's funds cannot be forfeited as substitute property because joint and several forfeiture is barred with respect to substitute assets:

> Section 853(p)(1) demonstrates that Congress contemplated situations where the tainted property itself would fall outside the Government's reach. To remedy that situation, **Congress did not authorize the Government to confiscate substitute property from other defendants or co-conspirators; it authorized the Government to confiscate assets only from the defendant who initially acquired the property and who bears responsibility for its dissipation.** Permitting the Government to force other co-conspirators to turn over untainted substitute property would allow the Government to circumvent Congress' carefully constructed statutory scheme, which permits forfeiture of substitute property only when the requirements of §§ 853(p) and (a) are satisfied.

*Honeycutt*, 137 S. Ct. at 1634 (emphasis added). The forfeiture of all the available property belonging to an unindicted, un-convicted entity as substitute property also would run afoul of this

country's ban on forfeiture of estates. *See* S. Rep. 99-1026, pt. 2, at 83–84 (1986) (American Bar Association's Report to the House of Delegates referencing the "serious constitutional problems" with forfeiture of substitute assets and noting that such forfeiture may constitute an unconstitutional forfeiture of estate). In fact, the Government has already instituted and carried out a forfeiture of estate by seizing and closing Petitioners' entire business operations through the coordinated action of the Justice and Treasury Departments to designate unlawfully the Petitioners under national security authorities as a significant TCO.

As outlined above, there can be no reasonable dispute that Petitioners exclusive and superior title to the PacNet accounts. Accordingly, Mr. Young cannot consent to forfeiture of PacNet's property in which he indisputably holds no interest and the funds cannot be forfeited as substitute assets. DOJ's own 2019 Asset Forfeiture Manual provides that "[i]n any plea agreement, a defendant may consent to forfeiture. A plea agreement that purports to forfeit the property may only bind the parties thereto and transfers **only the interest that the settling claimant/defendant possesses.**" DOJ Manual, *supra* note 15, at 158-159 (emphasis added). Mr. Young has never had any interest in or control over the PacNet Accounts and cannot consent to the forfeiture.

c.   **As the Supreme Court Emphasized in Honeycutt, There Can Be No Joint-and-Several Forfeiture Liability**

In criminal forfeiture, which is an action against the individual ("in personam") as opposed to an action against the property ("in rem"), only the defendant's interest in a property may be forfeited. Fed. R. Crim. P. 32.2(b) advisory comm. notes (2000). The Government has claimed in the interpleader civil action that it has seized PacNet funds as part of the Barka and Young criminal cases because "the government may seek forfeiture of the proceeds of an entire conspiracy against

33

a co-conspirator charged in a criminal case."[21] In so arguing in a pleading filed with this Court in July 2018 in the OFAC Interpleader, the Government ignored the Supreme Court's unanimous ruling in *Honeycutt* which was decided the prior year in June 2017. Instead, the Government relied exclusively upon 2006 and 2012 judicial opinions which were decided prior to, and overruled by, the United States Supreme Court in *Honeycutt*, 137 S. Ct. at 1631–34. In *Honeycutt*, a unanimous Supreme Court emphasized that criminal forfeiture "is limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 1635.

The holding in *Honeycutt* applies with full force to criminal forfeitures under 18 U.S.C. § 981(a)(1)(C), like the proposed forfeiture of the PacNet Accounts in this case. The Government has conceded before the U.S. Supreme Court, that "there is no 'distinguishing 18 U.S.C. 981 from 21 U.S.C. 853 for purposes of joint and several liability.'" *Peithman v. United States*, 140 S. Ct. 340 (2019) (Sotomayor J., dissenting from denial of certiorari) (quoting Brief in Opposition of the Solicitor General at 6). The Court of Appeals for the Second Circuit and other courts have recognized that the Supreme Court's ruling in Honeycutt applies to forfeitures under other federal forfeiture statutes, including 18 U.S.C. § 981 and § 982.[22]

---

[21] See OFAC Interpleader, Dkt. 158-5, Government's Opposition to Motion to Show Cause and for Sanctions at 15-16, (citing *De Almeida v. United States*, 459 F.3d 377, 381 (2d Cir. 2006) and *United States v. Watts*, 477 F. App'x 816, 817–18 (2d Cir. 2012)).

