# EXHIBIT 1

3rd March, 2020

Federal Reserve Consumer Help
PO Box 1200
Minneapolis, MN
55480 U.S.A.


Dear Sirs

Re: The Payments Factory LLC and Chexx (Americas) Inc
Routing 263191387
Account Number 0000147703996

and

Ms Lizzy DeSierra
Truist Bank
200 W Forsyth St
Jacksonville, FL
32202 USA

I have been corresponding and speaking with BB&T (now Truist Bank) about this matter for over two years. The bank has assigned a person to deal with it who seems to be incapable of writing clear instructions in English. The bank has asked me to travel (from Europe) to the branch in order to resolve the matter in person, but when I ask them to specify what documents they need, I cannot get a clear answer. I think that they have sufficient.

The Payments Factory LLC, my company, held the above account at the Forsyth St branch of BB&T. Activity in the account was ended on or about 22nd September, 2016, and the last known balance was USD $303,677.41. I would like to retrieve these funds and have them paid to the credit of the rightful owner.

I have sought assistance from our legal department and I request that you copy all communications to generalcounsel@pacnetservices.com. Dr Davis, General Counsel, will assist me from here onwards and I instruct that communications from him should be treated with equal authority as communications from me.

In April 2019 Ms deSierra wrote to me that the bank would need to have:

· Court order documenting business name change and new ownership
· Certified documentation naming authorized signor(s) for the business
· Government issued identification for the individual(s) named as signor(s)

This is abundantly unclear and unhelpful. First, there is no court order for a merger of the nature which ended the life of The Payments Factory LLC. It was, as I will demonstrate below, achieved through the Secretary of State for Delaware without Court involvement. Secondly, Ms deSierra does not say which

business she wants "certified documentation", or what that documentation exactly is. Thirdly, she already has my government issued identification among the account opening documents.

As this was not clear I requested further instructions and Ms deSierra wrote that she would like:

> …proof of ownership for authentication purposes will need to be presented by the account owners for the business name as was designated at time of account opening."

This latter instruction was impossible to understand, however in the interests of moving forward I provided the bank the following description and attach a package of exhibits, which is now attached hereto also.

1) The Payments Factory LLC was merged into Chexx Americas Inc, a Delaware Corporation, on December 31, 2013. **Exhibit 1, Agreement of Plan and Merger.**
2) As you know I was the authorized signer on the above account. My current "government ID" is attached. **Exhibit 2, Maria Sara Abanto Rojas Passport.**
3) On February 6, 2014, the cessation of The Payments Factory LLC was accepted by the government of Florida. **Exhibit 3, Print-out of Florida Secretary of State Information.**
4) On December 12, 2013, I was made a Director of Chexx (Americas) Inc. **Exhibit 4, Chexx (Americas) Inc Board Resolution.**
5) Chexx (Americas) Inc remains in existence in Delaware, and as such is the rightful owner of the account and the funds therein. **Exhibit 5, Delaware Secretary of State Information.**
6) Chexx (Americas) Inc intends to dissolve, and to this end I am no longer a Director. The sole officer, director and member of Chexx (Americas) Inc is Rosanne Phyllis Day. **Exhibit 6, Rosanne Phyllis Day passport, and Exhibit 7, Delaware Franchise Tax Return.**

I was completely unable to understand from Ms DeSierra's communications, above, which documents she wished to have, what she wanted certified, or by whom.

At this point I engaged our legal department, and Ms DeSierra wrote directly to Dr Davis to invite him to communicate with her. When he did so, however, she wrote back that there was no authorization "on the bank's forms" for Dr Davis to speak on behalf of the account owner. Dr Davis wrote back to her requesting "the bank's forms" to be sent to me, but Ms DeSierra did not respond or oblige me with the forms.

The position remains, however, that the bank is not entitled to retain these funds and the account should be closed. We are happy to accept a bank draft payable to any of:

The Payments Factory LLC (the original account holder)
Maria Sara Abanto Rojas (the original account signatory)
Chexx (Americas) Inc (the residual beneficiary) or
Rosanne Phyllis Day (the sole shareholder of Chexx (Americas) Inc.
IfrahLaw PLLC (US Attorneys for Chexx (Americas) Inc).

We have begged the bank, over a period of more than two years now, to simply tell us exactly what they want. They seem incapable of doing so. We have asked if Ms DeSierra has difficulty communicating in English (we are both fluent in several other languages) or if a translator could help. There has been no response to this offer.

At this point it seems there is nothing more I can do, the bank appears to be stonewalling without justification and I cordially request the help of the Federal Reserve to break the deadlock. I am prepared to travel to Jacksonville as the bank has suggested, but only if it is clear that the documents I carry will be sufficient for the bank and the matter will be resolved, so that I don't waste an expensive journey and my vacation time.

Yours truly,

M Sara Abanto Rojas

# AGREEMENT AND PLAN OF MERGER

BY AND AMONG

CHEXX (AMERICAS) INC.,
[Delaware Corporation Number 4489236]

and

CUSTOMER SERVICE INTERNATIONAL INC;
[Delaware Corporation Number 4461018]

THE PAYMENTS FACTORY LLC (NEVADA);
[Nevada LLC Entity Number E0405472008-6]

ARROWHEAD SERVICES INC;
[Delaware Corporation Number 4624613]

CHEXX INC LTD;
[Delaware Corporation Number 4711340]

XIPORT SERVICES LLC;
[New Hampshire LLC ID Number 605800]

YAPSTONES, INC;
[Delaware Corporation Number 4437092]

THE PAYMENTS FACTORY LLC (FLORIDA).
[Florica LLC Document Number L09000083658]

Dated DECEMBER 31, 2013

1

**CONTENTS**

ARTICLE I: THE MERGER ....................................................................................... 4

SECTION 1.01. The Merger. ................................................................................. 4

SECTION 1.02. Consummation of the Merger. ...................................................... 5

SECTION 1.03. Effects of the Merger. .................................................................. 5

SECTION 1.04. Certificate of Incorporation and Bylaws. ...................................... 5

SECTION 1.05. Directors and Officers. ................................................................. 5

SECTION 1.06. Cancellation of Shares. ................................................................ 5

SECTION 1.07. Withholding Taxes. ...................................................................... 6

SECTION 1.08. Subsequent Actions. ..................................................................... 6

ARTICLE II: PAYMENT FOR SHARES ................................................................. 6

SECTION 2.01. Payment for Shares. ..................................................................... 6

SECTION 2.02. Closing of the Companies' Transfer Books. ................................. 6

