FILED
CLERK

2/24/2021 8:43 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

For Online Publication Only

PACNET SERVICES LTD.,

                        Plaintiff,

      -against-

OFFICE OF FOREIGN ASSETS CONTROL OF THE
UNITED STATES DEPARTMENT OF THE
TREASURY; JOHN DOE DEFENDANTS 1 – 73,

                       Defendants.

-----------------------------------------------------------------------X

UNITED STATES OF AMERICA

      v.

RYAN YOUNG,

                       Defendant.

-----------------------------------------------------------------------X

**ORDER**

17-CV-6027 (JMA) (LB)

18-CR-46 (JMA)

**AZRACK, United States District Judge:**

      This Order addresses two related cases—one criminal and one civil—that have not been consolidated.  The Court addresses the pending motions in both cases in a single order as a matter of administrative convenience given their factual overlap.

      PacNet Services Ltd. v. United States Department of the Treasury, Office of Foreign Assets Control, et al., 17-cv-6027, is an interpleader action concerning over $5 million in funds.  Those same funds are the subject of criminal forfeiture proceedings in two related cases that are also pending before this Court.  United States v. Ryan Young, 18-cr-46; United States v. Ercan Barka, 18-cr-31.

Defendant Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") has moved to dismiss the interpleader action. OFAC argues that sovereign immunity has not been waived and that the Court lacks subject matter jurisdiction because the United States Postal Inspection Service ("USPIS") seized, in April 2018, all funds that had been deposited in the Court Registry Account to fund this interpleader action. Also pending in the interpleader action are motions filed by Plaintiff PacNet Services Ltd. ("PacNet") that challenge the seizure of those and other funds and ask the Court to compel the Government to deposit these seized funds with the Court in order to stave off dismissal of the interpleader action.

In addition to the pending motions, the parties responded to an Order to Show Cause ("OTSC") issued by the Court on May 31, 2020 that directed the parties to address why, even if the Court had jurisdiction over the interpleader action, the Court should not stay or dismiss the interpleader action in light of Young and a related case in the District of Nevada where four of PacNet's principals—including Rosanne Day, PacNet's founder, part-owner, and managing director—were indicted in June 2019. United States v. Day, et. al, 19-cr-155 (D. Nev.). The Indictment in Day charges those defendants with conspiracy to commit mail and wire fraud, substantive mail and wire fraud, and conspiracy to commit money laundering. The Day defendants remain at large and the Government is seeking their extradition.

In Young, the pending criminal forfeiture proceeding before this Court, the defendant, Ryan Young, pled guilty in February 2018 and the Court entered a preliminary order of forfeiture in September 2019 forfeiting all the funds at issue in the interpleader action. In February 2020, PacNet filed an ancillary petition in Young asserting that it is entitled to all those funds. The Government then moved to stay resolution of the ancillary forfeiture proceeding in Young until the resolution of the Day case in Nevada.

2

For the reasons set forth below, the Court grants OFAC's motions to dismiss, denies the motions filed by PacNet, and dismisses this interpleader action suit for lack of subject matter jurisdiction.  The Court also grants the Government's motion to stay the ancillary proceedings in Young until the resolution of the Day criminal matter.

## I.  BACKGROUND

### A.  Overview

Plaintiff PacNet Services Ltd., a Canadian company headquartered in Vancouver, was a payment processor, which handled the processing of incoming payments for its clients and its affiliated companies.  (Compl. ¶ 17, ECF No. 1.[1])  PacNet Services Ltd. also served as a holding company for the PacNet Group, which included PacNet Services and Chexx, a company that submitted outgoing payments, including rebates, refunds, and commissions, for its clients.  (Compl. ¶ 17.)  Another company related by common ownership was Accu-Rate Corporation, which handled foreign exchange transactions.[2]  (Id.)

According to the Indictment in the Day case:

[PacNet's "mass-mail clients" which] solicited payments from consumers by sending massive volumes of mail . . . made up a significant part of PacNet's processing business. During the last five years it was in operation, PacNet processed on average more than $100 million per year in checks and credit card payments from United States consumers to mass-mail clients. The total amount of money that PacNet processed for mass-mail clients, including cash from United States consumers and payments of all kinds from consumers outside of the United States, was considerably higher.

PacNet's mass-mail clients included companies that sent notifications intended to mislead the consumers into believing they would receive a large amount of money, a valuable prize, or specialized psychic services upon payment of a fee to the companies.

---

[1] Unless otherwise noted, all citations to "ECF No." refer to 17-cv-6027.

[2] Unless specified otherwise, all of these companies are referred to, collectively, as "PacNet" herein.

Many victims of PacNet's fraudulent mass-mail clients were elderly or otherwise vulnerable. Many victims were inundated with fraudulent notifications and were defrauded multiple times. Some elderly victims spent hundreds to thousands of dollars responding to fraudulent notifications before a family member or a victim's bank detected the fraud and worked to prevent additional losses.

PacNet was the payment processor of choice for fraudulent mass-mailers in the United States and around the world. Banks generally would not do business directly with fraudulent mass-mailers. PacNet thus served as a vital link between fraudulent mass-mail clients and banks, enabling the fraudulent mass-mail clients to profit from their criminal schemes by moving their money through the banking system undetected. PacNet processed tens of millions of dollars per year in payments from United States victims to fraudulent mass-mail clients.

For more than two decades, PacNet processed payments for mass-mail clients that its top management, including [the defendants indicted in Day, including PacNet's founder, part-owner, and managing director, Rosanne Day,] knew had been induced by fraudulent notifications that were designed to mislead victims into falsely believing they had won a prize or would receive something of value in exchange their payments.

(Day Superseding Indictment at 2–3 (numbering omitted), Day, 19-cr-155, ECF No. 18.) Day and the other defendants allegedly conspired with the operators of PacNet's clients that conducted fraudulent mass mailings. (Id. ¶¶ 14–15.) In addition to charging the defendants in Day, the Government has also filed charges against a number of the individuals who operated PacNet's mass-mail clients, including Barka and Young.

In its Interpleader Complaint and in numerous submissions to this Court, PacNet maintains that it was a legitimate business, which is innocent of any criminal conduct and has been unfairly and unlawfully targeted and wronged by the Government. (See PacNet OTSC Response at 20–22, ECF No. 170.) PacNet alleges that its clients include many well-respected companies and that only a "minority of PacNet's business pertained to merchants that distributed direct-mail promotions involving sweepstakes reports or astrological information." (Compl. ¶ 29.) PacNet stresses, inter alia, that it submitted numerous Suspicious Transactions Reports ("STRs") and Large Cash Transaction Reports ("LCTRS") to Canadian authorities, which, according to PacNet,

4

establish that it committed no crimes and never conspired with any of the mass mailers who are alleged to have committed mail fraud.  (Compl. ¶¶ 11–53; <u>see also</u> PacNet OTSC Response at 20–22; <u>id.</u> Ex. F (Mar. 30, 2016 FinTrac Report discussing Barka); PacNet Suppl. OTSC Response, ECF No. 174 (reports to Canadian and American authorities concerning Gary Denkberg and related entities).)

## B.  <u>Investigation into PacNet and its Designation by OFAC in 2016</u>

In September 2016, the United States Department of Justice ("DOJ"), the USPIS, and OFAC took action against a global network of mass mailing fraud schemes, for which PacNet allegedly played a critical role.  (<u>See</u> Aff. of Terrence Sullivan, ECF No. 139-9.)

As part of its enforcement actions, the Government obtained injunctions against various entities involved in the scheme, including direct mailers, list brokers, caging services, mass mailers, and printers.  (<u>Id.</u>; U.S. Opp'n to Cross-Mot. at 4, ECF No. 139-8.)  This ongoing investigation and enforcement effort have resulted in the <u>Day</u> Indictment, the indictment of various mass mailer defendants, and the seizure of over $6 million of PacNet's funds.

On September 20, 2016, Magistrate Judge Cheryl Pollak issued a seizure warrant authorizing the USPIS to seize of $963,205 from an account held by PacNet at BMO Harris Bank (BMO Harris Bank Account '0703), finding probable cause to believe that the funds are subject to

forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1).[3]  (U.S. Opp'n to PacNet Sanctions Mot. at 5–6, ECF No. 158-5.)

These funds, and all other seized funds discussed herein, were deposited into the United States Marshal's seized deposit account.  (Id. at 6.)

On September 22, 2016, OFAC invoked its authority to designate PacNet as a significant transnational criminal organization ("TCO").[4]  (Compl. ¶ 3.)  OFAC's designation placed 30 corporate entities and 12 employees and officers of PacNet on the Specially Designated Nationals Blocked Persons List ("SDN List").  As a result of OFAC's designation, a block was placed on all property of the designees subject to U.S. jurisdiction, and all United States persons or persons within the United States were prohibited from transacting business with the designated entities without a license from OFAC.  (Comp. ¶ 3.)  In its Interpleader Complaint and various filings, PacNet contends that this designation was improper and unlawful.

## C.  The September 2017 Agreement Between PacNet and OFAC

After OFAC's designation in September 2016, PacNet submitted multiple petitions to OFAC over the next year to try to convince OFAC the designation was improper.  (Compl. ¶ 8.)

---

[3]  The warrants discussed herein authorized seizures premised on mail fraud and money laundering.  Upon a showing of probable cause that property is subject to forfeiture, seizure warrants can be obtained under both the civil and criminal forfeiture statutes.  18 U.S.C. § 981(b); 21 U.S.C. § 853(f).

18 U.S.C. § 981(a)(1)(C) authorizes the forfeiture of any property "which constitutes or is derived from proceeds traceable to" mail fraud.  "Proceeds" are defined as "property . . .obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture."  18 U.S.C. § 981(a)(2)(A).

18 U.S.C. § 981(a)(1)(a) and § 982(a)(1)(a) both permit forfeiture of property "involved in" money laundering.  See § 981(a)(1)(a) (covering "property . . . involved in a transaction or attempted transaction in violation of [money laundering statutes], or any property traceable to such property"); § 982(a)(1)(a) (covering "property . . . involved in [a money laundering offense], or any property traceable to such property").

[4]  OFAC's authority to designate an entity as a "significant TCO" is based on the President's July 2011 Executive Order 13581, which the President issued pursuant to authority granted by Congress in the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. ("IEEPA").  (Compl. ¶ 42.)

6

On September 19, 2017, PacNet, Rosanne Day, and Robert Paul Davis entered into an agreement with OFAC (the "Agreement").  (Agreement, Decl. of George R. Calhoun ("Calhon Decl.") Ex. A, ECF No. 139-6.)  The Agreement provided a procedure for PacNet and these individuals to be removed from the SDN List.  According to the Agreement, as a result of the designations, PacNet had ceased active business operations and was in the process of winding down its business and closing and formally dissolving the PacNet companies.  (Id. at 1.)  Within five days, PacNet was required to provide OFAC with a list of all transactions PacNet intended to undertake after delisting in order to resolve its debts and liabilities as well as information and documents related to these proposed transactions, including the identities of the "bank or banks from which any transfers will be made."  (Id. at ¶ A.1.)

In the Agreement, "PacNet[] agree[d]" to, inter alia, the following provision:

[Once OFAC, after receiving received PacNet's information,] identifies and represents to the PacNet Group that a reasonable factual basis exists to believe that a proposed transaction involving any client of the PacNet Group . . . involves the proceeds of fraud or money laundering allegedly committed by the client and provides the PacNet Group with written notification of that determination . . . and the appropriate legal authorization to set aside the payment owed to such transaction beneficiary (for example, a license by OFAC), the PacNet Group agrees to deposit the equivalent of the funds owed to its client into an account held by a commercial escrow agent in the Eastern District of New York (chosen by the PacNet Group and agreed to by OFAC) or to interplead those funds in the United States District Court for the Eastern District of New York. Through the interpleader action or the deposit with the escrow agent, PacNet will provide a list to the United States Attorney's Office for the Eastern District of New York listing the following for each transaction OFAC identifies and for which PacNet transfers funds pursuant to OFAC's direction consistent with this agreement: (i) the PacNet client associated with the transaction; and (ii) the amount of funds transferred related to the transaction.  PacNet accepts the representation by OFAC as sufficient to indicate to PacNet that a dispute exists as to the identified funds and PacNet will therefore interplead or deposit the money in escrow until the dispute can be resolved. The parties agree that the interpleader or deposit of any funds into escrow is not an admission that any funds are proceeds of fraudulent conduct or money laundering or that PacNet had any involvement in or knowledge of any fraudulent conduct or money laundering.

(Agreement ¶ A.7.)  Notably, this entire provision of the Agreement, comes solely under the heading of what "PacNet[] agrees to."  (<u>Id.</u> at 1.)  OFAC, under a different heading, "agree[d]" to a separate set of provisions that set out OFAC's obligations.  (<u>Id.</u> at 3.)

In the Agreement, PacNet also agreed to "waive any and all claims to the interpleaded or escrowed funds . . . with respect to payments otherwise owed to its clients for a period of five years from the date of the transfer unless no claim is filed [for the] funds for three years."  (<u>Id.</u> at ¶ A.7.)  PacNet also waived any claims against OFAC and its officials arising out of OFAC's investigation and the September 22, 2016 designation.  (<u>Id.</u> ¶ A.8.)  PacNet, however, did not waive any rights to bring an interpleader action against OFAC.  (<u>Id.</u>)  Upon PacNet's compliance with certain obligations under the Agreement, OFAC was required to remove PacNet and other parties from the SDN List.  (<u>Id.</u> at ¶¶ B.2, B.3.)

The Agreement includes the following provision governing the use of information disclosed by PacNet:

> [e]xcept to the extent necessary to recover <u>by forfeiture action or otherwise</u> against the funds deposited with a commercial escrow agent or U.S. court pursuant to paragraph A.7 [of the Agreement], OFAC will treat all information obtained or disclosed pursuant to this agreement as confidential and . . . will not share such information with any other governmental agency or person unless authorized and compelled by legal process (i.e., subpoena) or judicial order.  The information obtained or disclosed pursuant to this agreement may not be used by OFAC, directly or indirectly, in any matter, proceeding, or action against PacNet or any person designated on September 22, 2016.

