BGK:TRP
F. #2010R01153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

                                                   18 CR 646 (JMA)

RYAN YOUNG,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X


**Government's Memorandum of Law in Support of Motion to Dismiss
Verified Petition for Hearing to Adjudicate Third Party Claims
of International Payout Systems, Inc.**


                                      BREON PEACE
                                      UNITED STATES ATTORNEY
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201

Tanisha R. Payne
Assistant U.S. Attorney
(718) 254-635

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .......................................................................... 1

FACTUAL AND PROCEDURAL HISTORY ..................................................... 3

    **I.  The Government's Investigation Into Mass Mail Fraud Schemes** .................... 3

        *PacNet's Involvement in Perpetrating Mass Mail Fraud Schemes* ........................ 4

        *Young's Involvement in Perpetrating Mass Mail Fraud Schemes* ........................ 5

    **II. The Government's Enforcement Actions Against PacNet** ............................... 6

        **A.   *OFAC Designation of PacNet*** ................................................................... 6

        **B.   *Criminal Forfeiture Actions*** ................................................................... 6

        **C.   *September 2017 Agreement Between OFAC and PacNet*** ............................ 8

    **III. The Civil Interpleader Action** ................................................................... 10

        *PacNet's Interpleader Complaint and Deposit Into the Court's Registry* ........... 10

        *The Government's Seizure of the Interpleader Funds* ........................................ 11

    **IV. The Criminal Cases** ................................................................................. 12

        *The Young and Barka Criminal Cases* ............................................................. 12

        *The Young Preliminary Order of Forfeiture* ................................................... 13

        *The Pending Criminal Case Against PacNet's Principals* .................................. 16

        *The Third Party Petitions* ............................................................................. 18

STATUTORY FRAMEWORK OF ANCILLARY PROCEEDINGS ........................... 19

STANDARD OF REVIEW ................................................................................. 21

ARGUMENT ................................................................................................... 22

    **I.  The Petition Must Be Dismissed Because Petitioner Lacks Standing to Contest the Forfeiture of the Interpleader Funds Under 21 U.S.C. § 853(n)(2)** ................. 22

    **II. The Petitioner Cannot Demonstrate a Superior Legal Interest in the Subject Funds under Section 853(n)(6)** ......................................................................... 29

        **A.   *Petitioner Cannot Demonstrate Priority of Ownership*** ........................... 29

        *At the Time of the Criminal Offenses Under Section 853(n)(6)(A)* ..................... 29

        **B.   *Petitioner Cannot Demonstrate That They Are*** ..................................... 31

        *Bona Fide Purchasers for Value under Section 853(n)(6)(B)* ............................. 31

    **III. The Young POF is Valid**…………………………………………………………32

**IV. Petitioner is Not Entitled to Attorney's Fees** ......................................................... **35**

**CONCLUSION** ................................................................................................................ 37

# TABLE OF AUTHORITIES

Page(s)

Cases

United States v. $3,000 in Cash,
  906 F. Supp. 1061 (E.D. Va. 1995) .................................................................... 24

Conley v. Gibson,
  355 U.S. 41 (1957)........................................................................................... 22

De Almeida v. United States,
  459 F.3d 377 (2d Cir. 2006).......................................................................... 33, 34

DSI Assoc. LLC v. United States,
  496 F.3d 175 (2d Cir. 2007)........................................................................... 23, 26

Healy v. Commissioner,
  345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007 (1953)............................................... 28

Honeycutt v. United States,
  137 S. Ct. 1626 (2017).......................................................................... 3, 32, 34, 35

United States v. Khan,
  1997 WL 701366 ............................................................................................. 28

Pacheco v. Serendensky,
  393 F.3d 348 (2d Cir. 2004)............................................................................ 21, 32

Scheuer v. Rhodes,
  416 U.S. 232 (1974)......................................................................................... 22

U.S. Currency,
  16 F.3d 344 (9th Cir. 1994) ............................................................................... 24

U.S. Currency,
  1999 WL 166847 (D. Or. 1999)..................................................................... 24, 25

U.S. Currency,
  2000 WL 360086 (D. Or. 2000)........................................................................ 24

United States v. $9,041,598.68,
  163 F.3d 238 (5th Cir. 1998) ............................................................................ 23

United States v. Amiel,
  995 F.2d 367 (2d Cir. 1993)......................................................................... 20

United States v. BCCI Holdings (Lux.), S.A.,
  69 F. Supp. 36 (D.D.C. 1999)..................................................................... 20

United States v. BCCI Holdings (Lux.), S.A.,
  980 F. Supp. 16 (D.D.C. 1997)................................................................... 22

United States v. BCCI Holdings (Luxembourg) S.A. (Final Order of Forfeiture and
  Disbursement),
  69 F. Supp. 2d 36 (D.D.C. 1999) ......................................................... 23, 26

United States v. BCCI Holdings (Luxembourg) S.A. (Petition of Chawla),
  46 F.3d 1185 (D.C. Cir. 1995).................................................................... 23

United States v. BCCI Holdings (Luxembourg) S.A. (Petition of OAS),
  73 F.3d 403 (D.C. Cir. 1996)...................................................................... 22

United States v. Cambio Exacto, S.A.,
  166 F.3d 522 (2d Cir. 1999)........................................................................ 24

United States v. Campos,
  859 F.2d 1233 (6th Cir. 1988) .................................................................... 23

United States v. Capoccia,
  402 F. App'x 639 (2d Cir. 2010) ................................................................ 34

United States v. Carrell,
  252 F.3d 1193 (11th Cir. 2001) .................................................................. 24

United States v. Contents of Accounts (Friko Corporation),
  971 F.2d 974 (3d Cir. 1992)........................................................................ 24

*United States v. Cox,*
  575 F.3d 352 (4th Cir. 2009) ...................................................................... 33

United States v. Eldick,
  No. 06-10602, 2007 WL 624041 (11th Cir. Mar. 1, 2007) ................... 26, 31

United States v. Gilbert,
  244 F.3d 888 (11th Cir. 2001) .................................................................... 19

United States v. Gonzalez,
  597 F. App'x. 270 (5th Cir. 2015) .............................................................. 30

United States v. Grossman,
   501 F.3d 846 (7th Cir. 2007) ............................................................. 34

United States v. Hooper,
   229 F.3d 818 (9th Cir. 2000) ............................................................. 31

United States v. Lazarenko,
   476 F.3d 642 (9th Cir. 2007) ............................................................. 30

United States v. McHan,
   345 F.3d 262 (4th Cir. 2003) ............................................................. 19

United States v. Porchay,
   533 F.3d 704 (8th Cir. 2008) ............................................................. 20

United States v. Puig,
   419 F.3d 700 (8th Cir. 2005) ............................................................. 20

United States v. Ramunno,
   59 F.3d  (11th Cir. 2010) ................................................................... 27

United States v. Ribadeniera,
   105 F.3d 833 (2d Cir. 1997)............................................. 21, 23, 24, 28, 29

United States v. Schwimmer,
   968 F.2d 1570 (2d Cir. 1992)......................................................... 23, 28

United States v. Soreide,
   461 F.3d 1351 (11th Cir. 2006) ......................................................... 20

United States v. Strube,
   58 F. Supp. 2d 576 (M.D. Pa. 1999)............................................... 20, 23

United States v. Timley,
   507 F.3d 1125 (8th Cir. 2007) ................................................... 21, 30, 31

United States v. U.S. Currency, $81,000.00,
   189 F.3d 28 (1st Cir. 1999)............................................................... 24

United States v. Warshak,
   No. 09-3321, 2011 WL 2450991 (6th Cir. Mar. 30, 2011) ............................... 31

United States v. Watts,
   477 F. App'x 816 (2d Cir. 2012) ......................................................... 34

Statutes

18 U.S.C. § 981(a)(1)(C) ................................................................................................. 12, 18

18 U.S.C. § 1341 ................................................................................ 1, 7, 8, 11, 18, 31

18 U.S.C. § 1343 ................................................................................................................... 18