[22] *United States v. Fiumano*, 721 F. App'x 45, 51–52 (2d Cir. 2018) (summary order) (vacating forfeiture order seeking to impose joint and several liability on the defendant pursuant to 18 U.S.C. § 981(a)(1)(C)); *United States v. Gil-Guerrero*, 759 F. App'x 12, 18 (2d Cir. 2018) (same); *United States v. Gjeli*, 867 F.3d 418, 427-28 (3d Cir. 2017) (finding that 18 U.S.C. § 981(a)(1)(C) is "substantially the same" as the statute in question in *Honeycutt* and holding that Honeycutt applies to criminal forfeitures under § 981(a)(1)(C)); *United States v. Brown*, 714 F. App'x 117, 118 (3d Cir. 2018) (finding that "Honeycutt applies with equal force to § 982(a)" and, accordingly, "the imposition of joint and several liability in the forfeiture money judgment was an error which requires remand"); *United States v. Carlyle*, 712 F. App'x 862, 864-65 (11th Cir. 2017) (per curiam) ("Although the forfeiture statute at issue in *Honeycutt*, 21 U.S.C. § 853, is not the same as the forfeiture statute at issue here, 18 U.S.C. § 981(a)(1)(C), the two statutes are largely the same in terms of their pertinent language, and so it appears that the Supreme Court's decision would apply to the statute at issue in the present case.").

As an initial matter, the contemplated forfeiture of the funds listed in paragraphs (c) through (g) of the Preliminary Order is barred by *Honeycutt* because the Government has not shown that Young "himself actually acquired" the property in the Preliminary Order "as the result of the crime." Nor can the Government make that showing, with respect to PacNet's funds identified in paragraphs (c) through (g) of the Preliminary Order, because those funds were the property of PacNet, and defendant Young never "acquired" them, whether as the result of a crime or otherwise.

In short, PacNet's property cannot be forfeited in this criminal matter as part of defendant Young's sentencing under a theory of joint and several liability. Not only has the Government failed to prove, or even pled, that PacNet was somehow the co-conspirator of Young, *Honeycutt* bars joint and several forfeiture liability even in the case of co-conspirators as present in the *Honeycutt* case.[23] As *Honeycutt* explains, a Court in ordering criminal or *in personam* forfeiture may not order the forfeiture of "untainted property" and "is limited to property the defendant himself actually acquired as the result of the crime." 137 S. Ct. at 1632 and 1635; *see also, e.g.,* *United States v. Fiumano*, 721 F. App'x 45, 51–52 (2d Cir. 2018) (summary order) (vacating forfeiture order pursuant to 18 U.S.C. § 981(a)(1)(C) imposing joint and several liability on defendant).

---

[23] After a year-long investigation with input from the U.S. Postal Inspection Service and the Justice Department, the U.S. Department of the Treasury ultimately determined PacNet to be a "disinterested stakeholder" and, therefore, an appropriate interpleader plaintiff. Based on that determination and finding, the U.S. Government entered into the September 19, 2017 Settlement Agreement, which was reviewed by the Justice Department. Based on that determination and finding, the Government issued a specific license authorizing the Petitioners to submit $5.2 million of the now seized funds into an Interpleader Fund within the Court's registry. Based on that determination and finding, the Government did not oppose the Petitioner's October 16, 2017 Motion for Interpleader Deposit. Thus, by the U.S. Government's own determination and admission, the PacNet Group was *not* an intentional wrongdoer. William Penn Life Ins. Co. of N.Y. v. *Viscuso*, 569 F. Supp. 2d 355, 362–63 (S.D.N.Y. 2008) (explaining and interpreting the rule of the Second Circuit allowing a party which may have acted negligently in relation to the disputed funds to serve as an interpleader plaintiff but not a party which has acted unconscionably, in bad-faith, or willfully in wrongful conduct).

### C.    The Government Should Be Judicially Estopped from Forfeiting These Funds

The record of this proceeding reveals that the U.S. Government has abused the criminal forfeiture process in order to effectuate the seizure and forfeiture of funds from Petitioners that it lacked a basis to seize civilly from PacNet. The Government should be judicially estopped from forfeiting the property in light of the Government's September 19, 2017 Agreement with PacNet Services, the Government's October 6, 2017 license directing the filing of the OFAC Interpleader in this District to resolve all outstanding claims relating to the funds, and the Government's consent to PacNet's October 16, 2017 Motion for Interpleader Deposit, which were all relied upon by the Court in issuing its October 18, 2017 Order Authorizing Deposit of Funds into the Court Registry.