ARTICLE III: REPRESENTATIONS AND WARRANTIES OF THE COMPANIES .......... 6

SECTION 3.01. Organization and Qualification. ................................................... 7

SECTION 3.02. Capitalization. .............................................................................. 7

SECTION 3.03. Authority for this Agreement; Board Action. ............................... 7

SECTION 3.04. Consents and Approvals; No Violation. ....................................... 8

SECTION 3.05. Litigation. ..................................................................................... 9

SECTION 3.06. Anticorruption. ............................................................................. 9

SECTION 3.07. State Takeover Statutes Inapplicable; Rights Agreement. ........... 10

SECTION 3.08. No Reliance. ................................................................................. 10

ARTICLE IV: REPRESENTATIONS AND WARRANTIES OF PARENT ...................... 10

SECTION 4.01. Organization. ............................................................................... 10

SECTION 4.02. Authority for this Agreement. ...................................................... 11

SECTION 4.03. Consents and Approvals; No Violation. ....................................... 11

SECTION 4.04. Sufficient Funds. .......................................................................... 12

SECTION 4.05. Litigation. ..................................................................................... 12

SECTION 4.06. No Reliance. ................................................................................. 12

ARTICLE V: COVENANTS .................................................................................... 12

SECTION 5.01. Conduct of Business of the Companies. ....................................... 12

SECTION 5.02. Access to Information. .................................................................. 12

SECTION 5.03. Takeover Laws. ...................................................................... 13

SECTION 5.04. Parent Approval. ................................................................... 13

SECTION 5.05. Control of Operations. ........................................................... 13

SECTION 5.06. Certain Transfer Taxes. ......................................................... 13

ARTICLE VI: CONDITIONS TO CONSUMMATION OF THE MERGER ..................... 13

SECTION 6.01. Conditions to Each Party's Obligation To Effect the Merger. ................ 13

ARTICLE VII: TERMINATION; AMENDMENT; WAIVER ........................................... 14

SECTION 7.01. Termination. ......................................................................... 14

SECTION 7.02. Effect of Termination. ............................................................ 14

SECTION 7.03. Fees and Expenses. ............................................................... 15

SECTION 7.04. Amendment. ......................................................................... 15

SECTION 7.05. Extension; Waiver; Remedies. .................................................. 15

ARTICLE VIII: MISCELLANEOUS ...................................................................... 15

SECTION 8.01. Entire Agreement; Assignment. ............................................... 15

SECTION 8.02. Severability. ......................................................................... 16

SECTION 8.03. Enforcement of the Agreement; Jurisdiction; Certain Limitations. ......... 16

SECTION 8.04. Notices. ............................................................................... 17

SECTION 8.05. Governing Law. ..................................................................... 18

SECTION 8.06. Descriptive Headings. ............................................................ 18

SECTION 8.07. Parties in Interest. ................................................................. 18

SECTION 8.08. Counterparts. ....................................................................... 18

SECTION 8.09. Interpretation. ....................................................................... 18

SECTION 8.10. Nonsurvival of Representations and Warranties. ......................... 19

ARTICLE IX: NOTIFICATIONS .......................................................................... 19

SECTION 9.1: United States Internal Revenue Service ...................................... 19

SECTION 9.2: State Tax Authorities ............................................................... 19

SECTION 9.3: Registered Agents ................................................................... 19

SECTION 9.4: State Registrations .................................................................. 20

# AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "Agreement") is made and entered into as of December 31, 2013, by and among CHEXX (AMERICAS) INC., a Delaware corporation ("Parent"), and the following seven entities (the "Companies") CUSTOMER SERVICE INTERNATIONAL INC a Delaware Corporation; THE PAYMENTS FACTORY LLC a Nevada LLC; ARROWHEAD SERVICES INC a Delaware Corporation; CHEXX INC LTD a Delaware Corporation; XIPORT SERVICES LLC a New Hampshire LLC; YAPSTONES, INC a Delaware Corporation; THE PAYMENTS FACTORY LLC a Florida LLC.

## RECITALS

WHEREAS, the Boards of Directors and Members of the Companies have unanimously determined that this Agreement and the transactions contemplated hereby, including the Merger (as defined below), are advisable and fair to, and in the best interests of, the Companies and their Members or Shareholders;

WHEREAS, the Boards of Directors of the Companies or Members have unanimously adopted resolutions approving the execution of this Agreement and the consummation of the transactions contemplated hereby and recommending that the Companies' Members or Owners adopt the agreement of merger (as such term is used in Section 251 of the Delaware General Corporation Law (the "Corporation Law")) contained in this Agreement;

WHEREAS, the Board of Directors of Parent has approved and declared advisable and in the best interests of Parent this Agreement and the transactions contemplated hereby, including the Merger, and the Board of Directors has determined that this Agreement and the transactions contemplated hereby, including the Merger, are fair to and in the best interests of its Shareholders;

WHEREAS, Parent and the Companies desire to make certain representations, warranties, covenants and agreements in connection with this Agreement;

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I: THE MERGER

### SECTION 1.01. The Merger.

Upon the terms and subject to the conditions set forth herein, and in accordance with the relevant provisions of the Corporation Law, the Companies shall be merged into the Parent, following the satisfaction or, to the extent permitted by applicable Law (as defined below), waiver of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing (as defined below) but subject to their satisfaction or, to the extent permitted by applicable Law, waiver, at the Closing) or on such other day as the parties may mutually agree. The Parent shall be the surviving corporation in the Merger (the "Surviving Corporation") under the name "Chexx (Americas) Inc." and shall continue its existence under the Law of the State of Delaware.

4

### SECTION 1.02. Consummation of the Merger.

Upon the terms and subject to the conditions set forth herein, Parent and the Companies shall cause the Merger to be consummated by filing with the Secretary of State of the State of Delaware a duly executed certificate of merger (the "Certificate of Merger"), as required by the Corporation Law, which may specify the date and time mutually agreed by the parties at which the Merger will become effective, and the parties shall take all such further actions as may be required by applicable Law to make the Merger effective. Prior to the filing referred to in this Section 1.02, a closing (the "Closing") will be held at the offices of Chexx (Americas) Inc, 6th Floor, 595 Howe St, Vancouver, Canada (or such other place as the parties may mutually agree) for the purpose of confirming all the matters contained herein. The Merger shall become effective at such time as the Certificate of Merger is duly filed with the Secretary of State of the State of Delaware, or at such later time as the parties shall agree and as shall be set forth in the Certificate of Merger (such time as the Merger becomes effective is referred to in this Agreement as the "Effective Time").