(<u>Id.</u> at ¶ B.4 (emphasis added).)

On September 19, 2017, PacNet provided the information required by the Agreement, including PacNet's "banking information" to OFAC.  (Calhoun Decl. ¶ 8.)

On September 21, 2017, Magistrate Judge Vera Scanlon issued warrants authorizing the USPIS to seize the following PacNet accounts: $1,503,251 from BMO Harris Bank Account

'2949; $765,611 from BMO Harris Bank Account '3306; and $362,222 from Avidia Bank Account '5257.  (U.S. Opp'n to PacNet Sanctions Mot. at 5.)  Judge Scanlon found there was probable cause to believe that the funds were subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1).  (Id.)

These funds were subsequently seized by the USPIS on September 22, 2017.[5]  (Calhoun Decl. Ex. F; Bill of Particulars, Young, 18-cr-46, ECF No. 4.)  PacNet was eventually informed of the seizures on November 8, 2017.  (Calhoun Decl. Ex. F.)

On October 5, 2017, OFAC sent PacNet a letter (hereinafter, the "October Determination"), entitled "Written Notification of Determination Pursuant to Paragraph A.7 . . . [of the Agreement]" (Calhoun Decl., Ex. B, ECF No. 139-6.)  The October Determination states that "OFAC has identified and hereby represents to PacNet that a reasonable factual basis exists to believe that certain proposed transactions disclosed by PacNet pursuant to [the Agreement] involve the proceeds of fraud or money laundering allegedly committed by certain PacNet clients."  (Id. (emphasis added).)  The October Determination included a list of the specific transactions at issue and, in accordance with the Agreement, "direct[ed] PacNet to initiate the transfer of funds associated with [those] transactions . . . . to escrow or interpleader accounts [as set out in Paragraph A.7 of the Agreement]."  (Id. (emphasis added); see also Agreement ¶ B.3.)  Because PacNet had previously informed OFAC that it intended to only use the interpleader option under the Agreement, OFAC, in accordance with the Agreement, provided PacNet with a license to transfer the amounts owed to one or more interpleader accounts of the U.S. District Court for the Eastern

---

[5]  For the $362,222 seized from Avidia Bank, the Government initiated an administrative forfeiture action in which PacNet filed a claim in December 2017.  (PacNet Cross-Mot. at 12, ECF No. 139-4.)

District of New York.  (October Determination; Agreement ¶ B.3; License, Calhoun Decl., Ex. C, ECF No. 139-6.)

## D.  PacNet Files the Interpleader Action

On October 16, 2017, PacNet filed its Interpleader Complaint naming, as Defendants/Claimants-in-Interpleader, OFAC and 73 former clients and accounts, which are named in the complaint as John Does, given the nature of OFAC's allegations concerning those clients.  (Compl. ¶ 20.)  The Interpleader Complaint was assigned to the Honorable Nicholas G. Garaufis, who presided over the case until its reassignment to the undersigned in November 2018.

In the Interpleader Complaint, PacNet alleges that it "has no claim or interest in those funds that are owed to its former clients."  (Id. ¶ 12.)  PacNet's complaint alleges that an interpleader action is appropriate because "[b]ased on its contractual obligations to its clients, and the prospect that making payment to those clients would conflict with the law or claims of the United States, PacNet reasonably fears the results of competing claims and obligations to the Interpleader Fund." (Id. ¶ 13.)  According to the complaint, the representation made by OFAC in the October Designation "regarding certain of its clients places PacNet in potential jeopardy of violating federal law," namely, prohibitions on money laundering, "if it were to pay claimed debts as contractually required to those clients so identified by OFAC."  (PacNet Opp'n to OFAC Mot. to Dismiss at 5.)

On the same day it filed the Interpleader Complaint, PacNet filed a motion seeking leave to deposit in the Court Registry a $5,220,855 interpleader fund.  (ECF No. 2.)  In the motion, PacNet requested that the Court allow the deposit of these funds "without prejudice to any party's claim to the funds or opposition to the Complaint in Interpleader."  (ECF No. 2 at 2.)  Two days later, on October 18, 2017, Judge Garaufis granted the unopposed motion and signed PacNet's proposed order (the "Interpleader Deposit Order"), which states that, "based on the record,"

"competing claims to the funds made them subject to an interpleader action under 28 U.S.C. § 1335." (ECF No. 7.)  The record before Judge Garaufis contained the Complaint and PacNet's brief, along with a copy of the Agreement, the October Determination, and the license provided by OFAC.  The Interpleader Deposit Order "authorized [PacNet] to transfer funds from BMO Harris Bank, Union Bank, and/or any other necessary financial institution or account to the registry of the Court, and may do so through one or more transactions."  (ECF No. 7.)  The Interpleader Deposit Order also:  (1) noted that OFAC had granted PacNet a license to transfer the Interpleader Fund to the Court; and (2) directed that the "Clerk of the Court shall not disburse the Funds absent a further order of this Court."  (ECF No. 7.)

On October 30, 2017, the Treasury Department, in accordance with the Agreement, rescinded PacNet's designation from the SDN list.  (PacNet OTSC Response, Ex. E.)

On November 8, 2017, PacNet wired $2,671,335 from accounts at Union Bank into the Court Registry Account.  (PacNet Cross-Mot. at 8, ECF No. 139-4.)  In a letter that same day, an AUSA informed PacNet of the September 2017 seizures.  PacNet asserts that it intended to fund the remainder of the Interpleader Fund with the funds seized by the USPIS in September 2017 and that the Government knew that those seizures would impede PacNet from funding the Interpleader. (See PacNet Cross-Motion Reply at 3, ECF No. 139-10.)

**E.  Claimants in the Interpleader Action**

A number of PacNet's former clients have intervened or appeared in the interpleader action and asserted claims that they are entitled to a portion of the Interpleader Fund.[6]

On December 31, 2017, International Payout Systems, Inc. ("I-Payout") filed a motion to intervene.  (ECF Nos. 39, 40, 41.)  Over PacNet's objection, Magistrate Judge Bloom granted

---

[6]  The defaults of all the John Doe Defendants that have not appeared are hereby noted.

I-Payout's motion.  (ECF No. 63.)  I-Payout alleges that it is entitled to $2,794,893 of the funds PacNet deposited in the Court Registry Account.  I-Payout maintains:  (1) it transferred over $3 million to Chexx in August 2016, shortly before OFAC's designation; (2) based on its contract with Chexx that "these funds were held in trust by Chexx and Chexx never held title to [those funds];" and (3) $1.9 million of these funds were in the Union Bank Account that PacNet used to fund the interpleader.  (I-Payout Answer, ECF No. 73 at 11; Aff. in Supp. of Mot. to I-Payout Intervene, ECF No. 41.)

Three additional former PacNet clients who were named as John Does in the Interpleader Complaint also submitted Answers, claiming they are entitled to recover, respectively, €354,646, €18,961, and $134,020.  (ECF Nos. 88, 90, 124.)  The Answers of these claimants assert that they were engaged in legitimate business transactions and that the funds at issue were not proceeds of mail fraud or money laundering.  (See, e.g., Otter Mist Answer at 8–9, ECF No. 124.)  Four other former clients of PacNet that are named as John Does in the Interpleader Complaint appeared and received extensions of time to file answers until the Government's pending motion to dismiss, discussed below, has been decided.  (ECF Nos. 134, 146.)

**F.  Motion Practice and the USPIS's Seizure of the Funds in the Court Registry Account**

On December 12, 2017, Magistrate Judge Robert Levy issued the USPIS a warrant to seize all funds in the Court Registry Account, finding that there was probable cause to believe that those funds were subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).  (U.S. Sur-Reply in Opp'n to Cross-Mot. at 4, ECF No. 143.)  The Government then submitted an ex parte sealed submission to Judge Garaufis concerning the seizure warrant.  On December 18, 2017, Judge Garaufis signed an ex parte sealed order directing the Clerk of Court to issue a check to the USPIS for all the funds in the Court Registry Account, totaling $2,671.335.  (ECF No. 158-6.)  The

USPIS eventually received these funds on April 2, 2018.[7]  (U.S. Sur-Reply in Opp'n to Cross-Mot. at 4.)

On January 19, 2018, OFAC filed a pre-motion conference letter for a proposed motion to dismiss based on sovereign immunity.  (ECF No. 72.)  On February 9, 2018, Judge Garaufis held a pre-motion conference attended by PacNet, OFAC, and I-Payout, where the September 2017 seizures were discussed.  Judge Garaufis then set a briefing schedule for OFAC's motion, a cross-motion by PacNet concerning the seized funds, and a submission by OFAC concerning the funds at issue in the interpleader and any other judicial proceedings involving those funds.  The motions were fully briefed and filed on the docket on April 5, 2018.

PacNet's Cross-Motion sought to compel the release of the $2,549,499 in seized funds that PacNet had intended to deposit with the Court, but which the USPIS seized in September 2017. PacNet also requested that the Court consolidate all forfeiture proceedings concerning the interpleader fund.  OFAC and "the United States" submitted separate briefs authored by separate AUSAs in response to PacNet's Cross-motion.  "The United States" explained that it submitted a separate brief "to aid the Court in addressing the asset forfeiture issues raised in the present proceeding."[8]  (U.S. Opp'n to Cross-Mot. at 1 n.1.)  DOJ/USPIS argued that PacNet's Cross-Motion to compel should be denied because the funds seized in September 2017 were lawfully seized by the USPIS.  In support of their opposition to the motion, DOJ/USPIS provided a copy of the affidavit that was used to obtain the September 20, 2016 seizure warrant signed by Judge

---

[7] In an earlier, unrelated case, E*Trade Securities, LLC v. Weiner et al., 11-CV-1997 (DLI), the Government also used a sealed warrant to seize funds from a pending interpleader action.  The parties in Weiner, including the SEC and the U.S. Attorney's Office, ultimately agreed to a stipulation of dismissal and did not litigate the seizure issue.

[8] The Court will, for purposes of simplicity, refer to this party in the text as the "DOJ/USPIS" since this submission and later submissions by "the United States" in the interpleader action focus on the conduct of the DOJ and the USPIS in the various seizures and related prosecutions at issue.

Pollak, pursuant to which the USPIS had seized $963,205 from the BMO Harris Bank '0703 Account.  In its brief, DOJ/USPIS noted that the funds seized in September 2017 were the subject of pending judicial forfeiture actions in two criminal cases before me, <u>Young</u>, 18-CR-46, and <u>Barka</u>, 18-CR-31.  OFAC submitted a short response to PacNet's Cross-Motion to compel, stressing that OFAC does not have control or custody of the funds, which other agencies seized.

On April 2, 2018, the funds in the Court Registry Account were, pursuant to Judge Garaufis's December 18, 2017 order, transferred to the USPIS.  After PacNet learned about this seizure on April 5, 2018, PacNet asked, in its reply papers, that the Court compel the Government to return those funds as well.  OFAC also filed a second motion to dismiss, arguing that because there were no longer any funds on deposit, the Court lacked subject matter jurisdiction over the interpleader action.

PacNet then proceeded to file a sanctions motion, joined by I-Payout, arguing that the seizures violated the Court's Interpleader Deposit Order and a February 12, 2018 scheduling order, which Judge Garaufis issued after the pre-motion conference.  In the course of briefing those motions, DOJ/USPIS disclosed Judge Garaufis's <u>ex parte</u> December 18, 2017 order to PacNet.  In November 2018, the interpleader action was transferred to the undersigned.

## G.  <u>Related Criminal Proceedings</u>

Barka and Young—along with their business entity, the Barka Young Group—engaged in various predatory mail fraud schemes.  (<u>See</u>, <u>e.g</u>, Information, <u>Young</u>, 18-cr-46, ECF No. 6; Aff. of Terrence Sullivan ¶¶ 66 –78, ECF No. 139-9.)  Beginning in 2012, PacNet processed victim payments for the Barka Young Group.  (Aff. of Terrence Sullivan ¶ 78.)  The Interpleader Complaint alleges that PacNet owes the Barka Young Group $834,854 in connection with PacNet's payment processing services.  (ECF No. 5;  U.S. Sur-Reply in Opp'n to Cross-Mot. at 10.)

14

On February 13, 2018, Young pled guilty to conspiracy to commit mail fraud. (Young, 17-cr-46, ECF No. 7). Two days later, on February 15, 2018, the Government filed a bill of particulars in Young specifying that it was seeking to forfeit from various monies, including all the funds in the Court Registry Account in the interpleader action as well as the funds seized by the USPIS in September 2017. (Id., ECF No. 4.) On March 26, 2018, the Government filed another bill of particulars for the funds seized in September 2016 from BMO Harris Bank. (Id., ECF No. 11.)

Barka pled guilty to conspiracy to commit mail fraud on January 25, 2018. (Barka, 18-cr-31, ECF No. 31.) On March 26, 2018—the same day the United States filed its opposition to PacNet's motion to compel—the Government filed a bill of particulars in Barka that, like in Young, sought forfeiture of all the funds seized by the USPIS in September 2016 and 2017 as well as the funds on deposit in the interpleader action. (Id., ECF No. 33.)

On June 19, 2019, four PacNet officials—Rosanne Day, Robert Paul Davis, Genevieve Renee Frappier, and Miles Kelly—were indicted in the District of Nevada and were charged with conspiracy to commit mail and wire fraud, substantive mail and wire fraud, and conspiracy to commit money laundering. (United States v. Day, et al., 19-cr-155 (D. Nev.).) According to the Indictment, Day "was the founder, a part-owner, and the managing director of PacNet, and was the person in charge of PacNet's headquarters in Vancouver from 1995 until September 2016." (Day Superseding Indictment ¶ 2.) Davis was also a part-owner of PacNet and ran PacNet's office in Ireland from 2001 until September 2016. (Id. ¶ 3.) The Indictment charges that the defendants in Day conspired with, among others, operators of PacNet's clients who engaged in fraudulent mass mailings. (Id. ¶¶ 14–15.)