18 U.S.C. § 1349 ................................................................................ 13, 15, 16, 17, 18

18 U.S.C. § 1956(a)(2)(A) .............................................................................................. 18

18 U.S.C. § 1957 ................................................................................................................... 12

18 U.S.C. § 1963(l) ............................................................................................................. 19

18 U.S.C. §§ 981(a)(1)(A) ............................................................. 1, 7, 8, 12, 18, 31

18 U.S.C. §§ 1956 ...................................................................................... 1, 7, 8, 12, 31

21 U.S.C. § 853(k) ............................................................................................................... 33

21 U.S.C. § 853(n) ................................................................................................ 1, 18, 19

21 U.S.C. § 853(n)(2) ...................................................................................... 2, 20, 21, 22

21 U.S.C. § 853(n)(3) ......................................................................................................... 20

21 U.S.C. § 853(n)(6) ............................................................................... 2, 16, 20, 36

28 U.S.C. § 2461(c) .............................................................................................. 18, 19

Section 853 ........................................................................................................................... 26

Rules

Fed. R. Crim. P. 32.2(b)(1)(A) ...................................................................................... 34

Fed. R. Crim. P. 32.2(b)(2)(A) ...................................................................................... 33

Fed. R. Crim. P. 32.2(b)(4)(A) ...................................................................................... 16

Fed. R. Crim. P. 32.2(c) ................................................................................................... 19

Fed. R. Crim. P. 32.2(c)(2) ............................................................................................ 16

<u>**PRELIMINARY STATEMENT**</u>

The United States of America, by its attorney, Breon Peace, United States Attorney for the Eastern District of New York, Tanisha Payne, Assistant United States Attorney, of counsel, submits this memorandum of law in support of its motion to dismiss the Verified Petition for Ancillary Proceedings to Adjudicate Interest Pursuant to 21 U.S.C. § 853(n) (the "Petition") (ECF No. 56) filed by International Payout Systems, Inc. ("i-payout") (the "Petitioner"), pursuant to 21 U.S.C. § 853(n) and Rule 32.2(c) of the Federal Rules of Criminal Procedure.

By way of its third party Petition, i-payout seeks to challenge the seizure of $2,671,335.59 in funds seized by the government for forfeiture from the Court's registry (the "Interpleader Funds") in the case captioned, <u>PacNet Services, Ltd. v. Office of Foreign Assets Control of the United States Department of the Treasury</u>, <u>et al</u>., 17-CV-6027 (JMA) (hereinafter, the "Interpleader Case"). The Interpleader Funds were seized by the government pursuant to a duly authorized warrant issued in United States District Court for the Eastern District of New York upon a showing of probable cause that the funds constituted: (a) proceeds traceable to mail fraud, in violation of 18 U.S.C. § 1341, or a conspiracy to commit such offense; and (b) money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and are therefore forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 982(a)(1).

Petitioner i-payout, a former client of PacNet Services, Ltd ("PacNet") and its subsidiary Chexx (Americas) Inc. ("Chexx"), seeks $2,337,365.85 of the Interpleader Funds based on its claim that PacNet used funds owed to it to fund the Interpleader Fund.

As an initial matter, i-payout's Petition must be dismissed because Petitioner lacks standing to assert a claim to the Interpleader Funds, pursuant to 21 U.S.C. § 853(n)(2). Petitioner is an unsecured general creditor, and as such lacks the requisite standing to assert a claim to property subject to forfeiture.  Apart from the Petitioner's lack of standing, Petitioner's claim to the Interpleader Funds also fails on the merits because Petitioner cannot demonstrate a superior legal interest in the forfeited funds under 21 U.S.C. § 853(n)(6).  To demonstrate such an interest, the Petitioner would have to establish that it had priority of ownership under Section 853(n)(6)(A) or that it was a bona fide purchaser for value under Section 853(n)(6)(B).  The Petitioner cannot prove either.   Petitioner cannot demonstrate priority of ownership because it is an unsecured creditor and is not the owner of the Interpleader Funds.   Also, Petitioner cannot demonstrate that it is a bona fide purchaser for value because it does not qualify as a "purchaser."

Further, i-payout's motion to strike paragraph (g) the Preliminary Order of Forfeiture entered against defendant Ryan Young should be denied.   Petitioner's assertion that this Court's Preliminary Order of Forfeiture violates <u>Honeycutt v. United States</u>, 137 S. Ct. 1626 (2017) and must be limited to property owned by defendant Ryan Young is contrary to well established forfeiture law. Second Circuit case law and Rule 32.2 of the Federal Rules of Criminal Procedure extend forfeiture to ***all*** property involved in a criminal offense.

Finally, i-payout's request for an award of attorney's fees and expenses related to their ancillary petition should be denied.

Accordingly, i-payout's Petition should be dismissed in its entirety.

## FACTUAL AND PROCEDURAL HISTORY

I.   The Government's Investigation Into Mass Mail Fraud Schemes

This matter stems from an investigation by the United States Postal Inspection Service ("USPIS") into an international network of mass mailing fraud schemes that collectively have defrauded millions of victims, particularly elderly and otherwise vulnerable victims, across the United States out of hundreds of millions of dollars each year.  These fraudulent mail campaigns involve tens of thousands of solicitations sent to consumers each year that promise large lottery and sweepstakes prizes or clairvoyant services.  The solicitations contain several misrepresentations and typically state that the recipient has won a large cash prize to be disbursed once the recipient sends in a small payment or "processing fee."  Victims who send in payments generally receive nothing of value in return, only an increased number of similar solicitations.

Several different entities played an integral role in furthering the mass mail fraud schemes, including direct mailers, list brokers, printers, distributors, mailing houses, caging services, and payment processors.  Payment processors collect the victim payments (cash, credit card, and checks) received by the caging services.  Payment processors then deposit the cash into their own accounts, process the credit card payments, withdraw the amount designated on the checks from the victims' checking account, and subsequently distribute the proceeds from the victim payments to the participants of the mail fraud scheme.

A.    <u>PacNet's Involvement in Perpetrating Mass Mail Fraud Schemes</u>

USPIS's investigation revealed that PacNet has a 20-year history of processing payments for numerous fraudulent mass mail campaigns.  PacNet is an international payment processor and money services business based in Vancouver, British Columbia, Canada, with subsidiaries and related companies around the world. During the period when it was conducting business, PacNet's clients included business and other entities in the United States and throughout the world.  Clients relayed to PacNet the checks, cash, money orders, and credit card transactions received from their customers.  PacNet then deposited those payments in its bank accounts and distributed the funds at the direction of its clients.

Clients that solicited payments from consumers by sending massive volumes of mail constituted a significant part of PacNet's processing business.  During the last five years it was in operation, PacNet processed on average more than $100 million per year in checks and credit card payments from United States consumers to mass mail clients.  The total amount of money that PacNet processed for its mass mail clients, including cash from United States consumers and payments of all kinds from consumers outside of the United States, was considerably higher.

PacNet's mass mail clients included companies that sent notifications intended to mislead consumers into believing they would receive a large amount of money, a valuable prize, or specialized psychic services upon payment of a fee to the companies.  Many victims of PacNet's fraudulent mass mail clients were elderly or otherwise vulnerable.   Some elderly

victims spent hundreds to thousands of dollars responding to fraudulent notifications before a family member or a victim's bank detected the fraud and worked to prevent additional losses.

PacNet has been publicly implicated as the payment processor for several mass mail fraud schemes that have been the subject of civil and criminal enforcement actions dating back as early as 1997. Notwithstanding these actions, PacNet continued to be the payment processor of choice in many mass mail fraud schemes.

PacNet's role in processing victim payments for the schemes provided a valuable money laundering service to its clients, in that PacNet acted as the intermediary between the orchestrators of the fraud schemes and the banking system which, as a result, obviated the need for the orchestrators to interact with the victims' banks directly, or deposit victim payments into their own bank accounts, thereby distancing themselves from law enforcement detection.