As Judge Failla recently explained in *District Attorney of N.Y. County v. Republic of the Philippines*, 307 F. Supp. 3d 171 (S.D.N.Y. 2018), a sovereign is judicially estopped from taking a position contrary to one it consistently has taken: "The purpose of the doctrine is to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment, and because it is designed to prevent improper use of judicial machinery.'" *Id.* at 218 (quoting *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012)). Here, the Government devised, initiated, directed, and facilitated through a mandatory federal license the filing of the interpleader complaint and deposit of funds into the Court's registry. Judicial estoppel bars the Government from reversing course and seeking forfeiture of those funds while taking advantage of its written agreement with PacNet under which PacNet agreed not to sue OFAC and its officials for their unlawful actions in the designation of PacNet and the destruction of its lawful and highly regulated financial services business in Canada.

The Government devised the plan for the OFAC Interpleader and then entered into an agreement with PacNet dated September 19, 2017 that required the initiation of that proceeding. The Agreement was reviewed and approved by the DOJ, and, in the Agreement, OFAC promised

36

to delist PacNet, its subsidiary companies, and three individuals in exchange for PacNet's promise to release its claims against OFAC and to interplead certain funds owed to entities alleged to be in violation of the law by the United States. The Agreement also required PacNet to provide OFAC with a list of outstanding debts and liabilities to PacNet's former clients. On September 19, 2017, PacNet provided that list.

On October 6, 2017, OFAC provided written notice to PacNet in which it asserted that several former PacNet clients were suspected of having violated the law. But the Government recognized PacNet's innocent stakeholder status by directing PacNet to initiate the interpleader and issuing a license authorizing PacNet to transfer the entirety of the interpleader stake (i.e. $5,220,855.08) into the Court registry. On October 16, 2017, PacNet requested leave to deposit $5,220,855.08 into this Court's registry. OFAC Interpleader, Dkt. 2. The Government did not file an opposition or response of any kind to the motion, and, on October 18, 2017, Judge Garaufis granted the motion. *Id.*, Dkt. 7. In light of the Government's significant involvement in this matter and "to prevent improper use of judicial machinery," the Court should hold that the Government has waived any right to forfeit PacNet's funds. *See Republic of the Philippines*, 307 F. Supp. 3d at 218. Instead, any conflicting interests in the funds should be resolved in the pending OFAC Interpleader.

The Government's misuse of the forfeiture process should not be rewarded. Looking back on the course of the OFAC designation, the OFAC Interpleader, and this forfeiture actions suggests there was "coordinated action" by two U.S. government agencies to engage in "impermissible gamesmanship" which resulted in a "single integrated effort by [the Government] to circumvent the Constitution by making two coordinated stops," first the designation, then the demand for "forfeiture" in the form of an interpleader. *United States v. Gorman*, 859 F. 3d 706, 719 (9th Cir.

37

2017) (similar analysis in the context of seizure of property in second traffic stop that followed

initial unconstitutional stop). Indeed, the Government's clandestine tactics to seize property

subject to the Agreement and Judge Garaufis's Interpleader Deposit Order flies in the face of

simple fairness and well-established principles of contract:

> When the Government provides specifications directing how a contract is to be
> performed, the Government warrants that the contractor will be able to perform the
> contract satisfactorily if it follows the specifications. . . . It is quite logical to infer
> from the circumstances of one party providing specifications for performance that
> that party warrants the capability of performance.

*Hercules v. United States*, 516 U.S. 417, 425 (1996).

### D.       The Government's Actions Violated the U.S. Constitution.

In addition to the infirmities described above, paragraphs (c) through (g) of the Preliminary

Order should be struck because the Government's actions with respect to PacNet violated the Due

Process Clause of the U.S. Constitution.[24] In seizing and seeking to forfeit PacNet's property,

without notice, in a criminal proceeding to which PacNet is not a party, the Government has

violated PacNet's right to due process under the Fifth Amendment to the Constitution and

unreasonably seized PacNet's property in violation of the Fourth Amendment to the Constitution.