### SECTION 1.03. Effects of the Merger.

The Merger shall have the effects set forth herein and in the applicable provisions of the Corporation Law. Without limiting the generality of the foregoing, at the Effective Time, all the property, rights, privileges, powers and franchises of the Companies shall vest in the Surviving Corporation, and all debts, liabilities and duties of the Companies shall become the debts, liabilities and duties of the Surviving Corporation, all as provided under the applicable Laws of the State of Delaware.

### SECTION 1.04. Certificate of Incorporation and Bylaws.

The Certificate of Incorporation of Parent (the "Certificate of Incorporation") is unchanged by virtue of the Merger and shall be the certificate of incorporation of the Surviving Corporation until thereafter amended as permitted by Law and this Agreement. A copy is attached hereto for reference purposes only. The Bylaws of the Parent (the "Bylaws"), as in effect immediately prior to the Effective Time, are unchanged in their entirety shall be the bylaws of the Surviving Corporation until thereafter amended as permitted by Law and this Agreement.

### SECTION 1.05. Directors and Officers.

The Directors and Officers of the Parent immediately prior to the Effective Time shall be the directors and officers, respectively, of the Surviving Corporation until their respective death, permanent disability, resignation or removal or until their respective successors are duly elected and qualified.

### SECTION 1.06. Cancellation of Shares.

At the Effective Time, by virtue of the Merger and without any action on the part of the Companies, all shares, stock or other ownership instruments in the Companies shall be cancelled without any consideration being exchanged therefor except for the payment of a sum equal to three times the 2013 net post-tax income of the Companies in respect of all except Customer Service International Inc and The Payments Factory LLC (Nevada) (the "Merger Consideration"). No consideration is payable or shall be paid in respect of Customer Service International Inc or The Payments Factory LLC (Nevada) as these two entities are wholly owned subsidiaries of the Parent. At the Effective Time all such Shares shall no

longer be outstanding and shall automatically be cancelled and shall cease to exist, and each holder of such Shares shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration as provided herein. The Merger Consideration shall be paid directly to PacNet Holdings Ltd of Shannon, Co Clare, Ireland, which is the ultimate beneficial owner of the applicable Companies.

### SECTION 1.07. <u>Withholding Taxes.</u>

Parent and the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as are required to be withheld and paid over to the applicable Governmental Entity (as defined below) under the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), or any applicable provision of state, local or foreign Tax Law. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Shares in respect of which such deduction and withholding was made.

### SECTION 1.08. Subsequent Actions.

If, at any time after the Effective Time, the Surviving Corporation shall consider or be advised that any deeds, bills of sale, assignments, assurances or any other actions or things are necessary or desirable to continue, vest, perfect or confirm of record or otherwise the Surviving Corporation's right, title or interest in, to or under any of the rights, properties, privileges, franchises or assets of the Companies as a result of, or in connection with, the Merger, or otherwise to carry out the intent of this Agreement, the officers and directors of the Surviving Corporation shall be authorized to execute and deliver, in the name and on behalf of the Companies, all such deeds, bills of sale, assignments and assurances and to take and do, in the name and on behalf of the Companies or otherwise, all such other actions and things as may be necessary or desirable to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties, privileges, franchises or assets in the Surviving Corporation or otherwise to carry out the intent of this Agreement.

## ARTICLE II: PAYMENT FOR SHARES

### SECTION 2.01. Payment for Shares.

(a) Within three calendar months following the Effective Time, the Parent shall make payment by Wire Transfer or Check, consideration for the shares or ownership portions of the Companies, as detailed above, directly to the Ultimate Beneficial Owner of the Companies. The calculation of the exact amounts payable will be based on the final tax filings of the companies with the United States Internal Revenue Service.

### SECTION 2.02. Closing of the Companies' Transfer Books.

At the Effective Time, the stock transfer books of the Companies shall be closed and no transfer of Shares shall thereafter be made.

## ARTICLE III: REPRESENTATIONS AND WARRANTIES OF THE COMPANIES

The Companies represent and warrant to Parent as follows:

### SECTION 3.01. Organization and Qualification.

The Companies are (a) a duly organized and validly existing entity in good standing (to the extent such concepts are recognized in the applicable jurisdiction) under the Law of jurisdiction of incorporation, (b) with all corporate power and authority to own properties and conduct business as currently conducted and are duly licensed, qualified and in good standing as a foreign corporation authorized to do business in each of the jurisdictions in which the character of the properties owned or held under lease by it or the nature of the business transacted by them makes such qualification necessary. The Companies have heretofore made available to Parent copies that are true, correct and complete of the Certificates of Incorporation and Bylaws of the Companies as in effect as of the date of this Agreement.

### SECTION 3.02. <u>Capitalization</u>.

(a) There are on the date hereof no outstanding (i) securities of the Companies convertible into or exchangeable for shares of capital stock or voting securities or ownership interests in the Companies, (ii) options, warrants, rights or other agreements or commitments to acquire from the Companies, or obligations of the Companies to issue, any capital stock, voting securities or other equity ownership interests in (or securities convertible into or exchangeable for capital stock or voting securities or other equity ownership interests in) the Companies, (iii) obligations of the Companies to grant, extend or enter into any subscription, warrant, right, convertible or exchangeable security or other similar agreement or commitment relating to any capital stock, voting securities or other ownership interests in the Companies or (iv) obligations (excluding Taxes and other fees) by the Companies to make any payments based on the market price or value of the Shares. As of the date of this Agreement, none of the Companies has outstanding obligations to purchase, redeem or otherwise acquire any Company Securities.

### SECTION 3.03. Authority for this Agreement; Board Action.

(a) The Companies have all necessary corporate power and authority to execute and deliver this Agreement and, subject to the adoption of the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement by the holders of a majority of the outstanding Shares prior to the consummation of the Merger and the filing of the Certificate of Merger with the Secretary of State of Delaware, to consummate the transactions contemplated hereby and to perform their obligations hereunder. The execution and delivery of this Agreement, including the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement, by the Companies and the consummation by the Companies of the transactions contemplated hereby, including the Merger, have been duly and validly authorized by the Boards of Directors or Members of the Companies and no other corporate proceedings on the part of the Companies are necessary to authorize this Agreement or to consummate the transactions contemplated hereby or to perform their obligations hereunder, other than, with respect to completion of the Merger, the adoption of the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement by the holders of a majority of the outstanding Shares prior to the consummation of the Merger and the filing of the Certificate of Merger with the Secretary of State of Delaware. This Agreement has been duly and validly executed and delivered by the Companies and, assuming this Agreement constitutes the legal, valid and binding agreement of the Parent , constitutes a legal, valid and binding agreement of the Companies, enforceable against the Companies in accordance with its terms, except that

(i) such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally and (ii) equitable remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(b) The Companies' Members or Boards of Directors (at a meeting or meetings duly called and held) have unanimously (i) determined that the Merger is advisable and fair to and in the best interests of, the stockholders of the Companies, (ii) approved and declared advisable this Agreement, including the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement, and (iii) resolved to recommend the adoption of the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement by the stockholders of the Companies (the "Company Board Recommendation").