The Day Indictment includes general forfeiture allegations, but does not identify any specific property as being subject to forfeiture.

On March 4, 2020, the Superseding Indictment in <u>Day</u> was issued, which made certain minor modifications to the original indictment.  To date, the <u>Day</u> defendants, who all live abroad, remain at large.  (<u>Day</u>, 19-cr-155, ECF No. 28.)  The Government is in the process of seeking their extradition.  (<u>Id.</u>)

On September 10, 2019, the Government filed an unopposed motion for forfeiture in the <u>Young</u> case.  (<u>Young</u>, 18-cr-46, ECF No. 14.)  The next day, the Court signed a Preliminary Order of Forfeiture in which Young "forfeit[ed] . . . all right, title, and interest in" various assets, including all the seized funds that are at issue in the interpleader action.[9]  (<u>Id.</u>, ECF No. 15.)

On January 4, 2020, the Government published an official Notification of Forfeiture on www.forfeiture.gov.  (PacNet Pet. at 26–27, <u>Young</u>, 18-cr-46, ECF No. 17.)  The Government has not yet sent direct written notice to potential interested parties, including PacNet or any of the parties in the interpleader action.

On February 28, 2020, PacNet filed a verified petition in the <u>Young</u> criminal case seeking to adjudicate its interests in an ancillary proceeding pursuant to 21 U.S.C. § 853(n).  PacNet asserts it is entitled all of the seized funds that are at issue in <u>Young</u>, contending, <u>inter alia</u>, that PacNet never conspired with Young and, in any event, under the Supreme Court's 2017 decision in <u>Honeycutt v. United States</u>, 137 S. Ct. 1626 (2017), the Government cannot rely on joint-and-several liability and Young cannot forfeit any of the seized funds at issue because they are not proceeds of his mail fraud scheme were never his property or under his control.  (PacNet Pet.)

---

[9] For convenience, when discussing the "funds at issue" in the interpleader action, the Court is generally referring to all the seized funds that PacNet seeks to have placed in this Court Registry Account—specifically, the funds seized in September 2017 as well as the funds seized from the Court Registry Account on April 2, 2018.  The parties' various arguments concerning those funds are addressed <u>infra</u>.

On May 27, 2020, the Government filed a motion seeking to stay the ancillary proceedings in the <u>Young</u> case until the <u>Day</u> criminal matter has been resolved.  PacNet opposed the Government's request for a stay arguing, <u>inter alia</u>, that there is no need to engage in any discovery to resolve the Petition and that the Government has not identified what discovery it believes is necessary or how any discovery in this proceeding would impair the Government's prosecution of the <u>Day</u> case.

On December 18, 2020, the Government filed an additional bill of particulars in the <u>Young</u> criminal action which provided notice of the Government's intent to seek forfeiture of an additional $444,817 that the Government seized from Truist Bank Account '3996 in July 2020.

Additionally, on August 27, 2020, Sean Novis and Gary Denkberg were indicted for mail and wire fraud charges, including conspiring to commit mail fraud.  (<u>United States. v. Sean Novis et al.</u>, 20-cr-335 (JMA) (E.D.N.Y.).)  Similar to Barka and Young, Novis and Denkberg allegedly orchestrated fraudulent mass mailings and used PacNet as a payment processor to accomplish their scheme.  (Indictment, <u>Novis</u>, 20-cr-335, ECF No 1.)  Prior to their indictment, Novis, Denkberg, and related entities were sued by the Government civilly in September 2016.  Additionally, three companies they allegedly control have appeared in the interpleader action.

## H.  <u>The Court's Order to Show Cause in the Interpleader Action</u>

In light of the developments in <u>Young</u> as well as the indictment of the defendants in <u>Day</u>, the Court issued an OTSC in the interpleader action on May 31, 2020.  The OTSC directed the parties to address a number of questions raised by these developments and the parties' recent filings in the <u>Young</u> criminal matter, including:

> 1) Assuming <u>arguendo</u> that the Court has jurisdiction over this interpleader action, why shouldn't this action be stayed until the resolution of <u>United States v. Roseanne Day, et. al.</u>, 19-CR-155 (D. Nev.)?

2) Because interpleader is "fundamentally an equitable remedy . . . . the rule that one who seeks equitable relief must come into court with clean hands applies." William Penn Life Ins. Co. of New York v. Viscuso, 569 F. Supp. 2d 355, 362 (S.D.N.Y. 2008). Assuming arguendo that this Court has jurisdiction over this interpleader action, why shouldn't this Court first address—before any other merits issue in this action—whether PacNet has the requisite clean hands to invoke interpleader?

\*\*\*\*

(5) The Government's May 27, 2020 filing in Young asserts various arguments as to why the forfeiture proceeding in Young should be stayed, including the argument that the Government should not be required to engage in civil discovery as part of forfeiture proceedings until Day has been concluded.  Why do those arguments not warrant a stay of this interpleader action?

\*\*\*

7) Why shouldn't this Court exercise [its] discretion to stay (or even dismiss) this interpleader action in light of Young and Day and the forfeiture issues raised in those cases?

(OTSC, ECF No. 168.)  PacNet, I-Payout, and the Government filed responses to the OTSC.  (ECF Nos. 170, 171, 173, 174.)

## II.  DISCUSSION

### A.  Overview

As explained below, the Court grants OFAC's motions to dismiss, and dismisses the interpleader action.  In conjunction with the resolution of those motions, the Court denies PacNet's Cross-Motion to Compel and the Sanctions Motion filed by PacNet, and joined by I-Payout.  The Court also grants a stay of the ancillary proceedings in Young until the Day case is resolved. Additionally, the Court also notes that, even if it had had jurisdiction over the interpleader action, it would also stay the interpleader action until the conclusion of the Day matter.  Before delving into each of the motions, the Court first sets out a brief overview of interpleader actions.

**B.  Overview of Interpleader Actions**

The purpose of an interpleader action is to "join[] two or more adverse claimants to a single proceeding in order, in turn, to promote efficiency and to protect the stakeholder from multiple lawsuits."  Dist. Attorney of New York Cty. v. Republic of the Philippines, 307 F. Supp. 3d 171, 189 (S.D.N.Y. 2018).  The federal interpleader statute, 28 U.S.C. § 1335, provides that:

> (a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person . . . having in his or its custody or possession money or property of the value of $500 or more, or  . . . being under any obligation written or unwritten to the amount of $500 or more, if
>
>> (1) Two or more adverse claimants, of diverse citizenship . . . are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits  . . . arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, or has given bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper . . . .

28 U.S.C. § 1335.  In addition to the requirements above, because interpleader is "fundamentally an equitable remedy . . . . the rule that one who seeks equitable relief must come into court with clean hands applies."  William Penn Life Ins. Co. of New York v. Viscuso, 569 F. Supp. 2d 355, 362 (S.D.N.Y. 2008).

Courts follow a two-step process in an interpleader action.  At the first stage, the Court determines whether the jurisdictional requirements of § 1335 are met and, if so, discharges the plaintiff from liability.  Dist. Attorney of New York Cty., 307 F. Supp. 3d at 189.  Additionally, any claim that the interpleader plaintiff "lacks the clean hands necessary to seek equitable relief" is addressed at the first stage of an interpleader action.  William Penn, 569 F. Supp. 2d at 360.  At the second stage of the interpleader process, the Court adjudicates "the parties' adverse claims on the merits."  Dist. Attorney of New York Cty.,  307 F. Supp. 3d at 189.

Interpleader "forces the claimants to contest what essentially is a controversy between them." 7 C. Wright, A. Miller, *Fed. Prac. & Proc. Civ.* § 1702.  An interpleader action is available to a plaintiff "even though neither an action has been brought against nor a formal demand has been made on the [plaintiff] by some or all of the potential claimants." 7 C. Wright, A. Miller, *Fed. Prac. & Proc. Civ.* § 1707.  The ability of a stakeholder plaintiff to interplead prospective claimants is reflected in § 1335(b)'s reference to "[t]wo or more adverse claimants . . . [who] <u>are claiming</u> or <u>may claim</u> to be entitled" to the money or property at issue.  28 U.S.C. § 1335(b) (emphasis added).

## C.  <u>Sovereign Immunity</u>

OFAC has moved to dismiss the interpleader action under Federal Rule of Civil Procedure 12(b)(1), arguing that the Court lacks jurisdiction over OFAC because no waiver of sovereign immunity applies to this suit.  In response, PacNet attempts to invoke sovereign immunity waivers found in various statutes and also seeks jurisdictional discovery.  The Court agrees with OFAC that none of PacNet's purported grounds for a waiver apply here.

### 1.  **Sovereign Immunity**

"Sovereign immunity is a jurisdictional bar, and a waiver of sovereign immunity is to be construed strictly and limited to its express terms." <u>Lunney v. United States</u>, 319 F.3d 550, 554 (2d Cir. 2003).  "In considering challenges to subject matter jurisdiction under Rule 12(b)(1), this Court may consider evidence extrinsic to the pleadings, such as affidavits, documents and testimony." <u>Spinale v. U.S. Dep't of Agric.</u>, 621 F. Supp. 2d 112, 117 (S.D.N.Y.), <u>aff'd</u>, 356 F. App'x 465 (2d Cir. 2009).

The Court addresses below the four statutes that PacNet asserts establish a waiver of sovereign immunity here.  None are applicable.  The only statute raised by Plaintiff that merits

extended discussion is Section 702 of the Administrative Procedure Act ("APA"), which contains

an immunity waiver that PacNet seeks to invoke here.

### 2. The Interpleader Statute – 28 U.S.C. § 1335

PacNet brings its interpleader complaint pursuant to 28 U.S.C. § 1335.  However, § 1335

"is not itself a waiver of sovereign immunity."  AmSouth Bank v. Mississippi Chem. Corp.

("AmSouth I"), 465 F. Supp. 2d 1206, 1209 (D.N.M. 2006) (citing, inter alia, Kentucky ex rel.

United Pacific Ins. Co. v. Laurel County, 805 F.2d 628, 636 (6th Cir. 1986)); see also Coastal

Rehab. Servs., P.A. v. Cooper, 255 F. Supp. 2d 556, 559 (D.S.C. 2003).  As the interpleader statute

does not itself waive sovereign immunity, the Court turns to Section 702 of the APA.

### 3. The Administrative Procedure Act - 5 U.S.C. § 702

#### i. The Relevant Provisions of the APA

The APA is codified at 5 U.S.C. §§ 701 et seq.  5 U.S.C. § 702 states:

> A person suffering legal wrong because of agency action, or adversely affected or
> aggrieved by agency action within the meaning of a relevant statute, is entitled to
> judicial review thereof.  An action in a court of the United States seeking relief
> other than money damages and stating a claim that an agency or an officer or
> employee thereof acted or failed to act in an official capacity or under color of legal
> authority shall not be dismissed nor relief therein be denied on the ground that it is
> against the United States or that the United States is an indispensable party.  The
> United States may be named as a defendant in any such action, and a judgment or
> decree may be entered against the United States: Provided, That any mandatory or
> injunctive decree shall specify the Federal officer or officers (by name or by title),
> and their successors in office, personally responsible for compliance. Nothing
> herein (1) affects other limitations on judicial review or the power or duty of the
> court to dismiss any action or deny relief on any other appropriate legal or equitable
> ground; or (2) confers authority to grant relief if any other statute that grants consent
> to suit expressly or impliedly forbids the relief which is sought.

The text highlighted text was added in 1976.  At the time, the first sentence of § 702 was already

part of the APA, which was first enacted in 1946.  B.K. Instrument, Inc. v. United States, 715 F.2d

713, 718 (2d Cir. 1983); see Kathryn E. Kovacs, Scalia's Bargain, 77 Ohio St. L.J. 1155 (2016).

Other sections of the APA contain other provisions that apply to suits under the APA. For example, 5 U.S.C. § 704 states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." And, 5 U.S.C. § 701 states, in relevant part, that "[t]his chapter applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

### ii. The Parties' Arguments

PacNet focuses on the following sentence from § 702 that contains the waiver of sovereign immunity:

> An action in a court of the United States seeking relief other than money damages and <u>stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority</u> shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphasis added.) PacNet maintains that its interpleader complaint meets all of the criteria set forth in this sentence and that, as such, the immunity waiver applies here.

According to OFAC, PacNet cannot invoke this waiver of sovereign immunity because this waiver is conditioned on other limitations placed on suits in §§ 701–704, including the first sentence of § 702. Additionally, OFAC insists that it "has not and does not assert a claim to the funds at issue in the interpleader action." (OFAC Mot. to Dismiss Reply at 1, ECF No. 139-7.)

PacNet responds that because it is not bringing an APA claim, it can invoke § 702's immunity waiver without having to meet any additional requirements found in the APA. PacNet also asserts that even if it is required to show "agency action" or "final agency action" in order to invoke the waiver in § 702, it has established both types of "action."

22

As explained, below, the Court agrees with OFAC that in order to invoke the waiver of sovereign immunity in § 702, a plaintiff must satisfy other requirements and conditions set forth in §§ 701–704 and that PacNet cannot meet those requirements here.

### iii.  Caselaw Interpreting § 702's Immunity Wavier

When a plaintiff brings a claim under the APA, the sovereign immunity waiver in § 702 applies and the plaintiff must also meet any other applicable statutory requirements set out in §§ 701 through 704 of the APA.  Here, however, PacNet does not bring a claim under the APA.  Rather, PacNet has brought a complaint in interpleader under 28 U.S.C. § 1335.  Thus, two threshold questions arise:  First, does the waiver of sovereign immunity in § 702 apply to claims that are not brought under the APA?  Second, if the immunity waiver in § 702 applies to non-APA claims, to what extent is a plaintiff's ability to invoke that waiver conditioned on the plaintiff meeting the other requirements set out in Sections 701 through 704?  Parsing the caselaw on these issues can be difficult as it is not always clear if a plaintiff is pursuing an APA or non-APA claim.