B.    Young's Involvement in Perpetrating Mass Mail Fraud Schemes

USPIS's investigation revealed that since at least 2012, defendant Ryan Young, his business partner Ercan Barka, and their business entity, the Barka Young Group, engaged in predatory mail fraud schemes that targeted victims throughout the United States and abroad through the use of fraudulent solicitations that falsely inform recipients that they have won a sweepstakes or lottery. PacNet processed victim payments on behalf of the Barka Young Group's mail fraud schemes since at least 2012 through approximately December 2017.

According to PacNet, the Interpleader Funds include approximately $834,854.97 owed to the Barka Young Group in connection with PacNet's payment processing

services on their behalf. (See Annex A to Complaint in Interpleader, PacNet v. OFAC, et al, ECF No. 5-1)

II.      The Government's Enforcement Actions Against PacNet

In September 2016, the United States Department of Justice, the USPIS, and the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") initiated civil and criminal enforcement actions against perpetrators of mass mailing fraud schemes.   The enforcement actions included criminal and civil injunctions against various entities, including direct mailers, list brokers, caging services, mass mailers, printers, and payment processor PacNet.

A.      OFAC Designation of PacNet

OFAC designated PacNet to be a significant transnational criminal organization ("TCO").  The OFAC designation placed PacNet, which is a group of companies that includes approximately 30 corporate entities and 12 employees and officers of the PacNet Group, on the Specially Designated Nationals and Blocked Persons List.  As a result of OFAC's designation, a block was placed on all property of the designees subject to U.S. jurisdiction, and all United States persons or persons within the United States were prohibited from transacting business with the designees without a license from OFAC.

B.      The Criminal Forfeiture Actions

The USPIS and the United States Attorney's Office for the Eastern District of New York conducted an asset forfeiture investigation which revealed that PacNet maintained a network of bank accounts in the United States and abroad, where it collected proceeds of,

and processed payments for, various mass mail fraud campaigns, and facilitated their

continued fraud activity.  Based on evidence obtained through the investigation, the USPIS

and the government sought seizure warrants for funds in certain of PacNet's bank accounts

which constituted proceeds of mail fraud, wire fraud, and/or were involved in money

laundering.

On or about September 20, 2016, a seizure warrant was issued by the

Honorable Cheryl L. Pollak, United States Magistrate Judge for the Eastern District of New

York, authorizing the seizure of approximately $963,205.14 from PacNet's account at BMO

Harris Bank, finding probable cause to believe that the funds constituted or were derived

from proceeds traceable to mail fraud, in violation of 18 U.S.C. § 1341 or a conspiracy to

commit such offense, and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957,

and were therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C),

and 982(a)(1).

On or about September 21, 2017, the Honorable Vera M. Scanlon, United

States Magistrate Judge for the Eastern District of New York, issued warrants authorizing the

seizure of three additional bank accounts controlled by PacNet: (i) approximately

$1,503,251.39 from BMO Harris Bank, N.A. account number 3722949 held in the name of

PacNet Services, Ltd.; (ii) approximately $765,611.07 from BMO Harris Bank, N.A. account

number 20333306 held in the name of Chexx (Americas) Inc.; and (iii) approximately

$362,222.68 from Avidia Bank account number 33595257 held in the name of PacNet

Services, Ltd., finding probable cause to believe that the funds constituted or were derived

from proceeds traceable to mail fraud, in violation of 18 U.S.C. § 1341 or a conspiracy to

commit such offense, and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and were therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1).

On or about July 10, 2020, a seizure warrant was issued by the Honorable Roanne L. Mann, United States Magistrate Judge for the Eastern District of New York, authorizing the seizure of approximately $333,817.05 from Truist Bank account number 0000147703996 held in the name of The Payments Factory, LLC, finding probable cause to believe that the funds constituted or were derived from proceeds traceable to mail fraud, in violation of 18 U.S.C. § 1341 or a conspiracy to commit such offense, and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and were therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1).

The funds seized by the USPIS from the aforementioned bank accounts pursuant to the above-refenced seizure warrants (the "Bank Seized Funds") were remitted to the United States Marshals Service ("USMS") and deposited into the USMS's seized asset deposit fund, where they currently remain, consistent with the lawful practice in the Eastern District of New York for funds seized pending a forfeiture adjudication.

C.     September 2017 Agreement Between OFAC and PacNet

On or about September 19, 2017, OFAC and PacNet entered into an agreement (the "OFAC Agreement"), whereby, inter alia, OFAC would delist the PacNet Group and remove it from the Specially Designated Nationals and Blocked Persons List.  The OFAC Agreement provided that PacNet's delisting was conditioned upon, inter alia, its providing

OFAC with "a list of all financial transactions that PacNet . . . intend[ed] to undertake anywhere in the world subsequent to delisting to <u>resolve any and all outstanding debts or other liabilities</u> to its clients in relation to the dissolution of PacNet."  With respect to this list of financial transactions, the OFAC Agreement states, in relevant part:

> In the event that OFAC identifies and represents to the PacNet Group that a reasonable factual basis exists to believe that a proposed transaction involving any client of the PacNet Group… involves the proceeds of fraud or money laundering allegedly committed by the client and provides the PacNet Group with written notification of that determination . . . the PacNet Group agrees to deposit the equivalent of the funds owed to its clients **into an account held by a commercial escrow agent** in the Eastern District of New York (chosen by the PacNet Group and agreed to by OFAC) **<u>or</u> to interplead those funds** in the United States District Court for the Eastern District of New York. (emphasis added)

Pursuant to the OFAC Agreement, PacNet provided OFAC with a list of outstanding debts and liabilities it owed its clients, and proposed transactions to remit these funds to its former clients.

Based on the aforementioned information received from PacNet and the USPIS, and pursuant to the terms of the OFAC Agreement, OFAC notified PacNet of specific clients for which the proposed transactions could involve the proceeds of fraud or money laundering allegedly committed by the client.  In response, and pursuant to the terms of the OFAC Agreement, PacNet agreed to transfer the funds it owed to the clients identified by OFAC into either an escrow account or an interpleader account.  As further detailed below, PacNet elected to commence an interpleader action and named the clients identified by OFAC as John Doe defendants in the interpleader action.

No other governmental agency other than OFAC was a party to the September 2017 Agreement, and OFAC made no representations or commitments on behalf of any other governmental agency.

III.     The Civil Interpleader Action

     A.     PacNet's Interpleader Complaint and Deposit Into the Court's Registry

On or about October 16, 2017, PacNet initiated the Interpleader Case.  In its interpleader complaint, PacNet named 73 of its former clients, previously identified by OFAC as described above, as John Doe defendants/claimants-in-interpleader.  PacNet alleged that these John Doe defendants have an interest in the interpleader fund, which would purportedly consist of $5,220,855.08.  PacNet further asserted that the PacNet Group had no interest in the funds it held on behalf of the John Doe defendants/claimants-in-interpleader, its former clients.

On October 18, 2017, the district court entered an order authorizing PacNet to transfer the interpleader funds to the Court's registry (the "Interpleader Deposit Order"). Pursuant to the Interpleader Deposit Order, PacNet transferred approximately $2,671,335.59 to the Clerk of the Court but did not transfer the full $5,220,855.08 amount that was the subject of its interpleader complaint.

On December 21, 2017, i-payout filed a motion to intervene in the interpleader action and claimed an ownership interest in $2,337,356.85 of the Interpleader Funds. i-payout is a technology company headquartered in Fort Lauderdale, Florida, that provides secure software solutions to corporate clients by providing the software and associated

services required to pay third parties (e.g., independent contractors, distributors).  i-payout claimed that it was a client of Chexx and contracted with Chexx to to distribute checks and process payments to i-payout's clients and contractors.

       On January 2, 2018, PacNet filed a motion opposing i-payout's intervention in the interpleader action.  On January 9, 2018, the Honorable Lois Bloom, United States Magistrate Judge for the Eastern District of New York, granted i-payout's motion to intervene.