The Preliminary Order must therefore be amended such that paragraphs (c) through (g) be struck.

"[T]here cannot exist under the American flag any governmental authority untrammeled

by the requirements of due process of law as guaranteed by the Constitution of the United States."

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668 n.5 (1974). Only in "an

extraordinary situation" does "postponement of notice and hearing until after seizure . . . not deny

due process." *Id.* at 679-80. No such pre-seizure notice was given to PacNet here. To the contrary,

---

[24] It further constitutes a violation of the Constitution's prohibitions on excessive fines and double jeopardy to forfeit
PacNet's property as the Government previously has imposed unlawful punishment upon PacNet, resulting in the
closing and termination of a lawful and regulated commercial financial services enterprise.

the Government expressly agreed and directed that the OFAC Interpleader proceeding would be

the appropriate proceeding in which to resolve potentially competing claims to PacNet's property.

But the Government ultimately elected to violate its Agreement with PacNet and seized PacNet's

property without prior notice.

For a seizure without prior notice or hearing to be constitutionally permissible, three

elements must be satisfied:

> [First,] the seizure has been directly necessary to secure an important governmental
> or general public interest. Second, there has been a special need for very prompt
> action. Third, the State has kept strict control over its monopoly of legitimate force:
> the person initiating the seizure has been a government official responsible for
> determining, under the standards of a narrowly drawn statute, that it was necessary
> and justified in the particular instance.

*Id.* at 678. The Government cannot satisfy those elements here. There was no "special need for

very prompt action," nor was the seizure "directly necessary to secure an important governmental

or general public interest." In fact, over $2.6 million of the funds seized without prior notice were

deposited in the Court's registry in support of the OFAC Interpleader. It defies reason to suggest

that the Government needed to take "very prompt action" with respect to those funds entrusted to

the Court. The lack of notice the Government provided before seizing the property and before

filing the untimely bills of particulars and a request for a preliminary order of forfeiture therefore

violate the Due Process Clause.

Even more fundamentally, the Government has violated PacNet's due process rights by

seeking to forfeit PacNet's property in a criminal proceeding without charging PacNet of a crime,

much less convicting it. As the Supreme Court recently reiterated in *Nelson v. Colorado*: "Absent

conviction of a crime, one is presumed innocent," 137 S. Ct. 1249, 1252 (2017); therefore, absent

a valid conviction of an individual, it violates the Due Process Clause to criminally forfeit a

person's property. A court "may not presume a person, adjudged guilty of no crime, nonetheless

guilty *enough* for monetary exactions." *Id.* at 1256 (emphasis in original). Here, PacNet has not been adjudged guilty of any crime and so its property may not be forfeited in a criminal proceeding. To do otherwise would violate its due process rights.

Far from charging PacNet with a crime, much less convicting it, the Government has conceded that PacNet is not criminally culpable and cannot be a co-conspirator of Young. In fact, the Government has agreed that PacNet is a disinterested stakeholder in relation to funds contractually owed to companies associated with Young and many others, which is why the Government entered into the September 2017 Agreement and directed and licensed PacNet to initiate the OFAC Interpleader. *See Viscuso*, 569 F. Supp. 2d at 362–63. Under *Nelson*, the property of such an admittedly disinterested stakeholder cannot be forfeited in a criminal proceeding.

Indeed, based on its own interpretations of the law, the Government has violated the fundamental requirements of criminal forfeiture. The DOJ has explained criminal forfeiture to the U.S. Congress in the following manner: "Criminal forfeiture is an action against a defendant that includes notice of the intent to forfeit property in a criminal indictment. A criminal conviction is required, and forfeiture is part of the defendant's sentence."[25] But PacNet is not a criminal defendant. PacNet has not received notice through indictment or otherwise. PacNet has not been convicted. To the contrary, the Government after its investigation and review of documentary evidence and public record information has agreed that PacNet is an innocent, disinterested stakeholder, not a criminal actor.

Due process also requires the Court to allow PacNet to intervene and challenge the

---

[25] DOJ Statement for the Record before the Senate Judiciary Committee for a Hearing Entitled "The Need to Reform Asset Forfeiture" (April 15, 2015) at p. 3, available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/2015/10/06/doj_submission_for_the_record_re_asset_forfeiture_reform_act_15apr152_2_508_compliant.pdf (last visited Feb. 21, 2020) ("DOJ Statement").