## SECTION 3.04. Consents and Approvals; No Violation.

Neither the execution, delivery and performance of this Agreement by the Companies, the consummation of the transactions contemplated hereby, nor the compliance by the Companies with any of the provisions hereof will (a) violate or conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws of the Companies (b) require any material consent, approval, authorization or permit of, or filing with or notification to, any supranational, national, foreign, federal, state or local government or subdivision thereof, or governmental, judicial, legislative, executive, administrative or regulatory authority, agency, commission, tribunal or body (a "Governmental Entity"), (c) violate, conflict with, or result in a breach of any provision of, or require any consent, waiver or approval or result in a default or loss or reduction of any rights (or give rise to any right of termination, cancellation, modification or acceleration, or trigger any requirement or option for additional consideration, or any event that, with the giving of notice, the passage of time or otherwise, would constitute a default or loss or reduction of any rights or give rise to any such right) under any of the terms, conditions or provisions of any note, license, agreement, contract, indenture or other instrument or obligation to which the Companies are a party or by which the Companies or any of their respective assets may be bound, (d) result (or, with the giving of notice, the passage of time or otherwise, would result) in the creation or imposition of any Lien on any asset of the Companies or (e) violate any Law or Order (as defined below) applicable to the Companies or by which any of their respective assets are bound.

(b) The unaudited financial statements (including the related notes thereto) of the Companies have been prepared (or when so filed will be) in accordance with U.S. generally accepted accounting principles applied on a consistent basis ("GAAP") throughout the periods involved (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments set forth therein including the notes thereto) and fairly present in all material respects the consolidated financial position of the Companies as of their respective dates, and the consolidated income, stockholders equity, results of operations and changes in consolidated financial position or cash flows for the periods presented therein (except as may be set forth therein or in the notes thereto).

(c) The Companies have implemented and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

(d) Since July 1, 2001 through the date of this Agreement, to the knowledge of the Companies, (i) none of the Companies or any director, officer, or auditor of the Companies has received, or otherwise had or obtained knowledge of, any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of the Companies or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that the Companies have engaged in questionable accounting or auditing practices and (ii) no attorney representing the Companies, whether or not employed by the Companies has reported evidence of a breach of fiduciary duty or similar violation by the Companies or any of its officers, directors, employees or agents to the Board of Directors of the Companies or any committee thereof or to any director or officer of the Companies.

## SECTION 3.05. <u>Litigation</u>.

There is no complaint, claim, action, suit, litigation, proceeding or governmental or administrative investigation (each, an "<u>Action</u>") pending or, to the knowledge of the Companies, threatened against or relating to the Companies and none of the Companies have received notice of any Action). None of the Companies is subject to any outstanding Order.

SECTION 3.06. <u>Tax Matters</u>. Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect:

(a) The Companies have timely filed all federal, state, local and foreign Tax returns, estimates, information statements and reports relating to any and all Taxes of the Companies or their respective operations (the "<u>Returns</u>") required to be filed by applicable Law by the Companies as of the date hereof. All such Returns are true, correct and complete, and the Companies have timely paid all Taxes attributable to the Companies that were due and payable by them without regard to whether such Taxes have been assessed, except in each case with respect to matters contested in good faith or for which adequate reserves have been established.

(b) As of the date of this Agreement, there is no written claim or assessment pending or, to the knowledge of the Companies, threatened in writing against the Companies for any alleged deficiency in Taxes of the Companies, and there is no audit or investigation with respect to any liability of the Companies for Taxes. None of the Companies has granted any extension of the period of limitations for the assessment or collection of any Tax of the Companies for any taxable period that remains open to assessment.

(c) For purposes of this Agreement, "<u>Tax</u>" or, collectively, "<u>Taxes</u>" shall mean any and all U.S. federal, state, local and non-U.S. taxes, assessments and other governmental charges, duties (including stamp duty), impositions and Liabilities, including capital gains tax, taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, escheat, excise and property taxes as well as public imposts, fees and social security charges (including health, unemployment, workers' compensation and pension insurance), together with all interest, penalties, and additions imposed by a Governmental Entity with respect to such amounts.

## SECTION 3.06. <u>Anticorruption</u>.

(a) Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, None of the Companies

9

n(including any of their officers, directors, agents, distributors, employees, or other Persons acting on their behalf) has, directly or indirectly, taken any action that would cause the Companies or any Company Subsidiary to be in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>"), or any other anticorruption or anti-bribery Laws applicable to the Companies or any Company Subsidiary (collectively with the FCPA, the "<u>Anticorruption Laws</u>").

(b) None of the Companies (including any of their officers, directors, agents, distributors, employees, or other Persons acting on their behalf) has taken any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of the payment, directly or indirectly, of any gift, money or anything of value to a Government Official (as defined below) to secure any improper advantage (e.g., to obtain a Tax rate lower than allowed by Law) or to obtain or retain business for any Person in violation of applicable Law.

(c) As of the date of this Agreement, to the knowledge of the Companies, (i) there is no investigation of or request for information from the Companies or any Subsidiary by any Governmental Entity regarding the Anticorruption Laws, and (ii) there is no other allegation, investigation or inquiry by any Governmental Entity regarding the Companies or any Subsidiary's actual or possible violation of the Anticorruption Laws.

(d) For purposes of this Agreement, "<u>Government Official</u>" means any (i) officer or employee of a Governmental Entity or instrumentality thereof (including any state-owned or controlled enterprise) or of a public international organization, (ii) political party or official thereof or any candidate for any political office or (iii) any Person acting for or on behalf of any such Governmental Entity or instrumentality thereof.

## SECTION 3.07. State Takeover Statutes Inapplicable; Rights Agreement.

Section 203 of the Corporation Law is inapplicable to and, to the knowledge of the Companies, no other Takeover Law is applicable to, the Merger and the other transactions contemplated hereby. As of the date of this Agreement, the Companies do not have in effect any "poison pill" or shareholder rights plans.