Second Circuit precedent indicates that the waiver in § 702 applies to non-APA claims. See B.K. Instrument, 715 F.2d 713, 718 (2d Cir. 1983) (holding that that waiver in § 702 applies to actions brought under 28 U.S.C. § 1331); Polanco v. U.S. Drug Enf't Admin., 158 F.3d 647, 649 (2d Cir. 1998) (finding sovereign immunity waiver in § 702 applied to the plaintiff's "judicially-created cause of action to remedy [an administrative] forfeiture that is procedurally deficient"); Other Circuits have held similarly.  See, e.g., Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 186 (D.C. Cir. 2006); see also Gupta v. S.E.C., 796 F. Supp. 2d 503, 509 (S.D.N.Y. 2011) (citing Trudeau, 456 F.3d at 186 for the proposition that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not," but not identifying whether plaintiff brought an APA claim and subsequently citing one provision of APA).

The Court must still determine whether, and to what extent, the other requirements set out in §§ 701–704 apply to non-APA claims when a plaintiff relies on §702's waiver.

Some Circuits have held that a plaintiff bringing a non-APA claim is not required to meet the requirements set out in §§ 701–704, including:  (1) establishing "agency action" or "final agency action," which are referenced in the first sentence of § 702 and § 704; or (2) meeting § 704's "no other adequate remedy" requirement.  See Navajo Nation v. Dep't of the Interior, 876 F.3d 1144, 1172 (9th Cir. 2017) (holding that "the second sentence of § 702 waives sovereign immunity broadly for all causes of action that meet its terms, while § 704's 'final agency action' limitation applies only to APA claims"); id. at 1172 n.36 (citing cases from the Third, Sixth, Seventh, Eighth, D.C. and Federal Circuits in observing that "[o]ther circuits are in near-unanimity," but noting that the Fifth Circuit has held to the contrary); Perry Capital LLC v. Mnuchin, 864 F.3d 591, 620–21 (D.C. Cir. 2017) ("[Section] 702 waives Treasury's immunity regardless whether there is another adequate remedy under § 704 because the absence of such a remedy is instead an element of the cause of action created by the APA.").[10]

The Fifth Circuit has taken a contrary approach, and has required a plaintiff alleging a non-APA claim to establish, at the very least, "agency action" in order to invoke § 702's immunity waiver.  See Belle Co. v. U.S. Army Corps of Engineers, 761 F.3d 383, 396 (5th Cir. 2014) (dismissing due process claim not premised on the APA because the plaintiff, who relied on § 702 to waive sovereign immunity, did not challenge "final agency action"), cert. granted, judgment vacated sub nom. Kent Recycling Servs., LLC v. U.S. Army Corps of Engineers, 136 S. Ct. 2427

---

[10] PacNet relies extensively on the Supreme Court's decision in Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 215 (2012).  In that case, the Supreme Court acknowledged that the "the APA generally waives the Federal Government's immunity from a suit 'seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'"  (Id. (quoting 5 U.S.C. § 702).)  However, that case involved an APA claim and the Supreme Court had no occasion to consider how the waiver in § 702 applies to non-APA claims.

(2016); Alabama-Coushatta Tribe of Texas v. United States, 757 F.3d 484, 488–90 (5th Cir. 2014) ("Section 702 . . . waives immunity for claims where a person is 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.' 5 U.S.C. § 702. This type of waiver applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA.").

The Second Circuit has not addressed this issue to the same extent as some Circuits. However, like the Fifth Circuit, the Second Circuit's decisions in this area indicate that additional requirements in §§ 701–704 must also be satisfied when a plaintiff bringing a non-APA claim relies on § 702 as a sovereign immunity wavier.

In S.E.C. v. Credit Bancorp., Ltd., 297 F.3d 127, 141 (2d Cir. 2002), a receiver filed a motion against the Government seeking a declaratory judgment that payment of the company's debts took priority over its tax liabilities. Id. at 141. This does not appear to have been an APA claim and nothing in the decision suggests otherwise. The Second Circuit held that the receiver's motion was barred by sovereign immunity and rejected the receiver's attempt to rely on § 702, finding that § 702's immunity waiver only applied to "agency action," and that such "agency action" was absent, rendering § 702 unavailable to the plaintiff. See id. at 141. Notably, the term "agency action" is found in the first sentence of § 702 and in § 704, but not in the immunity waiver language added to § 702 in 1976.

In Polanco v. U.S. Drug Enf't Admin., 158 F.3d 647, 649 (2d Cir. 1998), the plaintiff pursued a "judicially-created cause of action to remedy [an administrative] forfeiture that is procedurally deficient." Although the Second Circuit indicated that this claim was similar to a claim under the APA, it characterized the plaintiff's claim as distinct from an APA claim. Id. at 652–53. The Second Circuit required the plaintiff to meet additional requirements under the APA

in order to invoke § 702's sovereign immunity waiver, ultimately finding that the plaintiff met these requirements. See id. at 652 ("Section 702 waives sovereign immunity in an action seeking equitable relief from wrongful agency action, except where (i) the action also seeks monetary relief; (ii) there is an adequate remedy at law; or (iii) the action is precluded from judicial review by statute or committed by law to agency discretion.").

Two other decisions from the Second Circuit—in which the bases for the plaintiffs' claims are unclear—also suggest that § 702's waiver of sovereign immunity is conditioned on compliance with other requirements set out in §§ 701–704. See S.E.C. ex rel. Glotzer, 374 F.3d 184, 192 (2d Cir. 2004) (finding plaintiff's failure to exhaust administrative remedies, which is necessary to establish final agency action, meant that the "the SEC's actions were not subject to APA review, and the APA's waiver of sovereign immunity did not apply"); Sprecher v. Graber, 716 F.2d 968, 974 (2d Cir. 1983) (explaining that "Section 702 limits the waiver to a 'legal wrong [suffered] because of agency action'" and that the "legislative history of Section 702 amply demonstrates that Congress did not intend to waive sovereign immunity where a matter is statutorily committed to agency discretion," one of the limitations found in § 701(a).).

District courts in the Second Circuit have expressed conflicting views on the relationship between the immunity waiver in § 702 and the other provisions in §§ 701–704 of the APA. Compare Infante v. Drug Enf't Admin., 938 F. Supp. 1149, 1154 (E.D.N.Y. 1996) (not identifying whether the plaintiff brought an APA claim, but stating that "[w]hile 5 U.S.C. § 702 waives sovereign immunity for agency actions, sections 701 and 704 limit the terms of that waiver."); with Levitt v. F.B.I., 70 F. Supp. 2d 346, 347 (S.D.N.Y. 1999) (following a decision from the Eighth Circuit over Infante's analysis and reasoning that "[t]here is no suggestion in [the 1976 amendment to § 702] that Congress intended to confine the waiver of immunity by reference to Section 704").

26

In addition to the precedent from the Second Circuit set out above, two out-of-circuit district court cases cited in the parties' papers for other purposes are notable because in both cases, the court found that the plaintiff, which relied on the immunity waiver in § 702 to bring an interpleader action, was required to establish "final agency action."  See Bituminous Cas. Corp. v. Walden Res., LLC, 672 F. Supp. 2d 835, 844–848 (E.D. Tenn. 2009) (finding no sovereign immunity waiver under § 702 because "final agency action" was absent in suit where the plaintiff insurance company sought declaratory relief and filed interpleader against federal agencies which had, through various letters, notified the insurer of the insured's potential liability to the federal defendants); AmSouth Bank v. Mississippi Chem. Corp. ("AmSouth II"), 06-CV-711 (D.N.M. Jan 11, 2008) (ECF No. 48) (finding, in interpleader action, that the court lacked jurisdiction under the APA because the Fish and Wildlife Service had not taken any "final agency action").[11]

### iv. Analysis

It is unnecessary to determine if PacNet might be able to prevail under the interpretation of § 702 that has been adopted in some other Circuits because the Second Circuit's decisions in this area follow a different approach.  Not only does the precedent from the Second Circuit outlined above indicate that other requirements set out in §§ 701–704 (including the first sentence of § 702) apply to the immunity waiver in § 702, but such a reading makes sense given:  (1) Congress's

---

[11] PacNet relies extensively on AmSouth Bank v. Mississippi Chem. Corp. ("AmSouth I"), 465 F. Supp. 2d 1206 (D.N.M. 2006), an earlier decision in the AmSouth case.  In AmSouth I, as part of a plea agreement, a criminal defendant deposited funds with AmSouth Bank, which was required to pay the funds towards an environmental remediation project with the proviso that the United State Probation Office had to first approve any payments.  After the Probation Office refused to authorize certain payments, AmSouth instituted a statutory interpleader action, which was authorized by its escrow agreement.  The Probation Office, along with its co-defendant, the United States Fish & Wildlife Service, moved to dismiss, arguing that no waiver of sovereign immunity existed to permit the suit.  The court found that although the general interpleader statute, 28 U.S.C. § 1335, did not waive sovereign immunity, § 702 of the APA did waive sovereign immunity for the Fish & Wildlife Service because, unlike the Probation Office, it qualified as an "agency."  However, the "final agency action" requirement, which the court subsequently applied in AmSouth II, was not discussed in AmSouth I.

27

placement of the immunity waiver in § 702 of the APA; (2) the requirement that ambiguous waivers of sovereign immunity—which § 702 surely is—be strictly construed; and (3) other legislative history that weighs against the interpretation adopted by other Circuits, see Kovacs, 77 Ohio St. L.J. 1155, 1177–87 (discussing legislative history of § 702 and arguing both that the "waiver applies only to APA claims" and that "even if plaintiffs may use the APA's waiver of sovereign immunity to bring non-APA causes of action, as the courts of appeals have concluded, use of the waiver should still hinge on satisfying the other requirements of the APA").

Thus, the Court concludes that, under the first sentence of § 702 as well as § 704, a plaintiff must seek "judicial review" of "final agency action" in order to invoke the § 702 waiver in a non-APA case. Additionally, a plaintiff seeking to invoke § 702's waiver must also satisfy other requirements of the APA, including § 704's "no other adequate remedy" requirement and § 701's provision that excludes "agency action is committed to agency discretion by law."

OFAC—which maintains that it "has not and does not assert a claim to the funds at issue in the interpleader action"—argues that PacNet and this interpleader action do not object to, challenge, or seek "judicial review of" any agency action by OFAC. OFAC also argues that because PacNet "does not, and cannot challenge, OFAC's alleged agency action, PacNet does not have standing or a justiciable claims against OFAC." (OFAC Mot. to Dismiss Reply at 3.)

In response, PacNet points to various actions by OFAC—including the 2016 designation, entering into the Agreement, and providing the license PacNet needed to transfer the funds—that it claims are relevant to the waiver of sovereign immunity. PacNet also focuses on OFAC's October Determination, contending that OFAC's October Determination is both an "agency action" and "final." According to PacNet, OFAC's actions—including the October

Determination—"effectively seized" and asserted a claim to the funds at issue in the interpleader action.  (PacNet Opp'n to Mot. to Dismiss at 3, ECF No. 139–3.)  PacNet maintains that:

> [T]his [interpleader] action explicitly—though indirectly—challenges the government's assertion of control over PacNet client funds.  Multiple interpleader claimants have asserted claims to the interpleader fund in which they contest OFAC's designation of the sums due to them as proceeds of fraud or money laundering.

(Id. at 15.)

Ultimately, none of OFAC's actions PacNet cites are sufficient to trigger § 702's waiver.[12]

PacNet's arguments about the October Determination face a number of hurdles.  First, this interpleader action is different from most lawsuits against the Government in which the plaintiff asserts that some action the Government took was unlawful (or that the Government failed to take some action when the law required it to do so).  In most cases, it would be clear that the plaintiff is challenging and seeking "judicial review" of a specific act by the Government.  PacNet, however, is bringing an interpleader suit, which allows a plaintiff who faces competing claims or the prospect of competing claims to force all parties who "are claiming or may claim entitlement to . . . the property" to litigate their claims in one forum.  28 U.S.C. § 1335(b).

Here, PacNet is not itself seeking "judicial review" of any "agency action" by OFAC.  Perhaps, if the other claimants were, at the second stage of interpleader, contesting a claim that OFAC has made, through "agency action," to the funds at issue, they might be viewed as seeking "judicial review" of that action for purposes of § 702.  However, even assuming arguendo that such an approach might provide a path for an interpleader plaintiff to invoke § 702's waiver in

---

[12] The Court assumes that the October Determination is a "final agency action."  Notably, the October Determination had the direct legal consequence, under the Agreement, of requiring PacNet to either interplead $5,220,855 with this Court or to deposit that amount of funds in escrow.  While the October Determination had consequences for PacNet under the Agreement, PacNet does not challenge, in this interpleader action, its obligation under the Agreement to deposit the funds with the Court or put them in escrow.  Rather, PacNet vigorously asserts that the funds should have remained in this interpleader action.

some circumstances, PacNet's argument fails because none of OFAC's actions actually constituted a claim to the funds at issue here.