      B.    <u>The Government's Seizure of the Interpleader Funds</u>

       On or about December 12, 2017, the Honorable Robert M. Levy, United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing the seizure of the Interpleader Funds, totaling approximately $2,673,279.31, on deposit in the Court's registry in the civil interpleader case, finding probable cause to believe that the funds represented: (i) property traceable to proceeds of mail fraud, in violation of 18 U.S.C. § 1341, and were therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C); and (ii) property involved in money laundering in violation of 18 U.S.C. § 1956 (relating to the laundering of monetary instruments) and 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), and were therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

       In addition to obtaining a seizure warrant authorizing the seizure of the funds in the Court's registry, the government also sought and obtained an order from the then-

presiding district judge in the Interpleader Case directing the Clerk of Court to remit a check to the USPIS for the funds on deposit in the Court's registry related to the Interpleader Case.[1]

The Interpleader Funds were remitted to the United States Marshals Service's seized asset deposit fund and currently remain there pending a judicial disposition as to forfeiture, consistent with the lawful practice for funds seized pending a forfeiture adjudication.

## IV.   **The Criminal Cases**

### A.   The Young and Barka Criminal Cases

As noted above, defendant Ryan Young, his business partner Ercan Barka, and their business entity the Barka Young Group—all former PacNet clients—engaged in predatory mass mail fraud schemes that targeted victims throughout the United States and abroad through the use of fraudulent sweepstakes and lottery solicitations.  Both Young and Barka were charged in indictments filed in United States District Court for the Eastern District of New York.  See United States v. Ercan Barka, No. 18-CR-31 (E.D.N.Y. Jan. 18, 2018).

On January 25, 2018, Barka pled guilty to conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and is currently awaiting sentence.  On February 13, 2018,

---

[1]     The government's course of action was consistent with the procedures followed in prior instances involving the seizure of funds in an interpleader action. See E*Trade Securities, LLC v. Weiner et al., No. 11-CV-1997 (E.D.N.Y. 2011).

Young pled guilty to conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and is currently awaiting sentence.

     B.     <u>The Young Preliminary Order of Forfeiture</u>

On September 11, 2019, the Court entered a Preliminary Order of Forfeiture against Young (the "Young POF").  (ECF No. 15)   The Young POF ordered the entry of a forfeiture money judgment against Young in the amount of $1,500,000.00, and the forfeiture of all of defendant Young's right, title and interest in $1,413,556.58. (<u>Id.</u>).  The Young POF also ordered the forfeiture of all of defendant ***Young's*** right, title, and interest in the following property:

> (a)(i) Seventeen Thousand Seven Hundred Twenty-Six Dollars and Twenty-Five cents ($17,726.25), more or less, seized from Sussex Bank account number ****3394, held in the name of Parasol Media, LLC and all proceeds traceable thereto;
>
> (ii) Eight Thousand One Hundred Ten Dollars and Fifty Cents ($8,110.50), more or less, seized from Sussex Bank account number ****3402, held in the name of Pelorus Management, Inc. and all proceeds traceable thereto;
>
> (iii) Five Thousand Two Hundred Five Dollars and Seventy-five Cents ($5,205.75), more or less, seized from Sussex Bank account number ****3426, held in the name of Ryan Young and Rosanna Young, and all proceeds traceable thereto;
>
> (iv) Eighty-Five Thousand Three Hundred Nine Dollars and Fourteen Cents ($85,309.14), more or less, seized from Sussex Bank account number ******3490, held in the name of The Millhouse Trust, and all proceeds traceable thereto; . . .
>
> (b)(i) Forty-Eight Thousand Nine Hundred Fifty-Three Dollars and Eighty Cents ($48,953.80), more or less, seized from TD

Bank Account Number ******8845, held in the name of Int'l Data Sciences LLC, and all proceeds traceable thereto;

(ii) Seventy Three Thousand Three Hundred Thirty-Two Dollars and Ninety-Three Cents ($73,332.93), more or less, seized from TD Bank Account Number ******8853, held in the name of Electus Holdings, LLC, and all proceeds traceable thereto; . . .

(c) Nine Hundred Sixty-Three Thousand Two Hundred Five Dollars and Fourteen Cents ($963,205.14), more or less, seized from BMO Harris Bank Account Number ***0703, held in the name of PacNet Services Ltd., seized by law enforcement on or about September 20, 2016, and all proceeds traceable thereto;

(d) One Million Five Hundred Three Thousand Two Hundred Fifty-One Dollars and Thirty-Nine Cents ($1,503,251.39), more or less, seized from BMO Harris Bank Account Number ***2949, held in the name of PacNet Services Ltd., seized by law enforcement on or about September 22, 2017, and all proceeds traceable thereto;

(e) Seven Hundred Sixty-Five Thousand Six Hundred Eleven Dollars and Seven Cents ($765,611.07), more or less, seized from BMO Harris Bank Account Number ***3306, held in the name of Chexx (America) Inc., seized by law enforcement on or about September 22, 2017, and all proceeds traceable thereto;

(f) Three Hundred Sixty-Two Thousand Two Hundred Twenty-Two Dollars and Sixty-Eight Cents ($362,222.68), more or less, seized from Avidia Bank Account Number ****5257, held in the name of PacNet Services Ltd., seized by law enforcement on or about September 22, 2017, and all proceeds traceable thereto;

(g) any and all funds on deposit with the Court Registry under United States District Court case docket number 17-CV-6027 (E.D.N.Y.), up to and including the sum of two million six hundred seventy-one thousand three hundred thirty-five dollars and fifty-nine cents ($2,671,335.59), and all proceeds traceable thereto; and

(h) Three Hundred Thirty-Eight Thousand Three Hundred Five Dollars and Six Cents ($338,305.06) (the "Substitute Funds") as a substitute res for the premises and real property located at 38 Knollwood Road, Upper Saddle River, New Jersey 07458,

> together with all of its respective appurtenances, improvements, fixtures, attachments, easements and furnishings (the "Knollwood Property").

(the "Seized Assets") (Id.)

The $1,500,000.00 forfeiture money judgment entered against Young represents funds that Young personally obtained individually and through his business entities.  In addition, the Young POF forfeited all of ***Young's*** right, title, and interest in the assets listed above. (Id.).  Further, the Young POF provided that the forfeiture of certain of the Seized Assets, namely the assets listed above in items (a), (b), and (h), which were assets that Young controlled, and $632,430 of the funds administratively forfeited by Barka, would be credited to Young's forfeiture money judgment.  (Id.)  In contrast, the assets listed above in items (c) through (g), which were funds that were seized from PacNet-controlled bank accounts and the Interpleader Funds (hereinafter, the "Seized PacNet Funds"), would not be credited to Young's forfeiture money judgment.  (Id.).

Importantly, the Young POF did not order the final forfeiture of the Seized Assets, including the Seized PacNet Funds, to the United States; it only forfeited ***Young's*** right, title, and interest in the Subject Assets.  Consistent with asset forfeiture rules and statutes, the Young POF provided that the Subject Assets would only be forfeited to the United States after any and all claims to the Subject Assets were adjudicated by the district court, and provided instructions for how third parties may file a petition asserting an interest in any of the Subject Assets.  (Id.).  Specifically, the Young POF provided as follows, in relevant part:

[4]   The United States shall publish notice of this Preliminary Order, in accordance with the custom and practice in this district, on the government website www.forfeiture.gov, of its intent to dispose of the Subject Assets in such a manner as the Attorney General or his designee may direct.  The United States may, to the extent practicable, provide direct written notice to any person known or alleged to have an interest in the Subject Assets as a substitute for published notice as to those person so notified.

[5] Any person, other than the defendant, asserting a legal interest in the Subject Assets may, within thirty (30) days of the final publication of notice or receipt of notice, or no later than sixty (60) days after the first day of publication on an official government website, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his or her alleged interest in the Subject Assets, and for an amendment of the order of forfeiture, pursuant to 21 U.S.C. § 853(n)(6) . . . .

[8] Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and (B), this Preliminary Order shall become final at the time of the defendant's sentencing and shall be made part of the defendant's sentence and included in his judgment of conviction.  If no third party files a timely claim, this Preliminary Order, together with Supplemental Orders of Forfeiture, if any, shall become the Final Order of Forfeiture, as provided by Fed. R. Crim. P. 32.2(c)(2).  At that time, the monies and/or properties forfeited herein shall be forfeited to the United States for disposition in accordance with the law.