Preliminary Order. As the Supreme Court has held: "It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.7 (1979). Furthermore, defendant Young does not have the same incentive as a third-party claimant to argue that property subject to forfeiture is not his or otherwise is not properly forfeitable. Regardless of its disposition, defendant Young will not end up with the property either way, and he potentially could obtain a windfall if the Government treats PacNet's assets as substitute property to satisfy Young's debt. Furthermore, although PacNet cannot be certain because much of the docket in this case is sealed— an issue that also infringes upon PacNet's due process rights—Young likely agreed in his plea agreement not to object to the forfeiture of the property identified by the Government. If Young were to honestly apprise the Court of the owners of the property identified in paragraphs (c) through (g), he may risk being accused by the Government of violating his plea agreement.

In addition, the Government's seizures of funds following the September 19, 2017 Agreement were unreasonable and thus in violation of the Fourth Amendment. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48-52 (1993) (finding that both the Fourth Amendment's prohibition upon unreasonable seizures and the Fifth Amendment's due process requirement restrict the Government's forfeiture authorities). The Government's *ex parte* seizures in September 2017 and December 2017 were built upon the unlawful September 22, 2016 designation and seizure of PacNet's funds and business. *Gorman*, 859 F. 3d at 719 (finding unreasonable seizure of property in second traffic stop that followed initial unconstitutional stop). The seizure and forfeiture proceedings here have been an exercise in gamesmanship, not reasonable seizures consistent with the Fourth Amendment and due process, and are yet another example of the "egregious and well-chronicled abuses" of forfeiture laws by government actors.

*Leonard v. Texas*, 137 S. Ct. 847, 847–48 (2017) (Thomas, J. concurring). The Government has

not even pursued the forfeiture in a linear or lawful manner. Indeed, the Government initially

attempted to forfeit PacNet's bank accounts through an administrative forfeiture. But when PacNet

objected to the administrative forfeiture, the Government failed to act. Rather than follow the civil

forfeiture law and pursue civil forfeiture in a civil proceeding, the U.S. Attorney's Office for the

Eastern District of New York sought to circumvent and bypass federal law by using the criminal

prosecution of Young to give a false air of legitimacy to the proceeding. As the DOJ has stated to

the U.S. Congress:

> Following seizure, **the government is required to send direct written notice of
> the administrative forfeiture proceeding to every person who appears to have
> an interest in the seized property and whose identity is known to the
> government.** To ensure notice to interested persons whose identities are not known
> to the government, the government publishes notice of the administrative forfeiture
> proceeding on a dedicated website www.forfeiture.gov. **If anyone files a claim
> with the administrative agency contesting the forfeiture, the agency refers the
> case to a United States Attorney's Office, which then has to decide whether to
> proceed with a judicial forfeiture action or to return the property.** If no claim
> is filed, the administrative forfeiture still is not finalized until it has been reviewed
> for legal sufficiency by agency counsel.

*See* DOJ Statement, *supra* note 25, at 4 (emphasis added). Here, the Government twisted the DOJ's

own guidance and failed to give PacNet the process it is due under federal law. Such

gamesmanship highlights not only the unconstitutional lengths the Government will go to in order

to forfeit PacNet's property, it also illustrates the need to enjoin the Government from seizing or

attempting to forfeit PacNet's property in the future. The Government simply cannot be trusted to

act evenhandedly and constitutionally with respect to PacNet.

Furthermore, the fact that the Government is now surreptitiously attempting to forfeit

PacNet's property in a criminal proceeding amounts, in effect, to malicious prosecution and double

jeopardy after already being subjected to criminal punishment within the meaning of the

Constitution when, without prior notice or opportunity to be heard, designated and labeled a "significant transnational criminal organization" "such as" Los Zetas and the Camorra or Italian Mafia by the Government without factual or legal cause, thereby closing its business operations and taking its property and all future earnings. OFAC Interpleader, Dkt. 1, ¶¶ 30-53. This is particularly true given that the Government mandated the OFAC Interpleader, directed that PacNet file it, licensed the transfer of funds, and did not oppose PacNet's motion to deposit the funds in the Court registry, but then reversed course, seized the funds, and attempted to forfeit them without due process. *See United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) ("[T]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and a prosecution brought with vindictive motive, penalizing those who choose to exercise constitutional rights, would be patently unconstitutional.").