## SECTION 3.08. No Reliance.

Any other provision of this Agreement notwithstanding, the Companies acknowledges and agrees that (a) neither Parent nor any Person on behalf of Parent is making any representations or warranties whatsoever, express or implied, beyond those expressly made by Parent  in this Agreement and (b) the Companies have not been induced by, or relied upon, any representations, warranties or statements (written or oral), whether express or implied, made by any Person, that are not expressly set forth in this Agreement.

## ARTICLE IV: REPRESENTATIONS AND WARRANTIES OF PARENT

Parent  represents and warrants to the Companies as follows:

## SECTION 4.01. Organization.

Parent  is a duly organized and validly existing corporation in good standing under the Law of the jurisdiction of its organization and has all requisite corporate or similar power

and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect (as defined below).

### SECTION 4.02. Authority for this Agreement.

Parent has all requisite corporate power and authority to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. The execution and delivery of this Agreement, including the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement, by Parent  and the consummation by Parent  of the transactions contemplated hereby, including the Merger, have been duly and validly authorized by the Board of Directors of Parent  and no other corporate proceedings on the part of Parent are necessary to authorize this Agreement or to consummate the transactions contemplated hereby or to perform their obligations hereunder, other than, with respect to completion of the Merger, the adoption of the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement and the filing of the Certificate of Merger with the Secretary of State of Delaware. This Agreement has been duly and validly executed and delivered by Parent  and, assuming this Agreement constitutes the legal, valid and binding agreement of the Companies, constitutes a legal, valid and binding agreement of Parent , enforceable against Parent  in accordance with its terms, except that (a) such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally and (b) equitable remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

### SECTION 4.03. Consents and Approvals; No Violation.

Neither the execution, delivery and performance of this Agreement by Parent, the consummation of the transactions contemplated hereby, nor the compliance by Parent  with any of the provisions hereof will (a) violate or conflict with or result in any breach of any provision of the respective certificates of incorporation or bylaws (or other similar governing documents) of Parent, (b) require any material consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, (c) violate, conflict with or result in a breach of any provision of, or require any consent, waiver or approval or result in a default or loss or reduction of any rights (or give rise to any right of termination, cancellation, modification or acceleration, or trigger any requirement or option for additional consideration, or any event that, with the giving of notice, the passage of time or otherwise, would constitute a default or loss or reduction of any rights or give rise to any such right) under any of the terms, conditions or provisions of any note, license, agreement, contract, indenture or other instrument or obligation to which Parent or any of their respective Subsidiaries is a party or by which Parent or any of their respective assets may be bound, (d) result (or, with the giving of notice, the passage of time or otherwise, would result) in the creation or imposition of any Lien on any asset of the Companies, or (e) violate any Law or Order applicable to Parent or by which any of their respective assets are bound.

11

SECTION 4.04. **Sufficient Funds**.

      Parent has available and will have available at the Effective Time, the funds necessary to pay for the Shares and to consummate the Merger and the other transactions described herein.

SECTION 4.05. **Litigation**.

      As of the date hereof, there is no Action seeking to prohibit or materially delay the transaction contemplated by the Agreement including the Merger, that is pending or, to the knowledge of Parent, threatened against Parent (and Parent has not received notice of any such Action).

SECTION 4.06. **No Reliance**.

      Any other provision of this Agreement notwithstanding, Parent acknowledges and agrees that (a) None of the Companies nor any Person on behalf of the Companies is making any representations or warranties whatsoever, express or implied, beyond those expressly made by the Companies in this Agreement and (b) Parent has not been induced by, or relied upon, any representations, warranties or statements (written or oral), whether express or implied, made by any Person, that are not expressly set forth in this Agreement. Without limiting the generality of the foregoing, Parent acknowledges that no representations or warranties are made with respect to any projections, forecasts, estimates or budgets with respect to the Companies.

## ARTICLE V: COVENANTS

### SECTION 5.01. Conduct of Business of the Companies.

      Except (a) as expressly permitted or required by this Agreement, or (b) as may be agreed in writing by Parent (which consent shall not be unreasonably withheld), during the period from the date of this Agreement to the Effective Time, the Companies will conduct its business and operations according to its ordinary and usual course of business consistent with past practice and the Companies will use their reasonable best efforts to preserve intact their business organizations, to keep available the services of its current officers or employees who are integral to the operation of their businesses as presently conducted and to preserve the goodwill of and maintain satisfactory relationships with those Persons having significant business relationships with the Companies.

### SECTION 5.02. Access to Information.

      (a) From and after the date of this Agreement, subject to the requirements of applicable Law, the Companies will (i) give Parent and their authorized Representatives reasonable access (during regular business hours upon reasonable notice) to all books, contracts, commitments and records (including Tax returns) of the Companies and instruct the Companies' independent public accountants to provide access to their work papers and such other information as Parent may reasonably request, (ii) permit Parent to make such inspections as they may reasonably require, and (iii) cause its officers and those of its Subsidiaries to furnish Parent with such financial and operating data and other information with respect to the business, properties and personnel of the Companies as Parent may from time to time reasonably request; provided, that nothing herein shall obligate the Companies to

incur costs and time to produce such information outside of the ordinary course of business; provided, further, that nothing in this Agreement shall require the Companies to permit any inspection or disclose any information to Parent that would cause a violation of any Allowed Contract, would cause a risk of a loss of privilege to the Companies, would constitute a violation of applicable Laws, that is competitively sensitive information or to permit the other party or any of its Representatives to perform any onsite procedure with respect to any of its properties; provided, further, that the Companies shall take any and all reasonable action necessary to permit such disclosure without such loss of privilege or violation of agreement or Law. Parent hereby agrees that it shall treat any such information in accordance with the Confidentiality Agreement. Notwithstanding any provision of this Agreement to the contrary, the Companies shall not be obligated to grant any access or make any disclosure in violation of applicable Laws or regulations or if it would unreasonably interfere with the conduct of the Companies' business. The Confidentiality Agreement shall survive any termination of this Agreement.

(b) Information obtained by Parent pursuant to Section 5.02(a) shall not prejudice any of Parent's rights or remedies.

### SECTION 5.03. Takeover Laws.

The Companies shall take all reasonable steps to exclude the applicability of, or to assist in any challenge by Parent to the validity or applicability to the Merger or any other transaction contemplated by this Agreement of, any Takeover Laws.

### SECTION 5.04. Parent Approval.

Immediately following the execution of this Agreement, Parent shall execute and deliver, in accordance with Section 228 of the Corporation Law a written consent adopting the agreement and plan of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement.