PacNet contends that in the October Determination, OFAC (and the United States generally) asserted a claim to the funds at issue. The Court disagrees because OFAC's October Determination is, on its face, not a claim that OFAC (or even the United States Government, generally) is entitled to the funds at issue, through forfeiture or otherwise.[13] Rather, the October Determination was simply a factual determination that OFAC had a "reasonable factual basis . . . to believe that certain [specified] proposed transactions disclosed by PacNet . . . involve the proceeds of fraud or money laundering allegedly committed by certain PacNet clients." That factual determination had consequences under the Agreement and also put PacNet on notice that transferring the funds at issue could constitute money laundering. However, the October Determination was not a claim to the funds at issue. Because the factual determination made by OFAC largely mirrors the factual predicate for a forfeiture claim, the October Determination (along with the Agreement) does suggest that some agency "may" claim an entitlement to these funds at some point in the future as forfeitable property. However, PacNet cannot invoke § 702's immunity waiver because OFAC's actions never actually asserted a claim to the funds at issue that could be subject to "judicial review" in this interpleader suit. What PacNet's interpleader suit seeks to do is force OFAC to assert a forfeiture claim in this action so that the claim can then be subject to "review" and be challenged by other parties in the interpleader who claim entitlement to the

---

[13] PacNet also points to the provision in the Agreement which states: "<u>PacNet accepts</u> the representation by OFAC <u>as sufficient to indicate to PacNet</u> that <u>a dispute exists</u> as to the identified funds and PacNet will therefore interplead or deposit the money in escrow until <u>the dispute</u> can be resolved." (Agreement at ¶ A.7 (emphasis added).) However, this provision merely describes how PacNet—not OFAC—views OFAC's representation. Moreover, OFAC did not "agree" to this provision, which is found solely under the heading of what "PacNet[] agrees to" in the Agreement. Accordingly, the language in this provision does not render the October Determination a claim by OFAC (or the United States) that it is entitled to any of the funds at issue.

property.  That is putting the cart before the horse.  This interpleader action does not seek judicial review—by PacNet or any interpleader claimant—of any pre-existing claim by OFAC that it is entitled to the funds at issue.[14]  Not only does the plain language of the October Determination indicate that it was not a claim to the funds at issue, but OFAC has steadfastly maintained that it "has not and does not assert a claim to the funds at issue in the interpleader action," and it does not appear that OFAC even has the authority to pursue a forfeiture claim based on mail fraud or money laundering, which further confirms that the October Determination was not a claim to these funds.

PacNet's arguments also imply that—even if OFAC has not asserted a "claim" to the funds at issue—§ 702's immunity waiver would still be triggered because "[m]ultiple interpleader claimants have asserted claims to the interpleader fund in which they contest" OFAC's factual determination that "the sums due to them are proceeds of fraud or money laundering" by PacNet's former clients.  (PacNet Opp'n to Mot. to Dismiss at 15.)  The Court fails to see how a claimant can use an interpleader action to seek "judicial review" of a mere factual determination by OFAC when it has never claimed entitlement to the funds at issue.

In PacNet's reply brief for its Cross-Motion to Compel, PacNet asserts that the bills of particulars filed in <u>Young</u> and <u>Barka</u> that seek forfeiture of the funds in the Court Registry Account are inconsistent with OFAC's disclaimer of any interest in those same funds.  (PacNet Cross-Mot. Reply at 4.)  PacNet maintains that the Government "cannot have it both ways."  (<u>Id.</u>)  PacNet,

---

[14]  A plaintiff can bring an interpleader action under 28 U.S.C. § 1335 if, among other requirements, there are two adverse "claimants" who "are claiming or may claim to be entitled to" the property at issue.  The distinction between claimants who are currently "claiming . . to be entitled to" the property and prospective claimants who "may claim to be entitled to" the property at issue is normally irrelevant.  Here, however, it would seem that PacNet can only trigger § 702's waiver if this interpleader action can be viewed as seeking "judicial review" of a pre-existing "claim" by OFAC to the funds at issue.  Ordinarily, a plaintiff bringing an interpleader action can force a defendant who has not yet claimed entitlement—but who "may claim to be entitled to" the property—to raise that claim in the interpleader action.  However, the Court fails to see how either PacNet (or the other claimants) can seek "judicial review" of a claim that an agency has not yet asserted, even though it (or some other agency) "may" assert such a claim in the future.

however, never addresses, in any of its papers, how this affects its argument that § 702 waives sovereign immunity for this interpleader action. Accordingly, any such argument has been waived. In any event, the bills of particulars do not alter the Court's conclusion that PacNet cannot invoke § 702's sovereign immunity waiver. First, these bills of particulars—which were filed months after PacNet's Interpleader Complaint—are not the actions of OFAC, which is the only federal defendant in the interpleader action. Second, irrespective of what federal entity is named as the defendant,[15] multiple provisions of the APA preclude PacNet or any other claimant from relying on § 702's immunity waiver to challenge a bill of particulars filed by the DOJ. Cf. City of Oakland v. Lynch, 798 F.3d 1159 (9th Cir. 2015) (finding that civil forfeiture complaint could not be challenged under the APA because its filing was committed to agency discretion, it was not a final agency action, and the existing civil forfeiture statute already provided an adequate remedy).

PacNet also advances other alternative arguments concerning both the October Determination as well as other actions taken by OFAC, including the 2016 designation, the Agreement, and OFAC's provision of the license PacNet needed to transfer the funds. As explained below, this interpleader action does not challenge or seek "judicial review" of any of these actions and, as such, they do not trigger § 702's sovereign immunity waiver.

PacNet maintains that, through various actions, OFAC asserted "control" over the funds at issue. Contrary to PacNet's view, OFAC's purported assertion of control of PacNet's funds is not at issue in this interpleader action and thus is not under "judicial review" here.

Prior to this interpleader action, OFAC designated PacNet as a TCO in 2016, which had the effect of blocking PacNet from transferring any assets. However, the designation was

---

[15] PacNet—which has never sought to amend the complaint to name the DOJ or the United States as defendants—appears to assert that its suit against OFAC should be construed as one against the United States generally.

rescinded on October 30, 2017 as a result of PacNet's compliance with the Agreement. Neither PacNet nor any of the interpleader claimants seek "judicial review" of the now-rescinded designation in this interpleader suit.

The October Determination and the Agreement also did not assert control of the funds at issue for any purposes that can possibly be challenged in this interpleader action. OFAC's issuance of the October Determination obligated PacNet, under the Agreement, to either deposit in escrow or interplead a specific amount of funds. However, any control that OFAC exercised over PacNet's funds through this process would cease the moment PacNet deposited the funds into the interpleader account. OFAC's control over interpleaded funds would not be subject to "judicial review" in this interpleader action.[16] Thus, PacNet's attempt to analogize this case to AmSouth I, 465 F. Supp. 2d 1206, where the Government continued to withhold permission for a bank to disburse funds is not persuasive.

PacNet also suggests that OFAC's October Determination "effectively seized" the funds at issue. PacNet reasons that because OFAC determined that there was a reasonable factual basis to believe that the proposed transactions "involve the proceeds of fraud or money laundering," PacNet is now subject to potential criminal liability for money laundering if it were to transfer the funds to its clients. PacNet's attempt to invoke § 702's waiver on this basis is not persuasive. A factual determination by OFAC that puts parties on notice that transferring certain funds might expose PacNet to criminal liability would not place the October Determination at issue in this

---

[16] The only conceivable contractual control that OFAC continued to exert over any deposited funds would be the Agreement's requirement—imposed on PacNet—that "PacNet will . . . interplead  . . . until the dispute can be resolved." (Agreement ¶ A.7.) However, neither PacNet nor any interpleader claimant is challenging the requirement that the funds remain in the interpleader action until the disputes over the funds are resolved. In fact, PacNet and I-Payout have filed motions requesting that funds seized from the Court Registry Account be returned to that account so that the claimants can litigate, in this interpleader action, whatever claims they have to those funds.

interpleader action.   The fact that potential criminal consequences might flow from OFAC's determination does not render that determination a claim that OFAC is entitled to any of the funds at issue here.   Nor does OFAC exert any formal control over the funds through such a determination.

For the reasons set forth above, PacNet cannot invoke § 702's sovereign immunity waiver.

**4.  28 U.S.C. § 2410(a)**

28 U.S.C. § 2410(a) provides that "the United States may be named a party in any civil action or suit in any district court . . . having jurisdiction of the subject matter . . . of interpleader or in the nature of interpleader with respect to, real or personal property on which the United States has or claims a mortgage or other lien."  (emphasis added).

PacNet contends that OFAC's actions, including its October Determination establish that the Government has a lien or claims a lien on the funds at issue in this interpleader action.

"A lien is a security interest in property."  Credit Bancorp., 297 F.3d at 138 ("[B]roadly understood 'lien' may be considered as a general term embracing all sorts of security devices, legal or equitable[.]" (citing the Restatement of Security Ch. 2, Scope Note (1941)); see also Coastal Rehab. Servs., P.A. v. Cooper, 255 F. Supp. 2d 556, 560 (D.S.C. 2003) ("A 'lien' is defined as '[a] legal right or interest that a creditor has in another's property, lasting usu[ally] until a debt or duty that it secures is satisfied."  (quoting Black's Law Dictionary 922 (6th ed. 1990).)

None of OFAC's actions created a lien or claimed lien.  In addition to OFAC's insistence that "it does not have an interest in, and does not intend to make a claim to, the funds at issue in this action," the relevant caselaw does not support PacNet's arguments.  The cases cited by PacNet involve, for example, formal tax liens, which are clearly distinguishable from this case.

PacNet's assertion that the Government "laid a legal claim to the funds" and that OFAC "imposed a de facto lien" on the funds because PacNet could not transfer the funds without subjecting itself to potential criminal liability is clearly insufficient.  Cf. Bituminous Cas. Corp., 672 F. Supp. 2d at 844 (holding that claim to insurance proceeds under policy did not amount to a lien and stressing requirement that courts must construe waivers of sovereign immunity strictly.)

Moreover, even if OFAC's actions could be considered a claim (by OFAC or the United States) that the funds at issue were subject to forfeiture, a forfeiture claim is not a lien or a "claim[ed]" lien under § 2410(a).  "[C]ourts have consistently held that § 2410 does not waive sovereign immunity where the United States claims title to the property in question."  Greenfield v. Nat'l Westminster Bank USA, No. 94 CIV. 3262, 1995 WL 5807, at *3 (S.D.N.Y. Jan. 6, 1995). "Through forfeiture proceedings, the federal government seeks title to the property, not a mortgage or lien."  Id.; cf. Hudson Cty. Bd. of Chosen Freeholders v. Morales, 581 F.2d 379, 383 (3d Cir. 1978) (finding county's alleged entitlement under state forfeiture law was not a "mortgage or other lien" under § 2410(a)); Stapleton v. $2,438,110, 454 F.2d 1210, 1219 (3d Cir. 1972) (Adams, J., concurring) (same).  PacNet cannot rely on § 2410(a) as a waiver of sovereign immunity.

### 5.  The Little Tucker Act - 1346(a)(2)

The "Little Tucker Act," 28 U.S.C. § 1346(A), provides a waiver of sovereign immunity for claims that do not exceed $10,000, but does not cover suits for equitable relief.  Richardson v. Morris, 409 U.S. 464, 465 (1973).  Because PacNet is not seeking any money damages, it is precluded from relying on § 1346(A)(2)'s waiver of sovereign immunity.

### 6.  PacNet's Argument that a Statutory Waiver of Immunity is Not Required

Finally, PacNet argues that, even absent a statutory waiver of immunity, this Court has the ability, in this action, to award equitable relief to remedy an ongoing injury.  The cases cited by

35

PacNet do not support this argument.  Moreover, those cases discuss constitutional claims that are not even at issue here since PacNet is merely bringing an interpleader action.  See Schnapper v. Foley, 667 F.2d 102, 108 n .2 (D.C. Cir. 1981) (stating in a footnote that "[w]e may also doubt whether, even in the absence of section 702, the Larson case would prevent a court from awarding equitable relief on the basis of appellants' constitutional claims.").

### 7. Jurisdictional Discovery

PacNet seeks jurisdictional discovery.  That request is denied.  None of the discovery it seeks is relevant to, or could possibly alter, the Court's conclusions about sovereign immunity. PacNet's attempts to uncover evidence of coordination between OFAC and the DOJ/USPIS are irrelevant.  Even if such evidence existed, it would not alter any of the Court's conclusions above.

### D. Cross-Motion to Compel and Motion for Sanctions

### 1. Overview

OFAC has also moved to dismiss on another ground, arguing that the absence of any funds on deposit in the Court Registry Account deprives the Court of subject-matter jurisdiction.  In an effort to stave off dismissal, PacNet, in both its Cross-Motion to Compel and its Sanctions Motion, asks this Court to compel the Government to deposit the seized funds into the Court Registry Account.  PacNet invokes the Court's contempt power as well its authority to protect the interpleader stake.  PacNet also relies on the principle that a court may issue injunctive relief to prevent a defendant from frustrating or making uncollectable a judgment that a plaintiff may eventually obtain.  See In re Feit & Drexler, Inc., 760 F.2d 406 (2d Cir. 1985); Bank of Crete v. Koskotas, No. 88 CIV. 8412, 1989 WL 46587, at *3 (S.D.N.Y. Apr. 21, 1989).

PacNet argues that it is entitled to relief because:  (1) the Government violated two of Judge Garaufis's orders; (2) the Government violated the Agreement; (3) the Government's seizures of

the funds (and attempts to forfeit those funds through the <u>Young</u> and <u>Barka</u> cases) were otherwise

unlawful and improper; and (4) even if none of the above apply, the Government acted in bad faith,

impeded the due administration of justice and is also barred by judicial estoppel, from seizing the

funds at issue and pursuing forfeiture in criminal proceedings.  OFAC and the DOJ/USPIS dispute

all of the above.

### 2.  Standards for a Preliminary Injunction and for Sanctions Motion

"A preliminary injunction is an equitable remedy and an act of discretion by the court."

<u>Am. Civil Liberties Union v. Clapper</u>, 804 F.3d 617, 622 (2d Cir. 2015).  "A party seeking a

preliminary injunction must generally show a likelihood of success on the merits, a likelihood of

irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's

favor, and that an injunction is in the public interest."  <u>Id.</u>

"A party may be held in civil contempt for failure to comply with a court order if '(1) he

order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to

comply in a reasonable manner.'"  <u>Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys.</u>

<u>Info. Techs., Inc.</u>, 369 F.3d 645, 655 (2d Cir. 2004) (quoting <u>King v. Allied Vision, Ltd.</u>, 65 F.3d

1051, 1058 (2d Cir. 1995)).