(Id.).

The government provided notice of the government's intent to seek forfeiture of the Seized Assets in  Bills of Particular filed in the Young and Barka cases. (ECF Nos. 4 and 11).

C.      The Pending Criminal Case Against PacNet's Principals

On June 19, 2019, a grand jury empaneled in the District of Nevada returned an indictment in United States v. Rosanne Day, No. 19-CR-155 (D. Nev. 2019) (the "Day

Case"), charging PacNet principals Rosanne Day, Robert Paul Davis, Genevieve Renee Frappier, and Miles Kelly with conspiracies to commit wire fraud, mail fraud, and money laundering, in violation of 18 U.S.C. §§ 1349 and 1956(h). See Day Criminal Case Indictment ("Indictment") attached hereto as Exhibit A.

Day was the founder, a part-owner, and the managing director of PacNet, and was the person in charge of PacNet's headquarters in Vancouver from in or around 1994 until in or around September 2016. (Id.).  Davis was a part-owner of PacNet and was in charge of PacNet's office in Ireland from in or around 2001 until in or around September 2016.  Frappier was the director of marketing and client services for PacNet from in or around 1998 until in or around September 2016. (Id.).  Kelly was the chief corporate compliance and anti-money laundering officer for PacNet from in or around 2009 until in or around September 2016. (Id.).

The Day Indictment alleges that for more than two decades, PacNet processed payments for mass mail clients that its top management, including defendants Day, Davis, Frappier, and Kelly, knew had been induced by fraudulent notifications that were designed to mislead victims into falsely believing they had won a prize or would receive something of value in exchange for their payments. (Id.).

The Day Indictment contains forfeiture allegations that provide notice of the government's intent to seek forfeiture of: (i) any property constituting, or derived from, proceeds of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation 18 U.S.C. § 1343, or a conspiracy to commit such offenses in violation of 18 U.S.C. § 1349, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and (ii) and any property involved in

money laundering or a conspiracy to do same, in violation of 18 U.S.C. § 1956(a)(2)(A) and 1956(h), pursuant to 18 U.S.C. § 981(a)(1)(A) and 982(a)(1). (Id.).

The Day case is currently pending in the District of Nevada.  The defendants in the Day case are currently fugitives and the government is seeking their extradition.

D.    The Third Party Petitions

On or about February 28, 2020, PacNet, Chexx (Americas) Inc. and Accu-Rate Corp., jointly filed a Verified Petition for Ancillary Proceedings to Adjudicate Interest Pursuant to 21 U.S.C. 853(n). See PacNet Petition, ECF No 17.

On February 24, 2021, the Court granted the government's motion to stay the ancillary proceeding in this case.  By Order dated July 8, 2022, the Second Circuit dismissed the appeals filed by PacNet and i-payout in this case and remanded the case to the District Court for further proceedings. (ECF No. 52)

On or about September 21, 2022, i-payout filed the instant Verified Petition for Ancillary Proceedings to Adjudicate Interest Pursuant to 21 U.S.C. 853(n). (ECF No. 56)

On or about  October 24, 2022 and November 10, 2022, the Court adopted briefing schedules for filing of the present motion, i-payout's response, and the government's reply.

To date, none of the 73 John Doe defendants/claimants-in-interpleader have filed a petition claiming an interest in the Interpleader Funds in the ancillary proceeding in this case.

## STATUTORY FRAMEWORK OF ANCILLARY PROCEEDINGS

In criminal cases, third party challenges to an order of forfeiture are resolved in a post-trial ancillary proceeding.  See 28 U.S.C. § 2461(c) (incorporating procedures set forth in 21 U.S.C. § 853 into criminal forfeiture proceedings); Fed. R. Crim. P. 32.2(c).

The sole purpose of the ancillary proceeding is to determine *ownership* of a forfeited asset.  See United States v. Gilbert, 244 F.3d 888, 909 (11th Cir. 2001) (characterizing ancillary proceeding conducted pursuant to analogous RICO forfeiture provision, 18 U.S.C. § 1963(l), as quiet title proceeding that enables third parties to file claims to establish their ownership interest in property forfeited to government); United States v. McHan, 345 F.3d 262, 275-76 (4th Cir. 2003) (holding that petitioner in ancillary proceeding, which is akin to equitable quiet title proceeding, has no Seventh Amendment right to jury trial);  United States v. Porchay, 533 F.3d 704, 710 (8th Cir. 2008) ("Section 853(n) does not give a third party the right to challenge the legality of the seizure . . . .").

If the forfeited property belongs to the third party, then the property must be stricken from the order of forfeiture; however, if the property does not belong to the third party, then the preliminary order of forfeiture becomes final and the United States becomes

the exclusive titleholder to the property.  See 21 U.S.C. § 853(n)(6) and (7); United States v. Puig, 419 F.3d 700, 703 (8th Cir. 2005).

Courts generally require "strict compliance" with the rules and deadlines governing forfeiture proceedings.  See United States v. Amiel, 995 F.2d 367, 371 (2d Cir. 1993) (collecting cases applying "strict compliance" standard).  A third party petition must be filed within 30 days of final publication or the claimant's receipt of notice of the order of forfeiture, whichever is earlier.  21 U.S.C. § 853(n)(2).  The petition must set forth the legal basis for the claimed interest in property subject to forfeiture.  21 U.S.C. § 853(n)(3); see also United States v. BCCI Holdings (Lux.), S.A., 69 F. Supp. 36, 55 (D.D.C. 1999) (collecting cases in which petitions filed under Section 1963(l) were dismissed for failure to identify nature of interest claimed).  All grounds for recovery must be set forth within the petition, and a claimant may not later amend the petition to assert additional grounds for relief.  See, e.g., United States v. Soreide, 461 F.3d 1351, 1355 (11th Cir. 2006) (holding that claims not asserted in petition were statutorily time-barred); United States v. Strube, 58 F. Supp. 2d 576, 585 (M.D. Pa. 1999) (rejecting third party claims as untimely because they were not raised in petition but first asserted in response to government's motion to dismiss).  A petition will succeed or fail in its original and un-amended form.

In order to advance a claim in the ancillary proceeding, a third party claimant must first establish a "legal interest" in a particular asset within the meaning of 21 U.S.C. § 853(n)(2).  United States v. Ribadeniera, 105 F.3d 833, 834-35 (2d Cir. 1997); see also United States v. Timley, 507 F.3d 1125, 1129 (8th Cir. 2007) ("[A] party seeking to challenge the government's forfeiture of money or property used in violation of federal law

must first demonstrate a legal interest in the seized item sufficient to satisfy the court of its

standing to contest the forfeiture.") (citation omitted).

Only after a claimant makes a threshold showing of standing under Section

853(n)(2) may a court reach the merits of a claim in order to determine whether the claimant

falls within one of two narrow categories of property owners for whom the governing

forfeiture statute affords relief.  Timley, 507 F.3d at 1130, n. 2 (distinguishing between

"legal interest" required for claimant to establish standing under Section 853(n)(2), and

"superior legal interest" required for claimant to ultimately prevail on merits under Section

853(n)(6)).   If a claimant demonstrates that he has standing, he must then prove the merits

of his claim by either demonstrating priority of ownership over the forfeited property at the

time of the offense under Section 853(n)(6)(A), or by demonstrating that he acquired the

property subsequently as a bona fide purchaser for value under Section 853(n)(6)(B).  Id.;

Ribadeniera, 105 F.3d at 834-35.

## STANDARD OF REVIEW

An ancillary proceeding, which closely resembles a civil action, is generally

governed by the same procedures as those set forth in Federal Rules of Civil Procedure.  See

e.g., Pacheco v. Serendensky, 393 F.3d 348, 352 (2d Cir. 2004) (commenting that civil

procedures aid efficient resolution of claims in ancillary proceedings).  In the context of an

ancillary proceeding, a motion to dismiss a third party petition pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure may be granted if it appears that the claimant can prove

no facts that would entitle the claimant to relief.  United States v. BCCI Holdings (Lux.),

S.A., 980 F. Supp. 16, 20 (D.D.C. 1997) (citing Conley v. Gibson, 355 U.S. 41, 45-46

(1957)).  The Court must accept well-pleaded facts as true and construe the complaint liberally, granting a claimant the benefit of any reasonable inferences that can be derived from the facts alleged.  Id. (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  The Court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are pleaded as factual allegations.  Id. (citation omitted).