### E.    Any Forfeiture of the PacNet Accounts Cannot Exceed Money Judgment

Finally, even to the extent that the Government could reach Petitioners' property (and it cannot), it would be limited to the total amount of the $1.5 million money judgment entered against Young minus the amounts already paid to satisfy that judgment. Such judgment should reflect the defendant's total forfeiture liability arising from the offense of conviction.[26] This Court has found, based on the Government's submission and agreement with defendant Young, that the total amount of defendant Young's forfeiture liability is $1,500,000. The Preliminary Order provides as follows:

> Pursuant to 18 U.S.C. § 981(a)(l)(C), 28 U.S.C. § 2641(c) and 21 U.S.C. § 853(p), the defendant shall forfeit to the United States the full amount of the Forfeiture Money Judgment and all right, title and interest in the Subject Assets. The forfeiture of the Seized Sussex Accounts, the Seized TD Bank Accounts and the Substitute Funds will be credited towards the Forfeiture Money Judgment. Further, Six Hundred Thirty-Two Thousand Four Hundred and Thirty Dollars and Zero Cents ($632,430.00) of the Administratively Forfeited Funds will be credited towards the Forfeiture Money Judgment.

---

[26] *See, e.g., United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010); *United States v. Ginsburg*, 773 F.2d 798, 802 (7th Cir. 1985); *United States v. Casey*, 444 F.3d 1071, 1073-77 (9th Cir. 2006).

43

Preliminary Order at 3.

Thus, per the terms of the Preliminary Order, Young has already forfeited $576,943,43[27] of his own funds and property and had an additional $632,430.00 in funds seized from Ercan Barka credited against his money judgment. That leaves just $290,626.57 still outstanding and represents the upper limit of what the Government is entitled to seize from the PacNet Accounts even if it could meet its burden of demonstrating forfeitability (which it has failed to do and cannot).

## IV. CONCLUSION

For the reasons set forth above, the Court should strike paragraphs (c) through (g) from the Preliminary Order and order that the property identified in those paragraphs be deposited in the interpleader account maintained in the Court's registry in Case No. 17-cv-6027 (E.D.N.Y.) in sufficient amount to satisfy the terms of the Government's September 2017 agreement with PacNet and that any remaining funds be returned to the Petitioners. Petitioners further respectfully request that the Court (1) bar the Government from further action or seizure against the subject funds outside the context of recovery through the OFAC Interpleader and (2) award attorneys' fees and expenses pursuant to 28 U.S.C. § 2412 and other available provisions of federal law.

Dated: February 28th, 2020

A. Jeff Ifrah
jeff@ifrahlaw.com
George R. Calhoun (*pro hac vice* to be filed)
George@ifrahlaw.com
IFRAH LAW
1717 Pennsylvania Ave., NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 524-4142

*Counsel for Petitioners*

---

[27] This amount consists of $238,638.37 seized from Young's accounts ($17,726.25 + $8,110.50 + $85,309.14 + $48,953.80 + $73,332.93) plus the value of Young's property ($338,305.06) plus $632,430.00 seized from his alleged co-conspirator Ercan Barka for a total of $1,209,373.43.

44

## CERTIFICATE OF SERVICE

I hereby certify that, on February 28th, 2020, I caused a copy of the foregoing to be filed in person with the Clerk of the Court.

I further certify that, as required by the Notice of Forfeiture, a copy of this document will be transmitted by United States mail to the following:

Christopher Charles Caffarone
610 Federal Plaza
Central Islip, NY 11722
*Counsel for United States*

Tanisha Payne
United States Attorney's Office, Eastern District of New York
271 Cadman Plaza East
7th Floor
Brooklyn, NY 11201
*Counsel for United States*

James G. McGovern
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
*Counsel for Defendant Ryan Young*

_____
A. Jeff Ifrah

# VERIFICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing Petition is true and correct.

Executed this 27th day of February 2020

_____
BILL LEONG [Accountant]
[On behalf of PacNet Services, Chexx, and Accu-Rate]

**Kayla Strong**
Barrister and Solicitor
Nathanson Schachter & Thompson LLP
750 - 900 Howe Street
Vancouver, BC V6Z 2M4

46