### SECTION 5.05. Control of Operations.

Nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Companies' operations prior to the Effective Time. Prior to the Effective Time, the Companies shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over their operations.

### SECTION 5.06. Certain Transfer Taxes.

Parent shall pay the amount of any documentary, sales, registration, value-added, transfer, stamp, recording and other similar Taxes, fees, and costs together with any interest thereon, penalties, fines, costs, additions to Tax or additional amounts with respect thereto, imposed in connection with this Agreement or the Merger.

## ARTICLE VI: CONDITIONS TO CONSUMMATION OF THE MERGER

### SECTION 6.01. Conditions to Each Party's Obligation To Effect the Merger.

The respective obligations of the parties to effect the Merger shall be subject to the satisfaction at or prior to the Effective Time of the following conditions:

13

(a) Requisite Stockholder Approval. The Requisite Stockholder Approval shall have been obtained.

(b) No Injunctions or Restraints; Illegality. No Order issued by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Merger contemplated by this Agreement shall be in effect. No Law shall have been enacted, entered or promulgated by any Governmental Entity that prohibits or makes illegal consummation of the Merger.

## ARTICLE VII: TERMINATION; AMENDMENT; WAIVER

### SECTION 7.01. Termination.

This Agreement may be terminated and the Merger may be abandoned at any time (notwithstanding adoption of the agreement of merger (as such term is used in Section 251 of the Corporation Law) contained in this Agreement by the Requisite Stockholder Approval) prior to the Effective Time (with any termination by Parent also being an effective termination by Merger Sub):

(a) by mutual written consent of the Companies and Parent;

(b) by either the Companies or Parent, if any court of competent jurisdiction or other Governmental Entity shall have issued an Order, or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Order or other action shall have become final and non-appealable; provided, that the party seeking to terminate this Agreement pursuant to this Section 7.01(b) shall have used its reasonable best efforts to contest, appeal and remove such Order or action and shall not be in violation of Section 5.04 or otherwise in material violation of this Agreement;

(c) by the Companies or Parent, if the Companies shall have failed to obtain the Requisite Stockholder Approval at the Special Meeting or at any adjournment or postponement thereof, in each case at which a vote on such adoption was taken;

(d) by Parent, if the representations and warranties of the Companies shall not be true and correct or the Companies shall have breached or failed to perform any of its covenants or agreements set forth in this Agreement and which failure to be true and correct, breach or failure to perform is not cured by the Companies within thirty (30) days following written notice to the Companies, or which by its nature or timing is not capable of being cured;

(e) by the Companies, if the representations and warranties of Parent  shall not be true and correct or Parent shall have breached or failed to perform any of its respective covenants or agreements set forth in this Agreement, which failure to be true and correct, breach or failure to perform is not cured by Parent within thirty (30) days following written notice to Parent, or which by its nature or timing is not capable of being cured;

### SECTION 7.02. Effect of Termination.

If this Agreement is terminated and the Merger is abandoned pursuant to Section 7.01, this Agreement shall forthwith become void and have no effect, without any liability on the part of any party or its directors, officers or stockholders.

### SECTION 7.03. **Fees and Expenses**.

(a) Whether or not the Merger is consummated, except as otherwise specifically provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such expenses.

### SECTION 7.04. **Amendment**.

To the extent permitted by applicable Law, this Agreement may be amended by the Companies or Parent at any time before or after receipt of the Requisite Stockholder Approval but, after receipt of the Requisite Stockholder Approval, no amendment shall be made which decreases the Merger Consideration or which adversely affects the rights of the Companies' stockholders hereunder without the approval of the stockholders of the Companies. This Agreement may not be amended, changed, supplemented or otherwise modified except by an instrument in writing signed on behalf of all of the parties.

### SECTION 7.05. Extension; Waiver; Remedies.

(a) At any time prior to the Effective Time, each party hereto may (i) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (ii) waive any inaccuracies in the representations and warranties contained herein by any other applicable party or in any document, certificate or writing delivered pursuant hereto by any other applicable party or (iii) waive compliance by any party with any of the agreements or conditions contained herein. Any agreement on the part of any party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party. For purposes of this provision, Parent  shall be considered one party and the Companies shall be considered a separate party.

(b) All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any thereof by any party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such party. The failure of any party hereto to exercise any rights, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such party of its right to exercise any such or other right, power or remedy or to demand such compliance.

## ARTICLE VIII: MISCELLANEOUS

### SECTION 8.01. Entire Agreement; Assignment.

This Agreement (including the exhibits and schedules to this Agreement) and the Confidentiality Agreement constitute the entire agreement and supersedes all oral agreements and understandings and all written agreements prior to the date hereof between or on behalf of the parties with respect to the subject matter hereof. This Agreement shall not be assigned by any party by operation of law or otherwise without the prior written consent of the other parties provided, that Parent may assign any of their respective rights and obligations to any

direct or indirect Subsidiary of Parent, but no such assignment shall relieve Parent, as the case may be, of its obligations hereunder.

### SECTION 8.02. <u>Severability</u>.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

### SECTION 8.03. Enforcement of the Agreement; Jurisdiction; Certain Limitations.

(a) The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the District of Delaware or another court sitting in the state of Delaware, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties to this Agreement irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising under this Agreement brought by the other party to this Agreement or its successors or assigns shall be brought and determined exclusively in the Delaware Court of Chancery, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the District of Delaware or another court sitting in the state of Delaware. Each of the parties to this Agreement hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties to this Agreement hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve in accordance with this <u>Section 8.03</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by the applicable Law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter of this Agreement, may not be

enforced in or by such courts. Each of the Companies, Parent  hereby agrees that service of any process, summons, notice or document by U.S. registered mail to the respective addresses set forth in Section 8.04 shall be effective service of process for any proceeding arising out of, relating to or in connection with this Agreement or the transactions contemplated hereby, including the Merger.

(b) Each party to this agreement acknowledges and agrees that any controversy which may arise under this agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect of any litigation directly or indirectly arising out of or relating to this agreement, or the transactions contemplated by this agreement. Each party certifies and acknowledges that (i) no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) each party understands and has considered the implications of this waiver, (iii) each party makes this waiver voluntarily and (iv) each party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this section 8.03(b).