### 3.  The USPIS Was Authorized to Seize All the Funds at Issue

Before addressing PacNet's other arguments, such as those premised on the Agreement,

court orders, and purported bad faith, the Court turns to the question of whether it was otherwise

permissible for the DOJ/USPIS to seize these funds.  DOJ/USPIS argues that its seizures of all the

funds at issue were lawful and that it was legally proper for the DOJ to seek forfeiture of these

through the criminal forfeiture proceedings in the <u>Young</u> and <u>Barka</u> cases.  For its part, OFAC stresses that it was not involved in the seizures and does not have custody of the funds.

PacNet insists that both the seizures and the institution of criminal forfeiture proceedings in <u>Young</u> and <u>Barka</u> were unlawful and improper, relying on the Supreme Court's 2017 decision in <u>Honeycutt</u>, 137 S. Ct. 1626.[17]  PacNet insists that, under <u>Honeycutt</u>, the seized funds are not forfeitable because Young and Barka (along with the other PacNet clients named as John Does in the Interpleader Complaint) did not own, and never obtained, those funds—rather, they are merely PacNet's creditors.  PacNet also notes that it has not been named as a defendant or co-conspirator in any criminal action and contends that, given the reports it sent to authorities, PacNet could not have possibly conspired with any of the parties who sent fraudulent mass mailings.  In connection with its challenges to the seizures and the criminal proceedings, PacNet seeks disclosure of the affidavits supporting the seizure warrants, all sealed filings by the Government, and any documents showing coordination between DOJ, USPIS, and OFAC.

PacNet views its Cross-Motion to Compel and Sanctions Motion as a vehicle to litigate the Magistrate Judges' determinations of probable cause for the seizure warrants as well as the

---

[17]  PacNet's filings in both the Interpleader Action and in <u>Young</u> rely on <u>Honeycutt</u> in attempting to challenge the seizures at issue, the institution of the criminal forfeiture proceedings, and the forfeiture of the seized funds in <u>Young</u>. In <u>Honeycutt</u>, the Supreme Court held under 21 U.S.C. § 853(a)(1)—which governs forfeitures for certain drug crimes—that a defendant could not be found jointly and severally liable for property that his co-conspirator obtained from the crime, but that the defendant himself did not "actually acquire[] a result of the crime."  137 S. Ct. at 1635.  While the application of <u>Honeycutt</u> to § 981(a)(1)(C), which governs forfeitures for mail fraud, has not been definitively settled in a decision from the Second Circuit, <u>see</u> <u>United States v. Gil-Guerrero</u>, 759 F. App'x 12, 14 (2d Cir. Dec. 21, 2018), it appears that Honeycutt applies equally applicable to § 981(a)(1)(C), <u>see</u> <u>Peithman v. United States</u>, 140 S. Ct. 340 (Nov. 18, 2019) (Sotomayor, J., dissenting).

However, even if <u>Honeycutt</u> applies to § 981(a)(1)(C), other questions about <u>Honeycutt</u>'s scope and impact remain, as illustrated by <u>United States v. Kenner</u>, 443 F. Supp. 3d 354, 358 (E.D.N.Y. 2020) (Bianco, J.).  In <u>Kenner</u>, Judge Bianco held that <u>Honeycutt</u> does not apply to 18 U.S.C. § 982(a)(1), which requires defendants to "forfeit . . . any property . . . involved in" money laundering.  <u>Kenner</u>, 443 F. Supp. 3d at 358.  Judge Bianco also found that, even after <u>Honeycutt</u>, joint and several liability can still exist under § 981(a)(1)(C) when the defendant is not a "'low-level' member of the conspiracy," and instead exercises "substantial control and supervision" over a scheme.  <u>Kenner</u>, 443 F. Supp. 3d at 363 n.8.

propriety of the Government's institution of criminal forfeiture proceedings in Young and Barka. The Court disagrees.  These motions are not the appropriate vehicle for such inquiries.

The seizures of funds from PacNet's bank accounts in September 2017 and from the Court Registry Account in April 2018 were lawful because the USPIS seized these funds pursuant to judicially approved seizure warrants.  The fact that the funds seized in April 2018 were on deposit in the Court Registry Account for an interpleader action does not shield those funds from such seizure.[18]  The authorization provided by these judicially approved warrants is sufficient to defeat PacNet's attempts to challenge the warrants in its Cross-Motion to Compel and Sanctions Motion. These motions are not the appropriate vehicle to challenge the warrants and inquire into the question of probable cause.  PacNet cites no authority to suggest otherwise.  Because the USPIS seized all the funds at issue pursuant to judicially approved seizure warrants, the Court finds that PacNet's arguments above provide no grounds to order the Government to deposit any of the funds at issue with the Court.[19]

---

[18]  The Interpleader Deposit Order precluded the Clerk of the Court from disbursing the funds in the Court Registry Account without a further order of the Court.  As such, the USPIS could not obtain the funds in the Court Registry Account without Judge Garaufis's approval.  However, the mere fact that some court approval was required for these funds to be released, says nothing about what type of inquiry Judge Garaufis had to make before directing the Clerk of the Court to release the funds.

[19]  Even if, somehow, further inquiry by the Court into the propriety of the seizures were required, PacNet still could not prevail.  First, the funds seized in September 2017 were not deposited with the Court and never became part of this Interpleader Action.  As explained, infra, the Court rejects Plaintiff's other arguments that the Court should compel the Government to place those funds into the Court Registry Account.  Thus, even if some further inquiry by this Court were required into the propriety of the April 2018 seizure, the Court would have no basis for such an inquiry into the September 2017 seizures because those funds were never part of this Interpleader Action and never on deposit with the Court.  Second, even if some inquiry by this Court into the question of probable cause were necessary, the Court—after considering the sealed materials before it as well as PacNet's arguments and evidence—finds that the seizures of all the funds at issue were lawful.  (See, e.g., PacNet Reply to Sanctions Mot. at 6–9, PacNet OTSC Response at 20–22, 28–30, PacNet Suppl. OTSC Response.).  Third, if sovereign immunity did not apply and PacNet was, somehow, entitled to the discovery and disclosures it seeks (on this or any other issue) before the Court could rule on its Cross-Motion to Compel and Sanctions Motion, the Court would simply stay the interpleader action and, thus, would have no reason to permit any such discovery at this time.  As explained infra, even if the Court had jurisdiction, the Court would stay the interpleader action until the conclusion of the Day case and other proceedings.

The Court finds the seizures at issue were lawful and has, based on the arguments above, no reason to compel the Government to deposit the seized funds at issue into the Court Registry Account.  Accordingly, it is unnecessary to address, in the context of these motions, PacNet's arguments concerning the Government's attempts to forfeit the seized funds through the <u>Young</u> and <u>Barka</u> cases.

### 4.  No Court Orders were Violated by OFAC or the DOJ/USPIS

After learning of the USPIS's seizure of the funds in the Court Registry Account, PacNet filed a sanctions motion, joined by I-Payout, seeking to hold the Government in contempt.  PacNet contends that the Government violated Judge Garaufis's October 18, 2017 Interpleader Deposit Order and February 12, 2018 Scheduling Order and otherwise acted in disregard of the sound administration of justice.  PacNet seeks various forms relief, including deposit, in the Court Registry Account, of all funds seized in September 2017 and April 2018.  These arguments are meritless.

With respect to the funds seized in September 2017, the Interpleader Deposit Order simply authorized PacNet to transfer funds to the Court Registry Account from unspecified accounts at certain banks.  PacNet's argument that the September 2017 seizures violated the Interpleader Deposit Order fails because the USPIS obtained the seizure warrant and seized the funds at issue weeks <u>before</u> Judge Garaufis signed the Interpleader Deposit Order on October 18, 2017.  Moreover, the Interpleader Deposit Order that Judge Garaufis subsequently signed did not place any obligations on OFAC (or any other government agency) or direct the Government to engage in, or refrain, from taking any action.  The USPIS's seizure of the funds in September 2017 that PacNet intended to use to fund the interpleader was, in no way, a violation of Judge Garaufis's order.  PacNet's claim that the Interpleader Deposit Order somehow created an obligation on

DOJ/USPIS to unfreeze the funds that had been seized a month earlier is unavailing.  None of these arguments show that the Government violated a clear and unambiguous order.

PacNet's claim that the Government should be held in contempt for seizing the funds from the Court Registry Account also fails.  After the Government submitted a sealed <u>ex parte</u> application to Judge Garaufis, he signed an order on December 18, 2017 that explicitly directed the Clerk of Court to issue a check to the USPIS for all funds in the Court  Registry Account— funds which USPIS ultimately obtained on April 2, 2018.  The Government's seizure of the funds in the Court Registry Account cannot possibly be a violation of the Interpleader Deposit Order given that Judge Garaufis's subsequent order on December 18, 2017 explicitly addressed the seizure of the funds.   PacNet, however, contends that Judge Garaufis's February 12, 2018 scheduling order and his comments and questions at the pre-motion conference effectively superseded his December 18, 2017 order.  That scheduling order states:

> Minute Entry for proceedings held before Judge Nicholas G. Garaufis: . . . . The court granted OFAC leave to file a motion to dismiss and <u>granted PacNet leave to file a cross-motion to place all of the money at issue in this litigation together in one location</u>. The court set the following briefing schedule for the anticipated motions: OFAC shall serve its motion on PacNet by February 27, 2018; PacNet shall serve its cross-motion and its opposition to OFAC's motion on OFAC by March 12, 2018; OFAC shall serve its reply in support of its motion, if any, and its opposition to PacNet's cross-motion on PacNet by March 26, 2018; and PacNet shall serve its reply in support of its cross-motion, if any, on OFAC and file the fully briefed motions by April 5, 2018.  The Court directed OFAC to advise the Court, in a separate letter, about (1) any other judicial proceedings, past or current, that involve the money at issue in this litigation, and (2) the status of the money that has been seized by the Postal Inspector.

(Feb. 12, 2018 Scheduling Order (emphasis added); <u>see also</u> Feb. 9, 2018 Tr.)  PacNet asserts that "[i]mplicit in the Court's Scheduling Order was an understanding that funds on deposit with the Court registry would not be removed therefrom pending a decision on the parties' motions." (PacNet Sanctions Mot. at 12.)

Judge Garaufis's February 12, 2018 scheduling order and statements during the pre-motion conference did not vacate or override the ex parte order that he had previously signed on December 18, 2017, and certainly did not do so in a clear and unambiguous fashion. As such, the Government cannot be held in contempt. Moreover, whatever transpired before Judge Garaufis at the pre-motion conference and with the scheduling order is ultimately irrelevant. Judge Garaufis signed the ex parte order on December 18, 2017 and the USPIS obtained the funds pursuant to that order. The parties have now presented me with briefing on the question of whether the seizure of the funds from the Court Registry Account was lawful and permissible. As explained herein, I conclude that it was. Even with the benefit of PacNet's submissions, I also would have signed the December 18, 2017 order and allowed the USPIS to seize the funds from the Court Registry Account. Accordingly, the Court denies PacNet's motions for sanctions on this issue.

In its Sanctions Motion, PacNet also seeks discovery. None of the material that PacNet seeks is relevant to this motion. The Government did not violate a court order. None of the discovery sought by PacNet can change that fact or would alter the Court's conclusions above.

### 5. No Agency Violated the Agreement and PacNet's Claims of Bad Faith Provide No Grounds for Relief

PacNet insists that OFAC (and the Government generally) has violated the Agreement and that, even absent a violation, has acted in bad faith. None of PacNet's arguments are persuasive.

The Court assumes arguendo that if the Government violated the Agreement PacNet might have grounds for obtaining relief in this action. Even so, PacNet would have to show an actual violation of the Agreement–which it has not done. PacNet has not shown that OFAC—the only other party to the Agreement—actually violated the Agreement. PacNet's claim that the DOJ, which is not a party to this Agreement, should nevertheless, somehow, be bound by the Agreement based on its coordination with OFAC—is meritless.

42

None of the seizures undertaken by the DOJ and the USPIS could possibly violate the Agreement because they are not parties to the agreement.  Moreover, even OFAC has no obligations in the Agreement concerning the interpleader action.  The only obligations in the Agreement concerning the interpleader action are on PacNet and are found under the heading of what "PacNet agrees to."  (See, e.g., Agreement ¶ A.7 ("PacNet will therefore interplead or deposit the money in escrow until the dispute can be resolved.").)  The Agreement gave PacNet no rights—as against OFAC or the DOJ/USPIS—to interplead any specific pool of funds or funds from any specific bank account.  Nor did it give PacNet any contractual right to shield the funds it deposited into an interpleader from subsequently being seized pursuant to valid seizure warrants obtained by the USPIS.  In fact, the information sharing provision in the Agreement explicitly acknowledges the possibility of a "forfeiture action . . . against the funds deposited with a . . . . U.S. Court." (Agreement ¶ B.4.)

While PacNet was obligated under the Agreement to either deposit the funds at issue into escrow or interplead them, that did not give PacNet any contractual protection from otherwise lawful interference by the Government with the interpleader action and PacNet's attempt to fund the interpleader.  Even if the September 2017 seizures might have hindered PacNet from meeting its obligation under the Agreement to escrow or interplead the total amount of funds required by the Agreement, OFAC has not asserted that PacNet breached the Agreement or sought to avoid any of OFAC's obligations on that or any other basis.  Rather, OFAC upheld its end of the bargain and, pursuant to its obligations, delisted PacNet and other parties in accordance with the Agreement.

Neither Hercules Inc. v. United States, 516 U.S. 417 (1996), nor any of the other contract cases PacNet cites, (see PacNet OTSC Response at 10–12), show that the Agreement was violated here.  None of these cases suggest that PacNet's obligation to interplead or escrow a set amount of

money would give rise to an implied contractual <u>right</u>—enforceable against both OFAC and the DOJ—to interplead specific funds and have them remain on deposit with the Court, shielded from judicially approved seizure warrants.