## ARGUMENT

**I.      The Petition Must Be Dismissed Because Petitioner Lacks Standing to Contest the Forfeiture of the Interpleader Funds Under 21 U.S.C. § 853(n)(2)**

### A.      Petitioner Is A General Unsecured Creditor and Therefore Lacks Standing To Contest Forfeiture

The Petition must be dismissed because i-payout has failed to make the threshold showing that it has the requisite legal interest in the Interpleader Funds under 21 U.S.C. § 853(n)(2).   The record establishes that i-payout is a general unsecured creditor without standing to contest the forfeiture of the Interpleader Funds.

It is well established that unsecured creditors have no legal interest in forfeitable property, even if they can trace their losses to a forfeitable asset, and that such creditors therefore lack standing to contest forfeiture in a criminal case. See United States v. BCCI Holdings (Luxembourg) S.A. (Petition of OAS), 73 F.3d 403 (D.C. Cir. 1996) (bank depositor was only a general creditor of the defendant bank; therefore it was the defendant's property, not the claimant's, that was forfeited); United States v. BCCI Holdings (Luxembourg) S.A. (Petition of Chawla), 46 F.3d 1185 (D.C. Cir. 1995) (unsecured creditors are not owners); United States v. Schwimmer, 968 F.2d 1570 (2d Cir. 1992) (same); United States v. Campos, 859 F.2d 1233 (6th Cir. 1988) (same); United States v. Ribadeneira, 105

F.3d 833 (2d Cir. 1997) (person holding check drawn on defendant's forfeited bank account is a general unsecured creditor with no interest in specific funds); United States v. BCCI Holdings (Luxembourg) S.A. (Final Order of Forfeiture and Disbursement), 69 F. Supp. 2d 36 (D.D.C. 1999) (a person who voluntarily transfers his property to the defendant is no longer the owner of that property; his ability to trace his property to defendant's assets is irrelevant; therefore, victims who transferred their property to the defendant are merely unsecured creditors, not owners of the forfeited property); United States v. Strube, 58 F. Supp. 2d 576 (M.D. Pa. 1999) (family members who obtained a judgment lien against defendant personally were general creditors and not owners of any interest in an specific parcel of property); DSI Assoc. LLC v. United States, 496 F.3d 175, 184 (2d Cir. 2007) (holding that general unsecured creditor could not collect debt by asserting claim in ancillary proceeding).

       The standing requirement in criminal forfeiture ancillary proceedings is identical to that applicable to civil forfeiture proceedings.  A claimant must show that he has standing to contest the forfeiture under Article III of the U.S. Constitution.  To establish standing, a claimant bears the burden to demonstrate a "facially colorable interest in the proceeds sufficient to satisfy the case-or-controversy requirement."  United States v. $9,041,598.68, 163 F.3d 238, 244-45 (5th Cir. 1998); see United States v. U.S. Currency, $81,000.00, 189 F.3d 28, 35 (1st Cir. 1999); United States v. Contents of Accounts (Friko Corporation), 971 F.2d 974, 985 (3d Cir. 1992).

       Unsecured creditors have no interest in any particular asset.  Thus, they lack even a colorable interest in the property subject to forfeiture.  As the Second Circuit held in

Ribadeniera, in order to establish standing under Section 853(n)(2), a claimant must demonstrate an interest in "a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account." 105 F.3d at 836.  See United States v. Cambio Exacto, S.A., 166 F.3d 522 (2d Cir. 1999) (person to whom a money transmitter owes money lacks standing as a general creditor to contest forfeiture of money transmitter's account); United States v. Carrell, 252 F.3d 1193 (11th Cir. 2001) (woman contesting forfeiture on the ground that the property owner owes her child support payments lacks standing because she is not an owner); United States v. $20,193.39 U.S. Currency, 16 F.3d 344 (9th Cir. 1994) (general unsecured creditors lack standing under section 981); United States v. $3,000 in Cash, 906 F. Supp. 1061 (E.D. Va. 1995) (even though claimant/victim could trace his money to seized bank account, title was passed to perpetrator, making claimant an unsecured creditor without standing); United States v. $124,906 in U.S. Currency, 2000 WL 360086 (D. Or. 2000) ("unsecured creditors do not have standing to challenge the civil forfeiture of their debtor's property"); United States v. $15,060 in U.S. Currency, 1999 WL 166847 (D. Or. 1999) (claimant who allegedly loaned money to defendant, not knowing defendant intended to use it to facilitate drug trafficking, was an unsecured creditor with no legal standing to contest the forfeiture of the seized funds).

Here, according to its Petition, i-payout contracted with Chexx to distribute checks and bank transfers to the contractors and distributors of i-payout's clients through various methods, including local transfers, SWIFT transfers, and mailed paper checks.  See i-payout Petition at p. 9.  Petitioner claims that in August 2016, it sent funds in the amount of $3,130,310 to Chexx for payment processing services. Id at p.10.  Petitioner states that the

funds were sent "to Chexx", but does not specify any particular bank account to which the funds were sent.  Petitioner further states that Chexx processed some of the aforementioned funds, and that, at the time of OFAC's designation on September 22, 2010, Chexx held a total of $2,337,36.85, $1,916,734.87 of which were in Union Bank accounts, and $878,159 in uncleared checks that had been debited from i-payout's accounts (collectively, the "Subject Funds").

Petitioner i-payout argues, in sum, that it is entitled to recover a portion of the Interpleader Funds, in the amount of the Subject Funds, because PacNet transferred funds it owed to i-payout to the Court's registry in order to fund the Interpleader Fund in the Interpleader Case.  In support of its allegation that i-payout's funds were used to fund the Interpleader Fund, i-payout relies, not on Chexx' Union Bank records, but, a letter it received from PacNet principal Rosanne Day dated October 18, 2016.  See PacNet v. OFAC Dkt. 41-1, Ex.2 and Exhibit A, attached hereto).  However, the very same letter from Day confirms that funds held by Chexx are comingled with other funds and transferred between various bank accounts, including at TD Bank.  Id.  In addition, the letter indicates that the funds received from i-payout may not have been originally deposited into the Union Bank accounts at issue.  Id.

Petitioner argues that $1,916,734.87 of its funds were transferred to Chexx' Union Bank accounts, which were then transferred to the Interpleader Fund.  Petitioner provides no financial records in support of this claim.  Notably, Petitioner does not claim that the $878,159 in uncleared checks were on deposit in Chexx' Union Bank accounts, but inexplicably argues that it should nonetheless recover the equivalent of the uncleared checks from the Interpleader on the same grounds.  However, even if i-payout could trace its funds

to the funds that were ultimately transferred to the Interpleader Fund, it would not assist i-payout in establishing standing to assert a claim here because, as an unsecured creditor, it makes no difference if i-payout is able to trace losses directly to specific assets ordered forfeited.  For example, in DSI Assoc. LLC v. United States, a third party sold shares of stock to the defendant but did not retain a secured interest in any of the shares. 496 F.3d at 184.  After the government forfeited the stock in a criminal case, the third party filed a claim asserting that the defendant had not paid for the shares. Id. at 184-85.  The Second Circuit held that because the claimant had retained no secured interest in the property, the claimant was nothing more than an unsecured creditor without any legal interest in the shares. Id. Likewise, in United States v. BCCI Holdings (Luxembourg) S.A., 69 F. Supp. 2d 36, 59 (D.D.C. 1999), the court recognized that a fraud victim who voluntarily transferred property has a cause of action in tort against the defendant but "has no greater interest than any other general creditor" to the property once transferred.  The Eleventh Circuit held similarly in United States v. Eldick, No. 06-10602, 2007 WL 624041 (11th Cir. Mar. 1, 2007).  There, the court ruled that the fact that a fraud victim could trace losses to forfeited assets is of no import in establishing standing to assert a claim under Section 853. 2007 WL 624041, at *2. Another decision of the Eleventh Circuit in United States v. Ramunno, 59 F.3d 1269 (11th Cir. 2010), confirms this point. There, the court upheld dismissal of a defrauded investor's petition contesting forfeiture of a bank account containing over $2.1 million, almost all of which was allegedly traceable to the claimant's investment. Id. at 1271-72.