## SECTION 8.04. Notices.

All notices, requests, claims, demands and other communications hereunder shall be given (and shall be deemed to have been duly received if given) by hand delivery in writing or by facsimile or electronic transmission, in each case, with either confirmation of receipt or confirmatory copy delivered by internationally or nationally recognized courier services within three (3) Business Days following notification, as follows:

if to Parent:

Chexx (Americas) Inc
45th Floor, 595 Howe St
Vancouver, BC V6C 2T5
Canada
Rosanne@pacnetservices.com
Fax: 1-604-689-0311

with a copy to:

R Paul Davis LL.D.
Barrister & Solicitor
45 Knock Rushen
Castletown, Isle of Man
IM9 1TQ
paul@pacnetservices.com

61

if to the Companies:

PacNet Holdings Ltd
222 Shannon Airport House
SFZ, Co Clare

17

Ireland
Sharon@pacnetservices.com
Fax: +353-61-714369

With a copy to:

R Paul Davis LL.D.
Barrister & Solicitor
45 Knock Rushen
Castletown, Isle of Man
IM9 1TQ
paul@pacnetservices.com

or to such other address as the Person to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

### SECTION 8.05. Governing Law.

This Agreement, and any dispute arising out of, relating to, or in connection with this Agreement, shall be governed by and construed in accordance with the Laws of the State of Delaware, without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or of any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

### SECTION 8.06. Descriptive Headings.

The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

### SECTION 8.07. Parties in Interest.

This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

### SECTION 8.08. Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

### SECTION 8.09. Interpretation.

The words "hereof," "herein," "hereby," "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, Section, paragraph, exhibit and schedule references are to the articles, Sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified. Whenever the words "include," "includes" or

"including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." The words describing the singular number shall include the plural and vice versa, words denoting either gender shall include both genders and words denoting natural persons shall include all Persons and vice versa. The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import, shall be deemed to refer to the date set forth in the preamble to this Agreement. Any reference in this Agreement to a date or time shall be deemed to be such date or time in Vancouver, BC, unless otherwise specified. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Person by virtue of the authorship of any provision of this Agreement.

### SECTION 8.10. Nonsurvival of Representations and Warranties.

None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time. This <u>Section</u> shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time.

## ARTICLE IX: NOTIFICATIONS

### SECTION 9.1: United States Internal Revenue Service

No notifications shall be provided to the IRS until preparation of 2013 annual tax returns is complete, at which time the Companies' US accountants, Varner, Sytsma, Herndon, shall be instructed to file the Companies' tax returns as "final returns."

Following submission of the said "final returns" the Companies' in-house counsel shall be instructed to send follow-up letters to the IRS confirming the merged status of the Companies and requesting the cancellation of their Employer Identification Numbers for 2014 tax accounting purposes.

### SECTION 9.2: State Tax Authorities

No notifications shall be provided to the state tax authorities (where applicable, ie only Florida and Nevada) until preparation of 2013 annual tax returns is complete, at which time the Companies' US accountants, Varner, Sytsma, Herndon, shall be instructed to file the Companies' tax returns as "final returns."

Following submission of the said "final returns" the Companies' in-house counsel shall be instructed to send follow-up letters to the state tax authorities (where applicable) confirming the merged status of the Companies and requesting the cancellation of their Employer Identification Numbers for 2014 tax accounting purposes.

### SECTION 9.3: Registered Agents

Immediate notification shall be provided to all State Registered Agents of the merged status of the Companies with a cancellation of their appointments except in respect of Parent.

### SECTION 9.4: State Registrations

If applicable, immediate notification shall be provided to Secretaries of State where any of the Companies are registered for the conduct of business in-state, informing them of the merged status of the Companies and, if applicable, making application for in-state registration of Parent in lieu of the Companies' registrations.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all at or on the date and year first above written.

**CHEXX (AMERICAS) INC**

Rosanne P Day, Director

Ruth Ferlow, Secretary

**CUSTOMER SERVICE
INTERNATIONAL INC**

Rosanne P Day
Pp Chexx (Americas) Inc, Director

**THE PAYMENTS FACTORY LLC**

Rosanne P Day
Pp Chexx (Americas) Inc, Member

**ARROWHEAD SERVICES INC**

Gerard A Humphreys
Pp Chexx Inc Limited, Director

**CHEXX INC LTD**

R Paul Davis, Director

**THE PAYMENTS FACTORY LLC**

Gerard A Humphreys

Pp Chexx Inc Limited, Director
**XIPORT SERVICES LLC**

Gerard A Humphreys
Pp Chexx Inc Limited, Director

**YAPSTONES, INC**

Gerard A Humphreys
Pp Chexx Inc Limited, Director



*Delaware*   PAGE  1

The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "GREEN (AMERICAS)
INC.", FILED IN THIS OFFICE ON THE FOURTEENTH DAY OF JANUARY,
A.D. 2008, AT 6:24 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
KENT COUNTY RECORDER OF DEEDS.



4488236   8100

000042910

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 6310144

DATE: 01-14-08

21



Observations/Poznámky/Bemærkninger/Vermerke/
Märkused/Παρατηρήσεις/Observations/Osservazioni/
Piezīmes/Pastabos/Megjegyzések/Osservassjonijiet/
Opmerkingen/Adnotacje Urzędowe/Observações/
Úradné záznamy/Opombe/Lisämerkinnät/Anmärkningar

**Pas/Passport/Passeport**   **Éire/Ireland/Irlande**

SAGHAS/TYPE/TYPE   TÍR/COUNTRY/PAYS   PAS UIMHIR/PASSPORT NO/NO. PASSEPORT

P        IRL

2 SLOINNE/SURNAME/NOM
**ABANTO ROJAS**

2 TÚSAINM (REACHA)/FORENAME(S)/PRÉNOM(S)
MARIA SARA

3 NÁISIÚNTACHT/NATIONALITY/NATIONALITÉ      4 DÁTA BREITHE/DATE OF BIRTH/DATE DE NAISSANCE
ÉIREANNACH/IRISH

6 GNÉAS/SEX/SEXE   6 ÁIT BHREITHE/PLACE OF BIRTH/LIEU DE NAISSANCE
F        PER

7 DÁTA EISIÚNA/DATE OF ISSUE/DATE DE DÉLIVRANCE   8 AS FEOHM/DATE OF EXPIRY/DATE D'EXPIRATION
03 AIB/APR 2010        02 AIB/APR 2020

9 ÚDARÁS/AUTHORITY/AUTORITÉ
Oifig na bPasanna,
Baile Átha Cliath
Passport Office, Dublin

10 SÍNIÚ/SIGNATURE/SIGNATURE

P<IRLABANTO<ROJAS<<MARIA<SARA<<<<<<<<<<<<<<<<



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Florida Limited Liability Company
THE PAYMENTS FACTORY LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L09000083658 |
| **FEI/EIN Number** | 27-0824312 |
| **Date Filed** | 08/28/2009 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | CORPORATE MERGER |
| **Event Date Filed** | 02/06/2014 |
| **Event Effective Date** | NONE |