PacNet also suggests that OFAC breached the Agreement by improperly sharing information provided by PacNet—specifically, the banking information that PacNet provided to OFAC on September 19, 2017 pursuant to the Agreement.  PacNet accuses OFAC of providing this information to the DOJ/USPIS, which purportedly then used the information to obtain a seizure warrant on September 21, 2017.  (<u>See</u> Cross-Motion to Compel at 5.)

However, an OFAC official has provided a declaration, affirming that OFAC was not involved in the September 2017 seizure warrants and did not provide information to support those applications.  (Conklin Decl. ¶¶ 6–7, ECF No. 158-4.)  Additionally, counsel for DOJ/USPIS has represented that the information PacNet provided to OFAC on September 19, 2017 was "neither 'examined' by nor given to USPIS or DOJ, including the USAO-EDNY.'"  (U.S. Opp'n to Cross-Motion at 7.)

In the face of this representation and sworn declaration, PacNet points to nothing more than the timing of the September 21, 2017 warrants, which the USPIS obtained two days after PacNet provided the "banking information" discussed above to OFAC.  The Court finds, based on the record before it, that is insufficient to establish a breach of the Agreement, and, to the extent PacNet seeks discovery on this issue, is insufficient to justify any discovery as well.  Notably, DOJ and the USPIS were obviously already aware that PacNet had one account as BMO Harris, as funds were seized from BMO Harris in September 2016.  PacNet had not offered any details about the other accounts at BMO Harris or the account at Avidia to suggest that the DOJ and the USPIS were likely to have only learned of those accounts through the September 19, 2017 disclosure to OFAC.

44

Unable to show an actual violation of the contract, PacNet falls back on arguing that the Government acted in bad faith and has violated the spirit of the Agreement.  Such allegations are insufficient given this carefully drafted Agreement and the USPIS's authority to seize, pursuant to the judicially approved warrants, the funds at issue here.  Moreover, PacNet's claims of bad faith are contradicted by the provision of the Agreement that explicitly references the possibility that the Government would seek "to recover by forfeiture action or otherwise against the funds deposited with a. . . . U.S. court pursuant to paragraph A.7."  (Agreement ¶ B.4.)  Additionally, PacNet was, of course, already aware of the 2016 seizure of funds, which would certainly suggest that additional seizures were likely forthcoming.

### 6.  Judicial Estoppel

"Judicial estoppel 'prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding.'" Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 45 (2d Cir. 2015) (quoting Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir.1993)).  "'A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment.'"  (Id. quoting Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999)).

PacNet claims that—given the Interpleader Deposit Order, the Agreement, and the license OFAC that provided—judicial estoppel precludes the Government from arguing that it was not required to comply with that Interpleader Deposit Order and from proceeding with criminal forfeiture proceedings as to the seized funds.  However, as explained earlier, the Interpleader Deposit Order placed no obligations on OFAC, the DOJ, or the USPIS.  Additionally, OFAC never

affirmatively consented to the Interpleader Deposit Order and had not even appeared in this action when Judge Garaufis signed that order, two days after PacNet filed the Interpleader Complaint. Furthermore, the DOJ and the USPIS are even not parties to the Agreement or the interpleader action.  Also, the Agreement and the license provided by OFAC do not give rise to a judicial estoppel claim—nor does the fact that PacNet submitted those items to Judge Garaufis along with its motion to deposit the interpleader fund.  There is no basis for PacNet's judicial estoppel claim.

Finally, PacNet gestures, in a passing footnote, to the principle of equitable estoppel, without ever mentioning it by name.  (PacNet Cross-Motion Reply at 9 n. 15.)  As that is insufficient to raise such an argument, the Court declines to even consider the applicability of equitable estoppel.

### 7.  PacNet's Motion to Consolidate

In its Cross-Motion, PacNet also moved, in the alternative, to consolidate this interpleader action with any criminal forfeiture proceedings concerning the funds at issue.  That motion is denied.  Criminal forfeiture and related ancillary proceedings are governed by a specific statutory scheme tied to the underlying criminal proceedings.  See 21 U.S.C. § 853.

### E.  Motion to Dismiss for Lack of Jurisdiction Based on the Interpleader Statute

Now that PacNet's motions concerning the seized funds have been denied, the Court turns to OFAC's second motion to dismiss, which asserts that the Court lacks subject matter jurisdiction because no funds are on deposit in the Court's registry.[20]

"When the plaintiff-stakeholder fails to deposit all the money or property within its possession that is claimed by the defendant-claimants, it is appropriate for the district court to

---

[20]  OFAC also argued that once no funds were on deposit in the Court Registry Account, the Court lost jurisdiction to even consider PacNet's Cross-Motion to Compel.

dismiss the action for lack of subject matter jurisdiction." Pine Run Properties, Inc. v. Pine Run Ltd., No. 90-CIV-6289, 1991 WL 280719, at *7–8 (S.D.N.Y. Dec. 26, 1991) (citing Metal Transport Corp. v. Pacific Venture Steamship Corp., 288 F.2d 363, 366 (2d Cir. 1961)).

As PacNet's motions have been denied, the seized funds—including those seized in September 2017, which were never deposited with the Court in the first place—will not be deposited by the Government into the Court Registry Account. The Court Registry Account now sits empty. Because there are no funds in "the registry of the court, there to abide the judgment of the court," 28 U.S.C. § 1335, the Court dismisses this interpleader action for lack of subject matter jurisdiction.[21] See Pine Run Ltd., 1991 WL 280719, at *7–8 (dismissing action for lack of subject matter jurisdiction where plaintiffs "made insufficient deposit of the property that is the subject of the interpleader action").

Contrary to PacNet's argument, OFAC is not judicially estopped from seeking dismissal on this ground. In any event, subject matter jurisdiction is not waivable.

**F.  Stay of the Ancillary Proceeding in Young**

In Young, the Government seeks a stay of the adjudication of PacNet's Petition and the criminal forfeiture ancillary proceedings until the resolution of the Day case. Third-party claims to forfeited property are addressed through ancillary proceedings governed by 21 U.S.C. § 853(n).

---

[21]  Even prior to the seizure of the funds from the Court Registry Account in April 2018, PacNet had failed to fully fund the interpleader. While PacNet sought to compel the return of the funds seized in September 2017 so that those funds could be used to fund the interpleader, those motions have failed. As such—even without considering the seizure of the funds in April 2018 from the Court Registry Account—PacNet's failure to fully fund the interpleader is, standing alone, a sufficient reason to conclude that the Court lacks subject matter jurisdiction. See Pine Run Ltd., 1991 WL 280719, at *7–8 (dismissing action for lack of subject matter jurisdiction where plaintiffs "made insufficient deposit of the property that is the subject of the interpleader action"); Coopers & Lybrand, L.L.P. v. Michaels, No. 94-CV-5643, 1995 WL 860760, at *9–10 (E.D.N.Y. Oct. 31, 1995) (dismissing interpleader for lack of subject matter jurisdiction because plaintiff "failed to deposit all the money or property that is claimed by defendants" and "has made no showing that it is able or willing to post bond for such an amount"). Even PacNet conceded that its "failure to deposit the full value of the Interpleader Fund will deprive this Court of jurisdiction over this action." (PacNet Cross-Mot. at 15 (emphasis added).)

Section 853(n)(4) provides that the "[t]he hearing on [a] petition [in an ancillary proceeding] shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition." As explained below, the Court finds that, given all the circumstances, a stay of the proceedings in Young is warranted and "consistent with the interests of justice."

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 96 (2d Cir. 2012) (quoting Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)). Generally, in determining the propriety of a stay, a district court must make "'a particularized inquiry into the circumstances of, and the competing interests in, the case.'" Id. (quoting Banks v. Yokemick, 144 F. Supp. 2d 272, 275 (S.D.N.Y. 2001)). In considering the Government's motion to stay the ancillary proceedings in Young, the Court finds guidance in the stay provisions of the civil forfeiture statute, 18 U.S.C. § 981(g)(1), which provide:

> Upon the motion of the United States, the court shall stay the civil forfeiture proceeding if the court determines that civil discovery will adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case.

Id.; see United States v. Becker, No. 10-40077-02, 2011 WL 836743, at *2 (D. Kan. Mar. 4, 2011) (relying on § 981(g)(2) in addressing defendant's motion to stay criminal forfeiture proceedings in co-defendant's case). "[R]elated criminal case" and "related criminal investigation" are defined as:

> an actual prosecution or investigation in progress at the time at which the request for the stay, or any subsequent motion to lift the stay is made. In determining whether a criminal case or investigation is "related" to a civil forfeiture proceeding, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors.

18 U.S.C. § 981(g)(4).

Here, Day is a related criminal case and a stay is warranted as moving forward with the proceedings in Young will adversely affect the Government's prosecution in Day. PacNet maintains that it will prevail in Young as a matter of law, without the need for any discovery or a hearing, based on the Supreme Court's Honeycutt decision and documentary proof evidencing PacNet's ownership of the funds at issue. However, PacNet's success in the ancillary proceeding, as a matter of law, is not certain. For one thing, the fact that PacNet—which had processed payments for the companies of Barka and Young since 2012—owes $834,854 to these companies may raise issues that, even under Honeycutt, could necessitate discovery and a hearing to explore the alleged conspiracy involving Young, Barka, and employees of PacNet. Discovery and a hearing in Young would adversely affect the Government's prosecution of the Day matter, as the Government would have to, inter alia:

> [e]ngage in civil discovery that would require the government to preview its evidence, submit to document demands and subject its witnesses to depositions and cross examination prior to the criminal prosecution. In addition, previewing the government's evidence could allow current and future targets of the criminal investigation to avoid prosecution or destroy or move evidence, and could jeopardize the availability or willingness of witnesses and informants to cooperate with the government.

(Gov't Mot. to Stay at 9–10, Young, 18-cr-46, ECF No. 19.)

The Day case also justifies a stay of the Young proceedings for other reasons. While the filings in Day do not identify any specific property subject to forfeiture, the Government would—if PacNet prevailed, in whole or in part, in Young—surely seek forfeiture of the seized funds in Day. Thus, even if PacNet could prevail in ancillary proceedings in Young and Barka, none of the funds at issue would be released to PacNet or any other party until, at the very least, the conclusion

of the Day matter.[22]  Moreover, given the roles that the Day defendants played at PacNet and the charges against them, the Government, if it obtained convictions in Day, could have different forfeiture arguments at its disposal in the Day case.[23]

Judicial efficiency concerns also weigh in favor of a stay.  The potential forfeiture arguments available to the Government in the Day case favor a stay in Young because the resolution of the forfeiture issues in Day could render moot any ancillary proceedings in cases such as Barka and Young.

In arguing against a stay in Young (as well as in the interpleader action), PacNet asserted that any such stay would violate its due process rights, result in unreasonable delay, and would be improper in light of the Government's actions in both the interpleader action and the criminal proceedings.  As explained above, even if PacNet prevailed in Young, it would almost certainly be a hollow victory, given that none of the funds at issue would likely be released until after the resolution of the Day case anyway.  Moreover, neither further delay in the resolution of the ancillary forfeiture proceedings nor the Government's actions cited by PacNet warrant denying a stay here.

---

[22]  Even if the ancillary proceedings in Young and Barka were to proceed promptly and PacNet were to prevail in whole or part, the Government would surely, at some point prior to the final disposition of those proceedings, file a bill of particulars in the Day case concerning the seized funds.  That would trigger § 853(k) and presumably preclude PacNet from obtaining any of the seized funds until after the resolution of the Day case and any subsequent forfeiture proceedings.  See 21 U.S.C. § 853(k); Brown v. United States, 692 F.3d 550, 552 (6th Cir. 2012) (finding bill of particulars triggered § 853(k)(2)).

[23] The defendants in Day—unlike Young and Barka—are charged with money laundering offenses.  One court has found Honeycutt inapplicable to forfeitures of property "involved in" money laundering.  Kenner, 443 F. Supp. 3d at 358 (E.D.N.Y. 2020).  Moreover, given the Day defendants' roles at PacNet, the government may have other grounds for seeking forfeiture of the seized funds from them.  Cf. United States v. Bergstein, 788 F. App'x 742, 748 (2d Cir. 2019) ("For the purposes of forfeiture under 18 U.S.C. § 981(a)(1)(C), 'acquired' property 'need not be personally or directly in the possession of the defendant' as long as 'at some point, [it had] been under the defendant's control.' . . . Bergstein effectively controlled the proceeds of the P2 and TT funds as he was able to transfer the funds to shell companies and use the funds for personal expenses."  (citation omitted)).  PacNet's suggestion that the Government must advance specific veil-piercing allegations at this time in order justify a stay is meritless.

The Second Circuit has acknowledged, in the civil forfeiture context, that, at some point, the delay in resolving a pending forfeiture matter can violate due process.  United States v. Banco Cafetero Panama, 797 F.2d 1154, 1163 (2d Cir. 1986).  To determine the reasonableness of any delay, courts consider "the length of delay, the reason for delay, the claimant's assertion of his right to a prompt adjudication, and prejudice to the claimant."  Id.  The Second Circuit, however, has recognized that even substantial delays in resolving civil forfeiture proceedings can be justified by related criminal matters.  Id.  Notably, PacNet has not cited a single decision from the Second Circuit finding that a delay in the resolution of civil or criminal forfeiture proceedings actually rose to the level of a due process violation.