Petitioner i-payout has other remedies available to it outside of the criminal forfeiture ancillary proceeding that it can pursue in order to obtain the money owed to it by

Chexx and PacNet.  Petitioner may seek to have PacNet pay the outstanding debt from funds PacNet has in its possession, through a civil lawsuit or otherwise.  PacNet has not alleged that it lacks sufficient funds with which to pay i-payout.  Notably, during the litigation in this matter, PacNet resolved debts owed to one or more clients.  See PacNet v. OFAC at Dkt. No.

Based upon the foregoing, i-payout, without any demonstrable ownership interest in any particular dollar of the Interpleader Funds is, at best, an unsecured creditor that lacks standing to assert a claim under Section 853(n)(2).

B.    Petitioner Cannot Establish A Trust

Without providing any legal authority or documentary support for its assertion, i-payout asserts that all funds it deposited with Chexx remained the property of i-payout unless and until checks were deposited into the payees' bank accounts, and that Chexx held those funds in trust for i-payout. See i-payout Petition at p. 4.  Petitioner has failed to present any legal authority in support of its assertion that its contract for payment processing services created a trust which would impart legal standing on i-payout to contest the forfeiture in this matter.

A constructive trust is an *equitable* interest, not a legal interest. Healy v. Commissioner, 345 U.S. 278, 282, 73 S.Ct. 671, 674, 97 L.Ed. 1007, 1012 (1953) ("[a] constructive trust is a fiction imposed as an equitable device for achieving justice").  See also, United States v. Schwimmer, 968 F.2d 1570, 1582 (2d Cir. 1992).  The Second Circuit has held that imposition of a constructive trust is inappropriate in a forfeiture action, when the victim has an available remedy at law. See, e.g., United States v. Khan, 1997 WL 701366, at *2 (holding that "a constructive trust, as a remedy of equity, is not appropriate where remedies exist

at law and elsewhere [through] statutory remission . . . .") (citing <u>Ribadeniera</u>, 105 F.3d at 837 n.

5 (holding that remission procedures codified in Section 853(i) provide claimant with legal

remedy that "obviates the need for application of an equitable remedy")).  The equitable nature

of constructive trusts presents a bar to Petitioner, since Petitioner has a remedy at law that it

could pursue to enforce its contract with Chexx and recover the monies it claims it is owed.

      Here, the evidence in the record contradicts i-payout's claim of the existence

of a trust, including the above-referenced letter from Roseanne Day dated October 18, 2016,

and a letter from Roseanne Day to i-payout dated September 2016 which stated that "there is

significant commingling of client funds in many of Chexx's bank accounts," including one of

the accounts at Union Bank identified by i-payout. In addition, an analysis by the USPIS of

Chexx's bank accounts at Union Bank corroborates the fact that Chexx's accounts were

general accounts, which received deposits from various sources and were commingled,

which is inconsistent with a trust account.

      Notably, PacNet denies that any trust relationship existed on behalf of i-payout

and opposed i-payout's motion to intervene in the Interpleader Case. <u>See</u> PacNet's Motion in

Opposition, <u>PacNet v. OFAC</u> at Dkt. No. 63.  In its Motion in Opposition, PacNet argued

that i-payout's purported ownership interest in the Interpleader Funds was not based on any

claim to specific account balances that comprise the Interpleader Fund, but was based solely

on its general economic interest as "a client of PacNet" and ensuring that PacNet has enough

assets to return account balances held by PacNet in Union Bank and TD Bank.  <u>Id</u>.   PacNet

argued that i-payout could not show that it had a "significantly protectable" interest in

"specific funds," nor a protectable interest in a discrete, segregated fund, such as a trust fund or escrow account Id.

As set forth above, Petitioner i-payout has not shown that it held any specific ownership interest in any of the Interpleader Funds at issue here.  Petitioner has presented no evidence suggesting a facially colorable interest in the Interpleader Funds.  Petitioner cannot show the existence of a trust. In addition, Petitioner has other remedies available to it outside of the criminal forfeiture ancillary proceeding that it can pursue in order to obtain the money owed to it by Chexx and PacNet.  Accordingly, the Petitioner's claim to the Interpleader Funds should be dismissed.

## II.      The Petitioner Cannot Demonstrate a Superior Legal Interest in the Subject Funds under Section 853(n)(6)

Even if the Petitioner had the requisite legal interest in the Interpleader Funds, it cannot demonstrate priority of ownership over the Interpleader Funds at the time of the offense under Section 853(n)(6)(A), nor can it demonstrate that it subsequently Interpleader Funds as a bona fide purchaser for value under Section 853(n)(6)(B).

### A.      Petitioner Cannot Demonstrate Priority of Ownership At the Time of the Criminal Offenses Under Section 853(n)(6)(A)

The government's interest vests in forfeitable property at the time of the offense giving rise to forfeiture.   Title 21, United States Code, Section 853(c), also known as the "relation back provision" provides as follows:

> All right, title and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section.  Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United

States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject for forfeiture under this section.

"Under the relation-back doctrine, title to the forfeited property vests in the United States at the time of the defendant's criminal act." Timley, 507 F.3d at 1130 (8th Cir. 2007). See also United States v. Gonzalez, 597 F. App'x. 270 (5th Cir. 2015) (per curiam) (affirming district court's dismissal of defendant's wife's third party petition asserting legal claim to forfeited property because, according to relation back doctrine, the government's interest in property vested at time of defendant's offense, which occurred before couple purchased property); United States v. Lazarenko, 476 F.3d 642, 647 (9th Cir. 2007) (under the relation back doctrine, the Government's interest in forfeitable property vests at the time the defendant commits the crime; "otherwise, a defendant could attempt to avoid criminal forfeiture by transferring his property to another party before conviction").

Petitioner i-payout argues that its claim to the Interpleader Funds is superior to any interest held by defendant Ryan Young, PacNet and Chexx. However, since, for the reasons stated above, i-payout cannot show that it is anything more than an unsecured creditor, and cannot establish the existence of a trust in funds held by Chexx, it cannot prevail on its claim that its interest in the Interpleader Funds was superior to PacNet or Chexx. Further, pursuant to the relation back doctrine, i-payout cannot establish a superior interest in property subject to forfeiture superior to any right, title or interest of the defendant Ryan Young, nor the government, at the time of the commission of the acts which gave rise to the forfeiture of the property" since the Interpleader Funds constitute proceeds traceable to

mail fraud, in violation of 18 U.S.C. § 1341 or a conspiracy to commit such offense, and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and are therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1).

A third-party petitioner like Petitioner cannot establish a pre-existing interest under Section 853(n)(6)(A) in property, specifically the Interpleader Funds, that represent proceeds of crime because criminal proceeds come into existence only when a crime occurs. See United States v. Hooper, 229 F.3d 818, 821-22 (9th Cir. 2000) (holding that Section 853(n)(6)(A) can never be used to successfully challenge forfeiture of criminal proceeds, which by their very nature do not exist before commission of offense); Timley, 507 F.3d at 1130 ("As the court in Hooper explained, the proceeds of an offense do not exist before the offense is committed, and when they come into existence, the government's interest under the relation-back doctrine immediately vests."); United States v. Eldick, 223 Fed. Appx. 837, 840 (11th Cir. 2007) (following Hooper); United States v. Warshak, No. 09-3321, 2011 WL 2450991, at *2 (6th Cir. Mar. 30, 2011) (following Hooper).