**Principal Address**

10151 DEERWOOD PARK BLVD
BUILDING 200 SUITE 250
JACKSONVILLE, FL 32256-0557

Changed: 12/08/2010

**Mailing Address**

10151 DEERWOOD PARK BLVD
BUILDING 200 SUITE 250
JACKSONVILLE, FL 32256-0557

Changed: 12/08/2010

**Registered Agent Name & Address**

ABANTO, MARIA SARA
188 AFTON LANE
ST. JOHNS, FL 32259

Name Changed: 12/08/2010

Address Changed: 12/08/2010

**Authorized Person(s) Detail**

**Name & Address**

Title MGRM

CHEXX AMERICAS INC

6TH FLOOR
595 HOWE STREET
VANCOUVER, BC V6C 2T5 CA

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2012 | 01/07/2012 |
| 2013 | 01/10/2013 |
| 2014 | 01/16/2014 |

**Document Images**

| | |
|---|---|
| 01/16/2014 -- ANNUAL REPORT | View image in PDF format |
| 01/10/2013 -- ANNUAL REPORT | View image in PDF format |
| 01/13/2012 -- CORLCMMRES | View image in PDF format |
| 01/07/2012 -- ANNUAL REPORT | View image in PDF format |
| 01/05/2011 -- ANNUAL REPORT | View image in PDF format |
| 12/08/2010 -- Reg. Agent Change | View image in PDF format |
| 11/16/2010 -- ANNUAL REPORT | View image in PDF format |
| 06/25/2010 -- Reg. Agent Change | View image in PDF format |
| 06/17/2010 -- Reg. Agent Change | View image in PDF format |
| 02/19/2010 -- ANNUAL REPORT | View image in PDF format |
| 08/28/2009 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

BOARD RESOLUTION

**Chexx (Americas) Inc.**

We, the Board of Directors of Chexx (Americas) Inc., [hereinafter "Company"], a company duly organized, incorporated and existing under the laws of the State of Delaware, have adopted the following Resolution, a quorum being present, in accordance with the Memorandum and Articles of Association, in Vancouver, British Columbia, Canada on 12th December, 2013:

Resolved that

Maria Sara Abanto Rojas, of 188 Afton Lane, Jacksonville, FL 32259, date of birth 17th October 1969, is hereby appointed a Director of the Corporation with immediate effect.

Signed on behalf of the Board of Directors

12th December, 2013

Rosanne Phyllis Day
Chairman of the Board

I certify that the foregoing is a true and complete copy of the Resolution of the Board of Directors dated this 12th day of December, 2013

Ruth Ferlow
Company Secretary

Delaware.gov        Governor | General Assembly | Courts | Elected Officials | State Agencies

---

**Department of State: Division of Corporations**

Allowable Characters

| | |
|---|---|
| HOME | |
| About Agency | |
| Secretary's Letter | |
| Newsroom | |
| Related Links | |
| Frequent Questions | |
| Contact Us | |
| Office Location | |
| **SERVICES** | |
| Pay Taxes | |
| File UCC's | |
| Delaware Laws Online | |
| Name Reservation | |
| En ity Search | |
| Status | |
| Validate Certificate | |
| Customer Service Survey | |
| Loading... | |

### Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 4489236 | Incorporation Date / | 1/14/2008 |
| | | Formation Date: | (mm/dd/yyyy) |
| Entity Name: | CHEXX (AMERICAS) INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | COLBY ATTORNEYS SERVICE CO., INC. | | |
| Address: | 850 NEW BURTON RD. SUITE 201 | | |
| City: | DOVER | County: | Kent |
| State: | DE | Postal Code: | 19904 |
| Phone: | 302-734-1450 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ◯ Status   ◯ Status,Tax & History Information

[ Submit ]

[ View Search Results ]       [ New Entity Search ]

---

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov



I hereby certify that the within instrument is
a true and correct copy of the instrument of
which it purports to be a true copy.
Given under my hand and seal of office this

...............day of........................, 20.1.5....

....................................................

A Notary Public in and for the Province of British Columbia

**ROBERT J. LESPERANCE**
*Lawyer*
410 - 900 HOWE STREET
VANCOUVER, B.C.  V6Z 2M4
TEL: (604) 685-3567

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | | | | TAX YR. |
|---|---|---|---|---|
| CHEXX (AMERICAS) INC. | | | | 2019 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | |
|---|---|---|---|
| 4489236 | 2008/01/14 | | |

**PRINCIPAL PLACE OF BUSINESS**
1717 PENNSYLVANIA AVE SUITE 650
WASHINGTON, DC 20006

**PHONE NUMBER**
(604)657-9977

**REGISTERED AGENT**
COLBY ATTORNEYS SERVICE CO., INC.
850 NEW BURTON RD.
SUITE 201
DOVER DE  19904

**AGENT NUMBER**
9138928

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2008/01/14 | | COMMON | 3,000 | .0000000000 |

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| ROSANNE PHYLLIS DAY | 1717 PENNSYLVANIA AVE SUITE 650 WASHINGTON, DC 20006 | MRS |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| ROSANNE PHYLLIS DAY | 1717 PENNSYLVANIA AVE SUITE 650 WASHINGTON, DC 20006 |

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| ROSANNE PHYLLIS DAY 1717 PENNSYLVANIA AVE SUITE 650 WASHINGTON, DC 20006 US | 2019/02/21 | MRS |

# *State of Delaware*

# *Annual Franchise Tax Report*

| CORPORATION NAME | | TAX YR. |
|---|---|---|
| CHEXX (AMERICAS) INC. | | 2019 |

| FILE NUMBER | FEDERAL EMPLOYER ID NO. |
|---|---|
| 4489236 | 980568987 |

ASSETS FOR REGULATED INVESTMENT CORPS
JAN. 1st.          DEC. 31st.

**Date(s) of Inactivity**
From          To
2019/01/01     2019/03/31

| TOTAL NUMBER OF SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE |
|---|---|---|

| Franchise Tax | Penalty | 1.5% Monthly Interest | Annual Filing Fee | Prev Credit or Balance |
|---|---|---|---|---|
| $175.00 | $0.00 | $0.00 | $50.00 | $0.00 |

| Prepaid Qrty. Payments | Amount Due | Amount Paid | Check Number |
|---|---|---|---|
| $0.00 | $225.00 | $225.00 | |