Here, the Government's seizures of the funds at issue occurred between September 2016 and April 2018, and the resolution of the Day case may not happen for some time.  While the delay that PacNet faces here is substantial, the Government has weighty interests in investigating and prosecuting an alleged international mail fraud and money laundering scheme that has allegedly defrauded victims of hundreds of millions of dollars.  The hurdles of investigating and prosecuting this alleged complex cross-border scheme have undoubtedly contributed to this delay.  Moreover, the Government is seeking the extradition of the defendants in Day, who remain at large.  While PacNet has not itself been indicted, its claim that the delay from a stay is unreasonable and will violate its due process rights loses some of its force when one of the reasons for the delay is the refusal of PacNet's principals to face criminal charges in the United States.[24]  Moreover, PacNet is a business that is in the process of winding down and dissolving.  PacNet has not shown any

---

[24]  The Day defendants—and, at the very least, Rosanne Day herself—appear to still have a relationship with (and/or interests in) PacNet.  (See PacNet Response to Mot. to Stay, Young, 18-cr-46, ECF No. 23-2 (signed verification dated December 14, 2017 indicating that Day was still the CEO of PacNet Services Ltd.); PacNet OTSC Response at 4, 5, 7, 8, 26 (referring to the Day defendants as "principals" and "employees" of PacNet, with one reference to "former employees").)

pressing and immediate need for the seized funds.[25]  PacNet has also not shown that any delay will prejudice its ability to litigate its claims in the Young proceeding.  As noted above, PacNet contends that its entitlement to all the funds at issue in the Young proceeding can be established based on Honeycutt and documentary proof.

PacNet also claims that staying the Young proceedings is not appropriate because, according to PacNet, the Government has exhibited—in both the interpleader case and criminal matters—a pattern of bad faith conduct and gamesmanship that violates both the Agreement and due process.  The Court disagrees.  The Court has already denied PacNet's motions in the interpleader action, which challenged the Government's conduct there.  Moreover, the Government's actions (in both the criminal action and the interpleader) neither violated due process nor warrant denying a stay here.

Accordingly, after considering all the circumstances here, the Court grants the Government's motion to stay of the adjudication of PacNet's Petition and the ancillary proceedings in Young.

Because the Court is staying the proceedings in Young, the Court will not address the merits of PacNet's Petition.  However, before instituting the stay, the Court denies PacNet's pending motion which asks the Court to grant its Petition as unopposed because the Government's response to the Petition was purportedly untimely.  (Young, 18-cr-46, ECF No. 18.)  The Court did not set any deadline for the Government to respond.  Nor did any relevant statute or rule.  In any event, even if a response would have been required within 60 days as PacNet contends, the Court would

---

[25]  In the interpleader action, PacNet argued that its former clients—none of which have appeared in Young—will be prejudiced and injured by further delay if the interpleader action were to be stayed.  As discussed infra, those concerns would not have precluded a stay of the interpleader action.  Similarly, none of the concerns raised by PacNet and I-Payout in their papers filed in the interpleader action convince the Court that a stay in Young is unwarranted.

extend that deadline in light of the COVID-19 pandemic, the complicated issues presented by these cases, and the fact that the Court is staying the proceedings in Young until the Day action is concluded.

Finally, the Court notes that on January 11, 2021, PacNet filed a supplement to its verified petition in Young concerning the funds seized from the Truist account.  The same day, PacNet submitted a pre-motion conference letter seeking to file a proposed motion to unseal the supporting affidavit for the seizure warrant that the Government used to obtain the Truist Funds.  Given the Court's stay of the proceedings in Young, there is no reason to proceed with PacNet's proposed motion at this time.

**G.  Stay of the Interpleader Action**

Although the Court has already concluded that it lacks jurisdiction over the interpleader action, the Court notes that even if it had jurisdiction, it would have stayed the interpleader action until the resolution of the Day case.

As with the Young case, the Court, in considering whether to stay the interpleader action, would, given the circumstances, rely on the general standards for a stay, with particular emphasis on the stay standard for civil forfeiture proceedings set out in 18 U.S.C. § 981(g)(1).  Additionally, the fact that interpleader is "an equitable remedy" would also be relevant to the propriety of a stay. William Penn Life Ins., 569 F. Supp. 2d at 362.

The Day case is a related criminal case.  If the interpleader action went forward, it would adversely affect the Government's ability to investigate and prosecute the Day case.

As an initial matter, there is a potential unclean hands issue in this case.  See id. at 362. Criminal conduct by the Day defendants (and PacNet itself) could, if established, show that PacNet has unclean hands that could bar it from pursuing this interpleader action.  Litigation over this

unclean hands issue, which would occur at the first stage of the interpleader action, would adversely affect the prosecution of the Day case.[26]

Even if the Court were to ignore the unclean hands issue, the Government would still, at the second stage of the interpleader, litigate the question of the Day defendants' (and PacNet's own) criminal culpability.[27]  At this second stage, the Government, if compelled to litigate any forfeiture claims in the interpleader action, would surely assert that criminal conduct by the Day defendants and PacNet itself provides one of the bases to forfeit the funds at issue.  Litigation and discovery over that issue would adversely affect the Government's prosecution of the Day defendants.

Although PacNet would not be a party at the second stage of interpleader, requiring the Government to pursue forfeiture claims based on the alleged criminal conduct of PacNet and the Day defendants against other parties in civil litigation would still adversely affect the Government's prosecution and investigation of the Day case.  Notably, the Indictment in Day alleges that the Day defendants conspired with individuals who sent fraudulent mass mailings, a number of whom have appeared, through the entities they control, in the interpleader action.

---

[26] PacNet advances various arguments why it would purportedly be improper for the Court to sua sponte inquire into this issue or for OFAC to raise this issue.  OFAC "takes no position on whether PacNet has the requisite clean hands to invoke interpleader," but, nevertheless, points out that "the indictment returned in Day alleges the involvement of PacNet in the fraudulent scheme at issue in that case."  (Gov't OTSC Response at 3.)  It is unlikely that the arguments raised by PacNet would preclude this Court from inquiring into this issue sua sponte or would prevent OFAC or any other party from raising this issue.  That said, because there are multiple other grounds that would justify a stay, it is unnecessary for the Court to determine whether it would inquire into the unclean hands issue if this litigation were to go forward.

[27] OFAC is the only named federal defendant and insists it has no interest in the funds and is not a proper party.  For the purposes of the discussion above, the Court refers simply to the "Government," which is prosecuting the pending criminal cases and which, if PacNet had prevailed on the pending motions, may have faced the prospect of having to litigate any forfeiture claims to the funds in this interpleader action.

Requiring the Government to engage in civil discovery and to disclose its case against the <u>Day</u> defendants to such parties would adversely affect the <u>Day</u> prosecution.

At the second stage of interpleader, the Government would, of course, also assert that it is entitled to the funds at issue because the claimants themselves committed mail fraud and/or money laundering. Three claimants originally named as John Doe Defendants in the Interpleader Complaint have appeared and asserted claims seeking to recover almost $600,000 in funds from the interpleader action. Even if those claimants have not been charged with any crimes, litigation by the Government over the criminal culpability of those parties could negatively affect the Government's prosecution of <u>Day</u> as well as the prosecution of related defendants and the investigation of related targets and the claimants themselves.

Also of note are three additional John Doe Defendants—Marketing Services Inc. ("Horizon"), JGS Entertainment ("JGS"), and Quantum Marketing Inc. ("Quantum"). These companies appeared in the interpleader action, but have not yet filed answers because, in April 2018, their time to do so was stayed until the Court decided OFAC's motion to dismiss. The Interpleader Complaint alleges that PacNet owes these three entities, in the aggregate, approximately $900,000.[28] (Ex. A to Interpleader Compl., ECF No. 5.) These companies, along with Novis and Denkberg, were sued civilly by the Government in September 2016. <u>United States of America v. Novis et al</u>, 16-cv-5263 (SJF) (E.D.N.Y.) That matter was stayed, over the Government's objection, until the resolution of any criminal proceedings. Then, on August 27, 2020, after the Court issued its OTSC, Novis and Denkberg were indicted for conspiracy to commit mail fraud, mail fraud, and money laundering. Although Horizon, JGS, and Quantum have—in

---

[28] Given that these entities have already been named as defendants in civil litigation by the Government and their operators have been indicted, the Court finds no reason for these entities to continue to be named as John Doe defendants on the docket for the interpleader action.

light of the extension of time granted by Judge Garaufis—not filed an answer, they have already expressed an apparent intention to participate in the interpleader action if it were to proceed. Their presence in the interpleader action—along with the recent Indictment in <u>Novis</u>—provide further reasons to stay this action. To contest claims by Horizon, JGS, and Quantum to the funds at issue, the Government would have to engage in civil litigation over the same matters that are at issue in the criminal case against Novis and Denkberg. Requiring the Government to proceed in this interpleader action would adversely affect the Government's ability to prosecute the criminal case against Novis and Denkberg.

A stay of the interpleader action would also likely conserve judicial resources and promote an efficient and consistent disposition in the <u>Day</u> case of all the funds seized from PacNet. The Court has already stayed the <u>Young</u> ancillary proceedings until the resolution of the <u>Day</u> criminal case. The <u>Day</u> criminal case is in a different district and the PacNet funds seized by the Government include over $1 million that are not even potentially at issue in this interpleader action. Those points counsel in favor of deferring to proceedings in <u>Day</u>, as those proceedings could provide a single resolution concerning all of the funds seized from PacNet. Again, although none of the filings in <u>Day</u> specifically identify the funds at issue in the interpleader as being subject to forfeiture, convictions of the defendants in <u>Day</u> will likely result in the Government seeking, in those criminal proceedings, forfeiture of the funds at issue in this interpleader action along with any other funds seized from PacNet. And, as explained earlier, given the nature of the charges against the <u>Day</u> defendants and their positions at PacNet, the Government appears to have potentially viable forfeiture claims in <u>Day</u> to all the funds at issue in the interpleader action.

PacNet argues that a stay would be improper given all the circumstances of this case, the Government's conduct, and the delay that would result from a stay of the interpleader. Those

concerns do not overcome the competing interests that weight in favor of a stay here.[29]  The Court previously addressed many of PacNet's concerns in its discussion of the stay in <u>Young</u>—they are similarly unavailing here.  The Court also notes that it was clear, from the outset, that this interpleader action concerned funds alleged to be criminal proceeds.  As such, it was always likely that this interpleader would be stayed (or even dismissed) due to pending criminal investigations and cases, and that the funds at issue might be subject to criminal forfeiture proceedings.

The Court will briefly address two final points.  First, although PacNet claims that its former clients would be prejudiced and injured by a stay of the interpleader action, other than referencing I-Payout, PacNet provides no details concerning those clients.  Second, the Court acknowledges that, in its papers, I-Payout—a small legitimate business that used Chexx—alleges it has suffered, and continues to suffer, various harms as a result of its inability to recover, through the interpleader action, the $2,794,893 in seized funds it claims to own.  Nevertheless, as noted earlier, the Government has weighty interests in pursuing these criminal investigations and prosecutions, and those interests would outweigh I-Payout's interests on the stay issue.  Notably, the proof I-Payout has presented to the Court concerning its claimed entitlement to the funds at issue contains glaring deficiencies that suggest it is very unlikely to prevail on a claim that Chexx held the funds at issue in trust for I-Payout.  After OFAC's designation of PacNet in September 2016, Rosanne Day, writing on Chexx letterhead, informed I-Payout that the Chexx Union Bank Account '3328 held $1,669,247 and that all of those funds were "provided by i-Payout."  (<u>See</u> Aff. in Supp. of Mot. to I-Payout Intervene, Ex. B, ECF No. 41.)  Day also represented to I-Payout that $247,487 out of a total of $513,544 in the Chexx Union Bank Account '0527 were "provided by

---

[29]  It would have been inappropriate to release PacNet from liability prior to the lifting of any stay because, <u>inter alia</u>, the disposition of the funds at issue in this interpleader might be resolved in the criminal proceedings during the stay, which would presumably void any release from liability that PacNet received in the interpleader action.

i-Payout." (Id.)  However, the very same letter from Day also admits that "there is significant co-mingling of client funds in many of Chexx's bank accounts" and the letter indicates, on its face, that the funds in the '0527 account are commingled with other funds.   Additionally, the Government has represented to the Court that the financial investigation analysis conducted by the USPIS revealed that the Chexx accounts at Union Bank were general accounts that received deposits from various sources and that the funds were commingled, which would be inconsistent with a trust.  (U.S. Opp'n to I-Payout Sanctions Mot. at 17, ECF No. 161-3.)  Finally, I-Payout has not even identified the Chexx bank account to which I-Payout sent its funds in August 2016.   In fact, a 2017 letter I-Payout sent to OFAC implies that these transfers were not originally made to the Union Bank accounts at issue.   This further suggests commingling of funds and multiple transfers that undermine I-Payout's claim that this money was held in trust for it by Chexx.  While the ultimate merits of I-Payout's claims are not before the Court now, the weaknesses in I-Payout's trust claim show that a stay here of the interpleader action would not have been improper.

### III.   CONCLUSION

For the reasons stated above, the Court denies the motions filed by PacNet and I-Payout, (ECF Nos. 139, 158, 161), grants OFAC's motions to dismiss, (ECF Nos. 137, 139), and dismisses the interpleader action for lack of subject matter jurisdiction.   The Court previously noted the default of the John Doe Defendants that did not appear in the interpleader action.  Given the Court's dismissal of the interpleader action, the Answers of all parties that have appeared are dismissed.   Any party that appeared in the interpleader action and filed an Answer (or received an extension of time from Judge Garaufis for such a filing) is hereby granted leave to file a claim, if appropriate, in Young, 18-cr-46, within 30 days from the date of this order.   The Clerk of Court is directed to close 17-cv-6027.

The Court grants the Government's motion to stay the ancillary proceedings in <u>Young</u> until the resolution of the <u>Day</u> matter, (<u>Young</u>, 18-cr-46, ECF No. 19).  The Court also denies PacNet's motion to grant its Petition as unopposed.  (<u>Id.</u>, ECF No. 18.)  Given the Court's grant of the Government's motion to stay, any party that was dismissed from the interpleader action and given leave to file a claim in <u>Young</u>, may, in lieu of filing a complete petition, file a notice of appearance and request that its time to file a complete petition be extended.

**SO ORDERED.**

Dated:  February 24, 2021
       Central Islip, New York

                                                    ___/s/ (JMA)_____
                                                    JOAN M. AZRACK
                                                    UNITED STATES DISTRICT JUDGE