B.   Petitioners Cannot Demonstrate That They Are
Bona Fide Purchasers for Value under Section 853(n)(6)(B)

The Petition does not claim, nor present any facts to establish that Petitioner is a bona fide purchaser for value under Section 853(n)(6)(B).  In order to assert a successful claim under the statute, a petitioner must (i) "be a 'bona fide purchaser for value' of the property who (ii) was 'reasonably without cause to believe the property was subject to forfeiture' at the time of purchase."  Pacheco, 393 F.3d at 353 (quoting 21 U.S.C. § 853(n)(6)(B)).  As a threshold matter, the Petitioner cannot show that it was a bona fide

purchasers for value because Petitioner does not qualify as a "purchaser" and does not own any portion of the Interpleader Funds.  Further, an unsecured creditor is not an "owner" of forfeitable property.

Accordingly, the Petition has failed to establish that Petitioner has priority of ownership over the Interpleader Funds at the time of the offense under Section 853(n)(6)(A) and has failed to demonstrate that the Subject Funds were subsequently acquired by Petitioners as bona fide purchasers for value under Section 853(n)(6)(B).  Therefore, Petitioner's claim to the Interpleader Funds should be dismissed.

### III.    The Young Preliminary Order of Forfeiture is Valid

The Petitioner argues that the Young POF is invalid because it violates Honeycutt v. United States, 137 S. Ct. 1626 (2017), and must be limited to property owned by Young. The Petitioner's assertions are wrong and contrary to well-established forfeiture laws.  Second Circuit case law and Rule 32.2 of the Federal Rules of Criminal Procedure extend forfeiture to *all* property involved in a criminal offense.

A.    Well-Established Forfeiture Law Extends Forfeiture to
All Property Involved in a Criminal Offense

The Second Circuit explicitly recognized that "[c]riminal forfeiture is not a measure restricted to property owned by the criminal defendant . . . ."  2d Cir. Summary Order, at 2 (quoting De Almeida v. United States, 459 F.3d 377, 381 (2d Cir. 2006) ("[C]riminal forfeiture . . . reaches *any* property that is 'involved' in the offense.") (emphasis in original)).  The Second Circuit also recognized that because parties other than the defendant are statutorily prohibited from contesting the forfeitability of property at a criminal

trial, "[t]he likelihood that some property involved in an offense will be owned by persons other than the criminal defendant is reflected in the provision for an ancillary proceeding…" 2d Cir. Summary Order, at 2 (citing De Almeida, 459 F.3d at 381) ("An ancillary proceeding is evidently the *only* avenue for a post-indictment thirty party claim to forfeited property…") (emphasis in original)).

The criminal forfeiture statutes make clear that third parties, like Petitioner, have no right to directly challenge a preliminary order of forfeiture. See 21 U.S.C. § 853(k) ("no party claiming an interest in property subject to forfeiture . . . may . . . intervene in a trial or appeal of a criminal case involving the forfeiture of such property"); Fed. R. Crim. P. 32.2(b)(2)(A) (the "court must enter the [preliminary order of forfeiture] without regard to any third party's interest in the property"; "[d]etermining whether a third party has [] an interest [in the property] must be deferred until any third party files a claim in an ancillary proceeding" (emphasis added)); see also United States v. Cox, 575 F.3d 352, 358 (4th Cir. 2009) ("Rule 32.2 *requires* the issuance of a preliminary order of forfeiture when the proper nexus is shown, whether or not a third party claims an interest in the property" (emphasis original)).

Petitioner's asserted ownership interest in some of the assets listed in the Young Preliminary Order of Forfeiture does not change this calculus. The Court may order the forfeiture of any property with a nexus to the offense, regardless of whether the criminal defendant—or someone else entirely—owns that property. See Fed. R. Crim. P. 32.2(b)(1)(A); De Almeida, 459 F.3d at 381. Property derived from a criminal conspiracy may be forfeited from any co-conspirator, and the property need not belong to the defendant.

See De Almeida, 459 F.3d at 381 (holding that criminal forfeiture is not limited to property owned by the defendant; "it reaches any property that is 'involved' in the offense;" United States v. Watts, 477 F. App'x 816, 817-18 (2d Cir. 2012) (following De Almeida; holding that property may be forfeited based on its nexus to the offense, regardless of ownership); United States v. Capoccia, 402 F. App'x 639, 640 (2d Cir. 2010); see also United States v. Grossman, 501 F.3d 846, 849 (7th Cir. 2007) (affirming forfeiture of real property titled to defendant's wife because "[t]he interests subject to forfeiture encompass all the fruits of a defendant's crimes").  The ancillary proceeding serves to ensure that property belonging to third parties who have been excluded from the criminal proceeding is not improperly forfeited.  See Watts, 477 F. App'x at 817-18; De Almeida, 459 F.3d at 381 (purpose of ancillary proceeding is to allow third parties to challenge the forfeiture on ownership grounds).

> B.   Honeycutt Does Not Restrict Forfeiture to
> Property Owned by Defendant Young

The Petitioner argues that the Young POF's inclusion of the Interpleader Funds violated the Supreme Court's decision in Honeycutt v. United States, 137 S. Ct. 1626 (2017).  See Petition, at pg. 39.  The Petitioner is wrong and have misconstrued Honeycutt's holding.

In Honeycutt, the Supreme Court held that a criminal defendant may not be held jointly and severally liable in a forfeiture money judgment for criminal proceeds that he did not obtain.  137 S. Ct. at 1633.  Honeycutt does not apply to the facts in this case because it pertains to the imposition of a forfeiture money judgment and has never been extended to

the forfeiture of specific traceable assets with a nexus to the offense.  Further, it is clear from the plain language of the Young POF that the government is not attempting to hold Young jointly and severally with Petitioner for the Interpleader Funds.

Moreover, the Honeycutt challenge is Young's to make, not Petitioner's, and it has no place here because the government is not seeking to hold Young jointly and severally liable for a forfeiture money judgment for the Interpleader Funds.  The Young POF, the terms of which Young agreed to, clearly limits Young's individual forfeiture liability to $1,500,000.00, the amount that Young "obtained" from his crimes.  The Young POF provides for the application of credits to the forfeiture money judgment amount for certain funds listed in the Young POF, but does not include credits for the PacNet related funds.

Based on the foregoing, the Young POF is valid and the Court should deny Petitioner's request to strike paragraph (g) of that Order.

## IV.    Petitioner is Not Entitled to Attorney's Fees

Petitioner's request for attorney's fees and expenses related to this ancillary proceeding pursuant to 28 U.S.C. 2412 should be denied.  Title 28, United States Code, Section 2412(d)(1)(A) provides that, except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.  In civil actions brought by or against

the government, EAJA authorizes an award of attorney's fees to the prevailing party unless the government's position in the course of the proceedings was "substantially justified." United States v. Cox, 575 F.3d 352, 355 (4th Cir. 2009); 28 U.S.C. § 2412(d)(1)(A).  The government's position is substantially justified if it is " 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). The government's position must be "more than merely undeserving of sanctions for frivolousness," Id. at 566, 108 S.Ct. 2541, and must instead have a " 'reasonable basis both in law and fact,' " Id. at 565, 108 S.Ct. 2541. See Cox, 475 F.3d 352 at (government was government was "substantially justified" in opposing ex-wife's claim to funds in bank account seized in criminal forfeiture proceedings against her ex-husband, precluding award of attorney fees under Equal Access to Justice Act (EAJA), even though ex-wife prevailed; and government's tactics in seeking forfeiture of subject bank account were completely consistent with forfeiture statute and governing rules)

Based on the foregoing, the government's position in this matter is substantially justified in substance or in the main, that is, justified to a degree that could satisfy a reasonable person. Further the government's forfeiture action is consistent with forfeiture statutes and laws.  Accordingly, Petitioner's request for attorney's fees and expenses should be denied.

## CONCLUSION

For the reasons stated above, the Court should dismiss i-payout's Petition in its

entirety.

Dated: Brooklyn, New York
          November 18, 2022

                                          BREON PEACE
                                          United States Attorney
                                          Eastern District of New York

                          By:      /s  *Tanisha Payne*
                                          Tanisha R. Payne
                                          Assistant U.S. Attorney
                                          (718) 254-6358